1   Mildred K. O'Linn (State Bar No. 159055)
2       *missy.olinn@manningkass.com*
    Yury A. Kolesnikov (State Bar No. 271173)
3       *yury.kolesnikov@manningkass.com*
    Roslynn Wilfert (State Bar No. 303024)
4       *roslynn.wilfert@manningkass.com*
5   **MANNING & KASS**
    **ELLROD, RAMIREZ, TRESTER LLP**
6   801 S. Figueroa St, 15th Floor
7   Los Angeles, California  90017-3012
    Telephone:  (213) 624-6900
8   Facsimile:  (213) 624-6999
9
10  *Attorneys for Defendants City of Baldwin*
    *Park, Eric Camacho, and Jose Castro*
11

12              **UNITED STATES DISTRICT COURT**
13              **CENTRAL DISTRICT OF CALIFORNIA**

14
15  ANGEL FRANCISCO SANCHEZ,          | Case No.:  2:23-cv-03807 DMG (MAR)
16                        Plaintiff,  | **Reply Declaration of Yury A.**
17              v.                    | **Kolesnikov in Support of Defendants'**
                                      | **Motion to Stay Action Pending**
18                                    | **Resolution of Plaintiff's Related**
    CITY OF BALDWIN PARK, ERIC        | **Criminal State-Court Proceedings**
19  CAMACHO, JOSE CASTRO, and
20  DOES 1–10, INCLUSIVE,
21                        Defendants. | Judge:      Hon. Dolly M. Gee
                                      | Courtroom:  8C, 8th Floor
22                                    | Date:       December 13, 2024
                                      | Time:       9:30 a.m.
23
24                                    | Complaint Filed:   May 18, 2023
                                      | Trial Date:        April 8, 2025
25
26
27
28

1    I, Yury A. Kolesnikov, declare as follows:

2    1.    I am an attorney with Manning & Kass, Ellrod, Ramirez, Trester LLP,

3    counsel for Defendants City of Baldwin Park, Eric Camacho, and Jose Castro in this

4    action.  I submit this declaration in support of Defendants' motion to stay.

5    2.    The facts set forth in this declaration are based on my personal

6    knowledge and documents maintained by Manning & Kass in the ordinary course of

7    business.  These facts and events are true, or believed by me to be true, and I would

8    testify competently to them if called upon to do so.

9    3.    Attached as **Exhibit 7** is a true and correct copy of the full deposition

10    transcript from the deposition of Mr. Sanchez taken on November 5, 2024, highlighted

11    for the Court's convenience to indicate each instance where Mr. Sanchez invoked his

12    Fifth Amendment privilege against self-incrimination and refused to answer.

13    I declare under penalty of perjury that the foregoing is true and correct.

14    Executed on November 29, 2024, in San Diego, California.

15                          ___/s/ Yury A. Kolesnikov___

16                          Yury A. Kolesnikov

17

18

19

20

21

22

23

24

25

26

27

28

Kolesnikov Reply Declaration in Support of Defendants' Motion to Stay Action

# Exhibit 7

Angel Sanchez                                          November 05, 2024

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3                        ---o0o---

4

5

6
         ANGEL FRANCISCO SANCHEZ,          )
7                                          )
                        Plaintiff,         )
8                                          )
                vs.                        )     Case No.
9                                          )     2:23-cv-03807
         CITY OF BALDWIN PARK; ERIC        )     -DMG-MAR
10       CAMACHO; JOSE CASTRO; and DOES    )
         1-10, INCLUSIVE,                   )
11                                         )
                        Defendants.        )
12                                         )

13

14

15                       ---o0o---

16            TUESDAY, NOVEMBER 5, 2024

17           ZOOM VIDEOTAPED DEPOSITION

18            OF ANGEL FRANCISCO SANCHEZ

19                     VOLUME I

20                       ---o0o---

21

22

23

24
      REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR
25



1                    A P P E A R A N C E S

2                         ---o0o---

3    FOR THE PLAINTIFF:

4            LAW OFFICES OF DALE K. GALIPO
             21800 Burbank Boulevard, Suite 310
5            Woodland Hills, California  91367
             BY: SHANNON LEAP, ESQ.
6            (818)347-3333
             dgalipo@galipolaw.com
7

8    FOR THE DEFENDANTS:

9            MANNING & KASS
             ELLROD, RAMIREZ, TRESTER LLP
10           801 S. Figueroa Street, 15th Floor
             Los Angeles, California  90017-3012
11           BY: ROSLYNN WILFERT, ESQ.
                 MILDRED K. O'LINN, ESQ.
12           (213)624-6900
             roslynn.wilfert@manningkass.com
13           mildred.olinn@manningkass.com

14

15   ALSO PRESENT:

16           Randy A. Young, Videographer

17

18

19

20

21

22

23

24

25



Angel Sanchez                                            November 05, 2024
                                                                  Page 3

```
 1                      INDEX OF EXAMINATION
                             ---oOo---
 2
      ANGEL FRANCISCO SANCHEZ                            PAGE
 3
      BY MS. WILFERT                                       8
 4

 5                       INDEX OF EXHIBITS
                             ---oOo---
 6
      NUMBER    DESCRIPTION                              PAGE
 7
      1         Baldwin Park Police Department            41
 8             Field Interview Card by
               Officer Castro, Bates Nos.
 9             COBP 000346-47 (2 pages)

10    2         Photograph of Jesus Aldaco,               47
               Bates No. COBP 001232 (1 page)
11
      3         Photograph of Ingrid Molina,              52
12             Bates No. COBP 001233 (1 page)

13    4         Photographs of Black Chevrolet            56
               Tahoe, Bates No. COBP 001798
14             (1 page)

15    5         Photograph of Officer Camacho,            93
               Bates No. COBP 001184-86
16             (3 pages)

17    6         Photograph of Officer Castro,             94
               Bates No. COBP 001205 (1 page)
18
      7         Photographs of Scene of Incident,         97
19             Bates Nos. COBP 001750-1854
               (105 pages)
20
      8         Photograph of Case of White Claw,        123
21             Bates Nos. COBP 001855-1953
               (99 pages)
22
      9         Transcript of Interview with            191
23             Angel Sanchez Dated 5/22/21,
               Bates Nos. COBP 000265-96
24             (32 pages)

25
```



Angel Sanchez

November 05, 2024
Page 4

1  MARKED QUESTIONS

     ---o0o---

2

          18,  15
3         19,   4
          19,  18
4         20,  10
          23,  22
5         24,   4
          24,  13
6         24,  21
          25,  10
7         25,  20
          26,   6
8         26,  17
          27,   2
9         27,  11
          27,  21
10        28,   3
          29,   9
11        29,  18
          31,   9
12        34,   8
          34,  20
13        35,   6
          35,  21
14        36,   6
          37,   9
15        37,  18
          38,   5
16        38,  12
          39,  12
17        40,  25
          41,  12
18        41,  21
          43,   6
19        43,  20
          44,   7
20        44,  21
          46,   4
21        46,  24
          48,  10
22        49,   4
          58,  24
23        68,   9

24

25



Angel Sanchez

```
 1     MARKED QUESTIONS
            ---o0o---
 2
            68,  17
 3          69,   3
            69,  16
 4          83,  14
            95,  17
 5         110,  18
           111,   3
 6         111,  25
           112,  22
 7         115,  21
           116,  19
 8         117,   4
           117,  15
 9         117,  21
           118,  11
10         118,  17
           118,  25
11         119,   9
           119,  17
12         119,  23
           120,   5
13         126,   5
           126,  15
14         126,  21
           127,  23
15

16

17

18

19

20

21

22

23

24

25
```



```
 1          REMOTE VIA ZOOM, CALIFORNIA, NOVEMBER 5, 2024

 2                          ---o0o---

 3          BE IT REMEMBERED that on Tuesday, the 5th

 4  day of November 2024, commencing at the hour of

 5  11:12 a.m. thereof, remotely via Zoom, California,

 6  before me, Balinda Dunlap, a Certified Shorthand

 7  Reporter in and for the County of San Francisco,

 8  State of California, remotely appeared:

 9          THE VIDEOGRAPHER:  This marks the

10  beginning of Media Number 1 of Volume I of the

11  virtual Zoom deposition of Angel Francisco Sanchez,

12  taken on behalf of the attorneys for the defendants

13  in the matter of Angel Francisco Sanchez,

14  plaintiff, versus the City of Baldwin Park, et al.,

15  defendants, Case No. 2:23-cv-03807-DMG-MAR in the

16  U.S. District Court for the Central District of

17  California.

18          This deposition is being held remotely via

19  videoconference on November 5th, 20 -- 2024.  The

20  videographer today is Randy A. Young, and the court

21  reporter's Balinda Dunlap.  We're on behalf of

22  Magna Legal Services.

23          We are going on the record now, and the

24  time is 11:12 a.m. Pacific Time.

25          Will counsel please state your appearance
```



```
 1   for the record and state whom you represent.
 2            MS. LEAP:  Shannon Leap from the Law
 3   Offices of Dale K. Galipo on behalf of Plaintiff
 4   Angel Sanchez.
 5            MS. WILFERT:  Roslynn Wilfert.  We
 6   represent the defendants in this matter from
 7   Manning & Kass.  We represent the City of Baldwin
 8   Park, Officer Camacho, and Officer Castro.
 9            THE VIDEOGRAPHER:  Thank you.  If there
10   are no stipulations, will the court reporter please
11   swear in the witness.
12                 (Discussion off the record.)
13            MS. WILFERT:  Yes.  Thank you.
14            THE VIDEOGRAPHER:  We're off record at
15   11:13.
16                 (A recess was taken.)
17            THE VIDEOGRAPHER:  Okay.  We are back on
18   record at 11:17.
19            Counsel has identified themselves for the
20   record.  If there are no stipulations, will the
21   court reporter please swear in the witness.
22                 ANGEL FRANCISCO SANCHEZ
23            called as a witness by the Defense, having
24   been sworn to tell the truth, the whole truth, and
25   nothing but the truth, was examined and testified
```



Angel Sanchez                                    November 05, 2024
                                                          Page 8

```
 1   as follows:
 2                 EXAMINATION BY MS. WILFERT
 3       Q.    Thank you.  Good morning, Mr. Sanchez.
 4   How are you?
 5       A.    Good morning.
 6       Q.    Morning.
 7       A.    Could be better.  How are you?
 8       Q.    Good.  So as you heard, I represent the
 9   defendants in this matter, the City of Baldwin
10   Park, Officer Camacho, and Officer Castro.
11            And before we get started today, I just
12   would like to ask you if you received a deposition
13   notice noticing that you had a deposition scheduled
14   here today?
15       A.    Notice, like in the mail?
16       Q.    Maybe from your attorney, a deposition
17   notice.
18       A.    Yes, I did.
19       Q.    And that's why you're here today, is
20   because we sent you this deposition notice, right?
21       A.    Yeah, that's correct.
22       Q.    And have you ever been deposed before?
23       A.    I don't believe so.
24       Q.    So the purpose of this deposition is to
25   obtain facts related to an incident that occurred
```



```
 1   involving you and law enforcement officers on
 2   May 21st, 2021.
 3           Are you aware of that?
 4      A.   Yes.
 5      Q.   So -- and I ask, have you been deposed
 6   before?
 7      A.   I don't believe I have.
 8      Q.   Have you ever testified before?
 9      A.   No, I have not.
10      Q.   Have you ever test -- you've never
11   testified in court, then?
12      A.   No, I don't think so.
13      Q.   So let me just talk to you about the
14   deposition process.  It's an unusual process.  It's
15   not like a normal conversation.  There are certain
16   rules and procedures that we have to follow during
17   a deposition.
18           Do you understand that?
19      A.   Yeah.
20      Q.   So a deposition is a question-and-answer
21   session on the record.  As you're aware, you've
22   been placed under oath here today, which means that
23   you have to tell the truth, the whole truth, and
24   nothing but the truth.
25           Do you understand that?
```



Angel Sanchez                                                November 05, 2024
                                                                      Page 10

 1        A.    Yes, I do.

 2        Q.    So we have a court reporter here today,

 3   and she's taking down everything that's said during

 4   this deposition.  So it's really important that

 5   when you answer questions, you don't just say

 6   "uh-huh" or "huh-uh."  "Yes" or "no."

 7              And if you're asked a question, if you

 8   shake your head, that's not going to be documented

 9   by the court reporter.

10              Do you understand that?

11        A.    Yes, I do.

12        Q.    Now, when we conclude today's deposition,

13   there's going to be a transcript of the deposition,

14   okay?  And once you receive that transcript, you're

15   going to have an opportunity to review the

16   transcript and correct any errors in the trans --

17   transcript and make any corrections that you

18   believe are warranted.

19              However, if you make any changes to the

20   transcript, that could affect your credibility with

21   a jury or in other ways.

22              For example, like, I would be entitled to

23   point out to a judge or a jury that you gave an

24   answer A to one of my questions.  But then later

25   on, when you reviewed and corrected the transcript,



Angel Sanchez

November 05, 2024
Page 11

```
 1   you changed your answer to B.
 2           Do you understand that?
 3      A.   Yes.
 4      Q.   So I'd like to talk about just court
 5   reporter etiquette.  Since the court reporter is
 6   making an accurate record of this deposition, it's
 7   important that only one person speak at any given
 8   time.  And it's important to allow me to finish all
 9   questions that I have before you answer.
10           Do you understand that?
11      A.   Yes, I do.
12      Q.   Okay.  During this deposition, you're
13   going to hear from time to time counsel making
14   objections.  And they're not directed at you, okay?
15   But it's important that you allow the attorneys to
16   make the objections, and you wait until the
17   attorneys are done making their objections before
18   you've answered.
19           Do you understand that?
20      A.   Yes, I do.
21      Q.   And unless your attorney gives you an
22   instruction not to answer a particular question
23   after an objection, you may continue or complete
24   the answer for the record.
25           Do you understand that?
```



Angel Sanchez                                      November 05, 2024
Page 12

```
 1        A.    Yes, I do.
 2        Q.    Now, during a deposition, because your
 3   testimony today is sworn, it's important that you
 4   give your best answers to my questions.  That means
 5   you listen carefully, you wait for each question to
 6   be complete, and you give your best answer.
 7              If you don't understand a question, please
 8   let me know, and I'll see what I can do to help you
 9   understand it.  If you have a question and I'm
10   going to take -- or sorry.  Apologize.  If you
11   have -- if you answer my question, I'm going to
12   take that as you understood the question; is that
13   agreed?
14        A.    Okay.
15        Q.    So during the deposition, I'll be asking
16   you about events, acts, failures to act, omissions,
17   statements, things or circumstances about which you
18   have personal knowledge.  We're only entitled to
19   your personal knowledge.
20              If you don't have personal knowledge about
21   things you've seen, heard, touched, tasted,
22   smelled, or did, that's information we want.  For
23   example, if you see something with your own eyes --
24   you saw someone, for example, run a red light --
25   you have personal knowledge of that person running
```

```
 1    a red light.
 2            However, if you hear someone say that
 3    person ran a red light, you don't have personal
 4    knowledge that the person ran a red light.
 5            Do you understand that?
 6       A.   Yes, I do.
 7       Q.   Now, our questions here today are not
 8    criticisms, okay?  We're not suggesting that you
 9    should know something or that you should have done
10    something.  We're just trying to find out what you
11    know and what you observed.
12            Do you understand that?
13       A.   Yes, I do.
14       Q.   During the deposition we don't want you to
15    guess, okay?  We may ask you for your best
16    estimate.
17            Now, your sworn deposition should be from
18    your personal knowledge of events and
19    circumstances, that is, things you heard, smelled,
20    touched, tasted yourself firsthand.  If you don't
21    know something, don't guess.  I don't want you to
22    guess or speculate.  We're entitled to your best
23    answer.
24            So if you're not familiar with the
25    difference between a guess and an estimate, I'll
```



Angel Sanchez

November 05, 2024
Page 14

```
 1   give you an example, okay?
 2          Now, if I was to ask you the length of the
 3   desk or table you're sitting at right in front of
 4   you, you would be able to give me an estimate of
 5   the length of that table.
 6          Do you understand that?
 7      A.   Yes, I do.
 8      Q.   Now, if I were to ask you, "What is the
 9   length of the table or desk that I am sitting at?"
10   would you be able to give me an estimate of that?
11      A.   Probably not.
12      Q.   And you wouldn't be able to give me an
13   estimate because you don't see the table, right?
14      A.   Correct.
15      Q.   Now, I want to talk to you about the
16   difference between not knowing something and not
17   recalling something.
18          Now, in addition to restraining yourself
19   from guessing, I would also like to caution you
20   about using phrases "I don't know" versus "I don't
21   recall."  "I don't know" usually implies that you
22   don't know now, and you never knew a certain fact,
23   okay?
24          Now, on the other hand, if you don't
25   recall, it usually implies that you used to know
```



Angel Sanchez                                    November 05, 2024
                                                          Page 15

```
 1   but now you don't remember.
 2            Do you understand the difference between
 3   that?
 4        A.   Yes, I do.
 5        Q.   Now, in a deposition, as you're aware, I'm
 6   entitled to personal knowledge of the facts.  While
 7   from time to time someone might ask you your
 8   opinion or your conclusion about something, the
 9   purpose of this deposition is to collect the facts
10   that you observed.
11            So instead of using a conclusory language
12   like "John was speeding," the better practice is to
13   tell me something along the lines of "John was
14   driving 50 miles per hour in a 30-mile-per-hour
15   zone."
16            Do you understand the difference?
17        A.   Yes, I do.
18        Q.   Now, sometimes you may be asked to repeat
19   a statement by someone verbatim.
20            Now, when that happens, you should try to
21   repeat it in the exact words spoken as you remember
22   them, and that is called verbatim.
23            Do you understand that?
24        A.   Yes, I do.
25        Q.   Okay.  And then breaks, I'm sure you're
```



Angel Sanchez                                    November 05, 2024
                                                         Page 16

```
 1   wondering when -- you know, we've already been
 2   going for about 20 minutes -- when do we get a
 3   break.  So from time to time we may take short
 4   breaks throughout this deposition.  If you need a
 5   break, you just please let us know, okay?
 6        A.   Okay.
 7        Q.   However, I would ask that if there's a
 8   question pending, before you take a break, I would
 9   kindly ask that you answer that question before you
10   take the break.
11             Do you understand that?
12        A.   Yes, I do.
13        Q.   Now, is there any reason that would
14   prevent you from giving your best testimony here
15   today, like being ill or having some sort of
16   impediment?
17        A.   No.
18        Q.   Do you have any vision problems at all?
19        A.   No.
20        Q.   Do you have any problems with your hearing
21   at all?
22        A.   No.
23        Q.   Any problems with reading or anything like
24   that?
25        A.   No.
```



Angel Sanchez

November 05, 2024
Page 17

```
 1        Q.   Now, have you taken any drugs or alcohol
 2   in the past 24 hours that would impair your ability
 3   to give your best testimony here today?
 4        A.   No.
 5        Q.   Now, have you reviewed any photographs,
 6   videos, audiotapes or any other recordings,
 7   documents, records of any kind in preparation of
 8   the deposition today?
 9        A.   I believe I just saw photos.
10        Q.   And what photos did you see?
11        A.   Just a photo of the crime scene.
12        Q.   Did you see photos of -- can you describe
13   exactly what photos you saw.
14        A.   It was just of the street and the -- where
15   I was shot.  Pretty much it.
16        Q.   Did you see any photographs of the vehicle
17   involved in this incident?
18        A.   I believe the vehicle came out in the
19   photograph.
20        Q.   Did you review any documents?
21        A.   Not to my knowledge.  I think it was just
22   the photos I saw.
23        Q.   Did you listen to any audio recordings?
24        A.   No, I did not.
25        Q.   Now, what is your full legal name?
```



Angel Sanchez

November 05, 2024
Page 18

```
1          A.    Angel Francisco Sanchez.

2          Q.    And have you ever used any other name?

3          A.    No, I have not.

4          Q.    Have you ever been a member of a gang?

5                MS. LEAP:  I'm going to instruct my client

6     not to answer on the basis that it implicates his

7     Fifth Amendment privilege and that it's not

8     relevant to any parties' claim or defense.

9          Q.    BY MS. WILFERT:  And, Mr. Sanchez, are you

10    refusing to answer the question based on advice of

11    your attorney?

12         A.    Yes, I am.

13               MS. WILFERT:  Madam Court Reporter, if we

14    could mark the transcript at this moment.

15                    (Transcript marked.)

16               MS. WILFERT:  Thank you.

17         Q.    Mr. Sanchez, have you ever associated with

18    Northside Bolen Parque Gang?

19               MS. LEAP:  I'm going to instruct my client

20    not to answer on the basis that it implicates his

21    Fifth Amendment privilege.  It also lacks

22    foundation and calls for speculation.

23         Q.    BY MS. WILFERT:  And, Mr. Sanchez, are you

24    refusing to answer the question based on the advice

25    of your attorney?
```



Angel Sanchez                                                    November 05, 2024
                                                                        Page 19

1        A.    Yes, I am.

2              MS. WILFERT:  Madam Court Reporter, can

3    you please mark the transcript.

4                    (Transcript marked.)

5        Q.    BY MS. WILFERT:  Mr. Sanchez, on May 21st,

6    2021, were you an active Northside Bolen Parque

7    Gang member?

8              MS. LEAP:  I'm going to instruct my client

9    not to answer on the basis that it implicates his

10   Fifth Amendment privilege.

11       Q.    BY MS. WILFERT:  And, Mr. Sanchez, are you

12   refusing to answer that question based on --

13       A.    Yes.

14       Q.    -- the advice of your attorney?

15       A.    Yes, I am.

16             MS. WILFERT:  Ms. Dunlap, can you please

17   mark the transcript.

18                    (Transcript marked.)

19             MS. WILFERT:  Thank you.

20       Q.    Mr. Sanchez, on May 21st, 2021, were you

21   with another Northside Bolen Parque Gang member

22   when you were contacted by Baldwin Park Police

23   Department officers?

24             MS. LEAP:  Objection.  Calls for

25   speculation.  Lacks foundation.  Vague and



Angel Sanchez                                        November 05, 2024
                                                            Page 20

```
 1   ambiguous.  And I'm going to instruct my client not
 2   to answer on the basis that it can implicate his
 3   Fifth Amendment privilege against
 4   self-incrimination.
 5        Q.   BY MS. WILFERT:  Mr. Sanchez, are you
 6   refusing to answer the question?
 7        A.   Yes, I am.
 8            MS. WILFERT:  Ms. Dunlap, if you could
 9   please mark the transcript.
10                 (Transcript marked.)
11            MS. WILFERT:  Ms. Leap, if we could take
12   just a short break at this time, maybe five
13   minutes.  Can we go off the record?
14            MS. LEAP:  Sure.
15            MS. WILFERT:  Thank you.
16            THE VIDEOGRAPHER:  Okay.  We are off
17   record at 11:34.
18                 (A recess was taken.)
19            THE VIDEOGRAPHER:  We are back on record
20   at 11:44.
21            MS. O'LINN:  For purposes of the record,
22   Ms. Wilfert contacted me to notify me that -- I'm
23   sorry.  I have to take that phone call as well
24   relative to this.
25            Ms. Wilfert notified me that the plaintiff
```



```
 1   had invoked his Fifth Amendment right and was
 2   refusing to answer certain questions based upon
 3   that -- that issue.
 4            And we met and conferred prior to coming
 5   back on the record.  It's our understanding that
 6   plaintiff's counsel believes Mr. Sanchez will be
 7   asserting his Fifth Amendment right to various
 8   aspects of the matter involving our -- our clients
 9   and that we are being requested to continue to ask
10   every specific question relative to the -- to this
11   deposition for purposes of the record.
12            While that is something we will -- we will
13   proceed and attempt to do, that also, of course, is
14   problematic, given the fact that there will be no
15   substantive responses to which we would follow up.
16            We reserve our right to take a further
17   deposition.  And our meeting and conferring once
18   again with plaintiff's counsel with regard to the
19   stipulation, we have requested to file a joint
20   stipulation in this matter requesting a stay of
21   proceedings pending the completion of the criminal
22   prosecution of Mr. Sanchez, which would alleviate
23   this -- this issue.
24            Ms. Leap, are you still taking the
25   position that you will not agree to a stay?
```



Angel Sanchez                                            November 05, 2024
                                                                  Page 22

```
 1              MS. LEAP:  At this point, we are not
 2   agreeing to a stay, and Mr. Sanchez will invoke his
 3   Fifth Amendment privilege or -- or any other
 4   privilege to the extent that any individual
 5   question implicates that privilege.
 6              And we are prepared to go forward today.
 7   And it's defendant's choice to conduct the
 8   deposition as they would prefer -- as they would
 9   like to.
10              MS. O'LINN:  Okay.  So with regard to this
11   process, I'm sure you recognize that this is in
12   large part a waste of time, given the fact that
13   Mr. Sanchez, in an exercise in futility aimed at
14   the defense of this matter, given the fact that
15   we're all aware that there's criminal prosecution
16   ongoing for Mr. Sanchez relative to the actual
17   incident involving his allegations in the complaint
18   of this matter against our clients.  And so we will
19   note that for the record.
20              And, Ms. Wilfert, I will step out and
21   allow you to proceed.  And I will be consulting
22   with our team with regard to any potential other
23   issues, and I will reach back out to you.
24              Thank you, Counsel.
25              MS. WILFERT:  Thank you.
```



Angel Sanchez                                          November 05, 2024
                                                              Page 23

```
 1              MS. LEAP:  Thank you.
 2                  (Discussion off the record.)
 3              MS. WILFERT:  So from this point on in the
 4    proceeding, Ms. Dunlap, at any point that
 5    Mr. Sanchez invokes his right to remain silent and
 6    refuses to answer questions, I'd request that you
 7    mark the transcript.  I will not repeat that
 8    statement throughout the deposition.  Thank you.
 9              COURT REPORTER:  You're welcome.
10        Q.   BY MS. WILFERT:  So, Mr. Sanchez, you
11    heard that we are back on the record.  You are
12    still under oath.
13              Do you understand that?
14        A.   Yes, I do.
15        Q.   So, Mr. Sanchez, when did you join
16    Northside Bolen Parque Gang?
17              MS. LEAP:  I'm going to instruct my client
18    not to answer on the basis that it implicates his
19    Fifth Amendment privilege.  And I object on the
20    basis that the question lacks foundation and calls
21    for speculation.  And that's my objection.
22                  (Transcript marked.)
23        Q.   BY MS. WILFERT:  Mr. Sanchez, did you have
24    a moniker in the Northside Bolen Parque Gang?
25              MS. LEAP:  And I will instruct my client
```



Angel Sanchez

November 05, 2024
Page 24

1    not to answer on the basis that it implicates his

2    Fifth Amendment and lacks foundation and calls for

3    speculation.

4            (Transcript marked.)

5       Q.   BY MS. WILFERT:  Mr. Sanchez, isn't it

6    true your moniker in the Northside Bolen Parque

7    Gang was Serio, S-e-r-i-o?  Is that correct?

8            MS. LEAP:  And I'll instruct my client not

9    to answer on the basis that it implicates his Fifth

10   Amendment privilege against self-incrimination.

11   And that the question lacks foundation and calls

12   for speculation.

13           (Transcript marked.)

14      Q.   BY MS. WILFERT:  Mr. Sanchez, what is the

15   Northside Bolen Parque Gang territory, do you know?

16           MS. LEAP:  I'm going to object as the

17   question calls for calls for speculation and lacks

18   foundation and is vague and ambiguous.  And I'll

19   instruct my client not to answer on the basis that

20   it implicates his Fifth Amendment privilege.

21           (Transcript marked.)

22      Q.   BY MS. WILFERT:  And, Mr. Sanchez, just to

23   be clear, when your attorney advises you not to

24   answer questions, are you going to refuse to answer

25   all of those questions?



Angel Sanchez                                                    November 05, 2024
                                                                        Page 25

1        A.    Yes.

2        Q.    Mr. Sanchez, isn't it true the Northside

3    Bolen Parque Gang territory is the north side of

4    Baldwin Park north of Ramona Boulevard?  Is that

5    true?

6             MS. LEAP:  I'm going to instruct my client

7    not to answer on the basis that it implicates his

8    Fifth Amendment privilege, and that the question

9    lacks foundation and calls for speculation.

10            (Transcript marked.)

11       Q.    BY MS. WILFERT:  And who is the rival gang

12   to Northside Bolen Parque, Mr. Sanchez, do you

13   know?

14            MS. LEAP:  I'm going to object that the

15   question calls for speculation and lacks foundation

16   and is vague and ambiguous as to "rival."  And I'm

17   going to instruct my client not to answer on the

18   basis that it implicates his Fifth Amendment

19   privilege against self-incrimination.

20            (Transcript marked.)

21       Q.    BY MS. WILFERT:  And isn't it -- is the

22   Northside Bolen Parque rival gang Eastside of --

23   Eastside Bolen Parque Gang?

24            MS. LEAP:  Objection.  Calls for

25   speculation.  Lacks foundation.  Vague and



Angel Sanchez

November 05, 2024
Page 26

```
 1    ambiguous as to "rival."  And I'm going to instruct
 2    my client not to answer on the basis that it
 3    implicates his Fifth Amendment privilege.  And I'll
 4    also object that this line of questioning is not
 5    relevant to any parties' claim or defense.
 6              (Transcript marked.)
 7        Q.   BY MS. WILFERT:  And, Mr. Sanchez, how
 8    many gang members are in the Northside Bolen Parque
 9    Gang?
10              MS. LEAP:  Objection.  Calls for
11    speculation.  Lacks foundation.  Not relevant and
12    not calculated to lead to any admissible evidence
13    under Rule 26.
14              And I'm going to instruct my client not to
15    answer on the basis that it implicates his Fifth
16    Amendment privilege against self-incrimination.
17              (Transcript marked.)
18        Q.   BY MS. WILFERT:  And, Mr. Sanchez, is
19    there a particular type of clothing that Northside
20    Bolen Parque Gang members wear, do you know?
21              MS. LEAP:  Objection.  Lacks foundation
22    and calls for speculation.  Vague and ambiguous.
23              And I'm going to instruct my client not to
24    answer on the basis that it calls -- it implicates
25    his Fifth Amendment privilege against
```



Angel Sanchez

November 05, 2024
Page 27

1    self-incrimination.

2              (Transcript marked.)

3      Q.    BY MS. WILFERT:  And, Mr. Sanchez, how did

4    you dress as a Northside Bolen Parque Gang member?

5              MS. LEAP:  Objection.  Calls for

6    speculation.  Lacks foundation.  Vague and

7    ambiguous.

8              And I'm going to instruct my client not to

9    answer on the basis that it implicates his Fifth

10   Amendment privilege against self-incrimination.

11             (Transcript marked.)

12     Q.    BY MS. WILFERT:  And, Mr. Sanchez, what

13   does the term "banging" mean in regards to a gang?

14             MS. LEAP:  Sorry, Counsel.  I didn't mean

15   to interrupt you.  I'm going to object that the

16   question lacks foundation and calls for speculation

17   and is vague and ambiguous.

18             And I will instruct my client not to

19   answer on the basis that it implicates his Fifth

20   Amendment privilege against self-incrimination.

21             (Transcript marked.)

22     Q.    BY MS. WILFERT:  Mr. Sanchez, were you

23   ever jumped into the Northside Bolen Parque Gang?

24             MS. LEAP:  Vague and ambiguous.  And I

25   will instruct my client not to answer on the basis



Angel Sanchez                                November 05, 2024
                                                     Page 28

 1   that it implicates his Fifth Amendment privilege

 2   against self-incrimination.

 3                  (Transcript marked.)

 4       Q.   BY MS. WILFERT:  On the date of the

 5   incident, were you carrying a loaded firearm?

 6            MS. LEAP:  Just objection.  Vague and

 7   ambiguous as to "loaded."

 8            But he can answer.

 9            THE WITNESS:  Yes, I was.

10       Q.   BY MS. WILFERT:  What kind of firearm were

11   you carrying on the date of the incident?

12            MS. LEAP:  Calls for speculation.

13            But he can answer.

14            THE WITNESS:  I don't recall exactly

15   what -- what caliber it was or -- I don't remember

16   what kind it was.

17       Q.   BY MS. WILFERT:  Did you load that firearm

18   with ammunition on the day of the incident?

19       A.   I did not load it, no.

20       Q.   Do you know who loaded it?

21            MS. LEAP:  Calls for speculation and lacks

22   foundation.

23            But he can answer.

24            THE WITNESS:  It was -- when I got it, it

25   was already loaded.



Angel Sanchez                                    November 05, 2024
                                                        Page 29

 1          Q.    BY MS. WILFERT:  And who did you get the
 2    firearm from that you possessed on the date of the
 3    incident?
 4               MS. LEAP:  And I will object that the
 5    question calls for speculation.  And I'll instruct
 6    my client not to answer on the basis that it
 7    implicates his Fifth Amendment privilege against
 8    self-incrimination.
 9                    (Transcript marked.)
10          Q.    BY MS. WILFERT:  Did you get the firearm
11    from another Bolen Parque -- or Northside Bolen
12    Parque Gang member?
13               MS. LEAP:  Objection.  Calls for
14    speculation and lacks foundation.  And I'll
15    instruct my client not to answer on the basis that
16    it implicates his Fifth Amendment privilege against
17    self-incrimination.
18                    (Transcript marked.)
19          Q.    BY MS. WILFERT:  Why were you carrying a
20    loaded firearm on the date of the incident?
21          A.    For protection.
22          Q.    For protection from whom?
23          A.    From anybody.  It was just -- my best
24    friend was killed in his backyard, so that -- I
25    mean, I felt like you need protection.



Angel Sanchez

November 05, 2024
Page 30

```
 1      Q.   What was your best friend's name?

 2      A.   Brian Morales.

 3      Q.   Brian Morales?

 4      A.   Yes.

 5      Q.   And did you grow up with Brian Morales?

 6      A.   Yeah, you could say that.  Played football

 7  together when we were younger.

 8      Q.   And who was Brian Morales killed by?

 9           MS. LEAP:  Calls for speculation and lacks

10  foundation.

11      Q.   BY MS. WILFERT:  Let me rephrase that,

12  Mr. Sanchez.

13           Do you know who killed Brian Morales?

14      A.   Now I do, because he was arrested.  But I

15  didn't know who it was.

16      Q.   Who was arrested for -- if you know,

17  who -- who was arrested for killing your friend

18  Brian Morales?

19      A.   I believe it was some guy from Lomita near

20  Long Beach.

21      Q.   Did you say Lomita?

22      A.   I think the little city is called Lomita.

23  I'm not 100 percent sure.

24      Q.   And was -- and do you know that

25  individual's name?
```



```
 1        A.    No, not by -- no, I don't.

 2        Q.    Was your friend Brian Morales's murder, if

 3   you know, associated with him being in a gang?

 4              MS. LEAP:  Vague and ambiguous and lacks

 5   foundation and calls for speculation.  And I'll

 6   instruct my client not to answer on the basis that

 7   it can implicate his Fifth Amendment privilege

 8   against self-incrimination.

 9              (Transcript marked.)

10        Q.    BY MS. WILFERT:  Was your friend Brian

11   Morales killed on May 21st, 2020?

12        A.    No.

13        Q.    What day was he murdered?

14        A.    I believe it was in July of 2020.

15        Q.    And what city was your friend Brian

16   Morales murdered in?

17        A.    Baldwin Park.

18        Q.    Now, you said on the date of the incident

19   you were carrying a loaded firearm.

20              Do you know what caliber that firearm was?

21        A.    I don't remember.

22        Q.    Do you know how many bullets were in the

23   gun?

24        A.    I don't remember.

25        Q.    Did you -- on the date of the incident,
```



```
 1   did you check to see if the gun was loaded?

 2        A.    I don't believe I did.

 3        Q.    But you knew it was loaded, correct?

 4        A.    Yeah.

 5        Q.    And describe how the gun looks.  What

 6   color was it?

 7        A.    If I remember correctly, it was -- I think

 8   it was, like, black with, like, some -- a little

 9   bit of gray, like, black and gray, I believe.

10        Q.    And what type of gun was it?  Was it a

11   revolver?  Was it a semiautomatic?

12              MS. LEAP:  Just -- I will quickly object

13   that it calls for speculation and lacks foundation

14   and is vague and ambiguous.

15              But he can answer to the extent that he

16   knows.

17              THE WITNESS:  I believe it was a

18   semiautomatic.

19        Q.    BY MS. WILFERT:  And on the date of the

20   incident, where were you carrying the gun on your

21   person?

22        A.    Vague and ambiguous as to time.

23              But he can answer.

24              THE WITNESS:  I'm sorry.  Can you repeat

25   the question?
```



```
 1        Q.    BY MS. WILFERT:  Yeah.  I can rephrase it.
 2              On the date of the incident, you were
 3    carrying a loaded firearm, correct?
 4        A.    Yes.
 5        Q.    And right before you're contacted by
 6    officers, right before the traffic stop, where --
 7    where was the gun located?  Where was the gun at?
 8        A.    It was under the seat.
 9        Q.    What seat?
10        A.    The back passenger where I was sitting.
11              MS. O'LINN:  Counsel, I need to take a
12    quick break to consult with Ms. Wilfert.  We just
13    need five minutes.
14              MS. LEAP:  Okay.
15              THE VIDEOGRAPHER:  Okay.  We are off
16    record at 12:02.
17                 (A recess was taken.)
18              THE VIDEOGRAPHER:  We are back on record
19    at 12:09.
20        Q.    BY MS. WILFERT:  Mr. Sanchez, you're aware
21    you're under oath, correct?
22        A.    Yes, I am.
23        Q.    So what does the term "put in work" mean
24    for a gang, do you know?
25              MS. LEAP:  Calls for speculation.  Lacks
```



Angel Sanchez

November 05, 2024
Page 34

1    foundation.  Vague and ambiguous.  And I'll

2    instruct my client not to answer on the basis that

3    it implicates his Fifth Amendment privilege against

4    self-incrimination.

5        Q.    BY MS. WILFERT:  Mr. Sanchez, are you

6    refusing to answer?

7        A.    Yes.

8                 (Transcript marked.)

9        Q.    BY MS. WILFERT:  So on the date of the

10   incident, were you -- when you possessed that

11   loaded firearm and you pointed it at Officer

12   Camacho, were you putting in work for the Northside

13   Bolen Parque Gang?

14            MS. LEAP:  Misstates testimony.  Lacks

15   foundation and calls for speculation.

16   Misrepresents the evidence in the record in this

17   case.  And I will instruct my client not to answer

18   on the basis that it implicates his Fifth Amendment

19   privilege against self-incrimination.

20                 (Transcript marked.)

21       Q.    BY MS. WILFERT:  So, Mr. Sanchez, did you

22   commit crimes for the Northside Bolen Parque Gang?

23            MS. LEAP:  Lacks foundation and calls for

24   speculation.  Vague and ambiguous.  And I will

25   instruct my client not to answer on the basis that



Angel Sanchez

1   it implicates his Fifth Amendment privilege against

2   self-incrimination.

3       Q.   BY MS. WILFERT:  Mr. Sanchez, are you

4   refusing to answer the question?

5       A.   Yes, I am.

6                (Transcript marked.)

7       Q.   BY MS. WILFERT:  So, Mr. Sanchez, what

8   happens, if you know, when a rival gang is in the

9   Northside Bolen Parque Gang territory?

10          MS. LEAP:  Vague and ambiguous as to

11  "territory" and "is in."  And lacks foundation and

12  calls for speculation.  It's also not reasonably

13  calculated to lead to admissible evidence.

14          And I will instruct my client not to

15  answer on the basis that the question implicates

16  his Fifth Amendment privilege against

17  self-incrimination.

18      Q.   BY MS. WILFERT:  And, Mr. Sanchez, you're

19  refusing to answer?

20      A.   Yes.

21               (Transcript marked.)

22      Q.   BY MS. WILFERT:  Okay.  Mr. Sanchez, do

23  you have any members of your family that are

24  members of the Northside Bolen Parque Gang?

25          MS. LEAP:  Calls for speculation.  Lacks



Angel Sanchez

November 05, 2024
Page 36

1   foundation.  Vague and ambiguous.  And I will

2   instruct my client not to answer on the basis that

3   it implicates his Fifth Amendment privilege and

4   also could implicate the privacy rights of third

5   parties.

6                (Transcript marked.)

7        Q.   BY MS. WILFERT:  So, Mr. Sanchez, the

8   loaded gun that you were carrying on the date of

9   the incident, that was your gun, right?

10                MS. LEAP:  I'll object just as to vague

11   and ambiguous as to "loaded."  And lacks foundation

12   and calls for speculation.

13                But he can answer.

14                THE WITNESS:  And I'm sorry.  I couldn't

15   hear you clearly.  It was, like -- like, cutting

16   off.  Could you repeat the question?

17        Q.   BY MS. WILFERT:  Yes.  On the date of the

18   incident, the loaded firearm that you were

19   carrying, was that your firearm?

20        A.   I guess so.

21                MS. LEAP:  I'll just make -- raise the

22   same objections.

23        Q.   BY MS. WILFERT:  What was your answer?

24        A.   Yes, it was mine.

25        Q.   Did you buy that firearm from someone?



Angel Sanchez

November 05, 2024
Page 37

1        MS. LEAP:  I'll instruct my client not to
2    answer on the basis that it implicates his Fifth
3    Amendment privilege.  And it is vague and ambiguous
4    and not reasonably calculated to lead to admissible
5    evidence.
6        Q.   BY MS. WILFERT:  Are you refusing to
7    answer, Mr. Sanchez?
8        A.   Yes, I am.
9             (Transcript marked.)
10       Q.   BY MS. WILFERT:  Mr. Sanchez, are you --
11   do you have a concealed weapons permit?
12            MS. LEAP:  I'll instruct my client not to
13   answer on the basis that it implicates his Fifth
14   Amendment privilege against self-incrimination.
15       Q.   BY MS. WILFERT:  Are you refusing to
16   answer, Mr. Sanchez?
17       A.   Yes, I am.
18            (Transcript marked.)
19       Q.   BY MS. WILFERT:  Mr. Sanchez, was the
20   loaded gun that you were carrying, did it have a
21   serial number?
22            MS. LEAP:  And I'll instruct my client not
23   to answer on the basis that it implicates his Fifth
24   Amendment privilege against self-incrimination.
25   The question also lacks foundation and calls for



1    speculation.

2        Q.   BY MS. WILFERT:  Are you refusing to

3    answer?

4        A.   Yes, I am.

5              (Transcript marked.)

6        Q.   BY MS. WILFERT:  Mr. Sanchez, did you

7    register that loaded firearm that you carried on

8    the date of the incident in your name?

9              MS. LEAP:  And I'll instruct my client not

10   to answer on the basis that it implicates his Fifth

11   Amendment privilege against self-incrimination.

12             (Transcript marked.)

13       Q.   BY MS. WILFERT:  Mr. Sanchez, you -- you

14   said that you carried the firearm for protection;

15   is that right?

16       A.   Yes.  Correct.

17       Q.   Yet were you -- did you intend on using

18   the firearm that night if you needed to?

19             MS. LEAP:  Vague and ambiguous.  And lacks

20   foundation and calls for speculation.

21             But he can answer.

22             THE WITNESS:  Can you, like, rephrase the

23   question?

24             MS. WILFERT:  Madam -- Ms. Dunlap, if you

25   could read back the question to Mr. Sanchez.



Angel Sanchez                                                    November 05, 2024
                                                                        Page 39

```
 1              (Record read as follows:
 2                  "QUESTION:  Yet were you -- did
 3                  you intend on using the firearm
 4                  that night if you needed to?")
 5              MS. LEAP:  And I'll actually instruct my
 6      client not to answer that question on the basis
 7      that it could implicate his Fifth Amendment
 8      privilege.
 9         Q.   BY MS. WILFERT:  Mr. Sanchez, are you
10      refusing to answer?
11         A.   Yes.
12              (Transcript marked.)
13         Q.   BY MS. WILFERT:  Mr. Sanchez, you
14      understand that -- or do you know if firearms that
15      are loaded with ammunition are dangerous?
16              MS. LEAP:  Vague and ambiguous as to
17      "dangerous."
18              But he can answer.
19              THE WITNESS:  I mean, yeah.  Look what
20      they did to me.
21         Q.   BY MS. WILFERT:  So you're aware that
22      firearms can seriously injure or kill someone,
23      right?
24         A.   Yes.
25         Q.   And you're aware that pointing a firearm
```



1  at someone is dangerous because they can be

2  seriously injured or killed, right?

3          MS. LEAP:  Objection.  Vague and ambiguous

4  as to "pointing."  And lacks foundation and calls

5  for speculation.

6          But he can answer.

7          THE WITNESS:  If you shoot it, yeah.

8      Q.   BY MS. WILFERT:  But what if you point it

9  at someone with your finger on the trigger, that's

10  dangerous, right, because the gun could go off?

11          MS. LEAP:  Same objections.

12          THE WITNESS:  I -- I guess so.

13      Q.   BY MS. WILFERT:  And, Mr. Sanchez, do you

14  know if any Northside Bolen Parque Gang members

15  ever shot an officer in the City of Baldwin Park?

16  That's if you know.

17          MS. LEAP:  I'm going to object as vague

18  and ambiguous and overbroad.  And I will instruct

19  my client not to answer on the basis that it

20  implicates his Fifth Amendment privilege against

21  self-incrimination.

22      Q.   BY MS. WILFERT:  Mr. Sanchez, are you

23  refusing to answer?

24      A.   Yes, I am.

25                (Transcript marked.)



Angel Sanchez                                                    November 05, 2024
                                                                       Page 41

```
 1        Q.    BY MS. WILFERT:  Mr. Sanchez, have you

 2   ever been contacted by Baldwin Park gang

 3   enforcement unit?

 4             MS. LEAP:  Calls for speculation and lacks

 5   foundation.

 6             And I'll instruct my client not to answer

 7   on the basis that it could implicate his Fifth

 8   Amendment privilege against self-incrimination.

 9        Q.    BY MS. WILFERT:  Mr. Sanchez, are you

10   refusing to answer?

11        A.    Yes, I am.

12             (Transcript marked.)

13        Q.    BY MS. WILFERT:  So, Mr. Sanchez, isn't it

14   true that you were contacted by a Baldwin Park

15   officer who did gang enforcement prior to this

16   incident?

17             MS. LEAP:  I'll instruct my client not to

18   answer on the basis that it implicates his Fifth

19   Amendment privilege against self-incrimination.

20   The question is also vague and ambiguous.

21             (Transcript marked.)

22             MS. WILFERT:  So I'm sharing my screen.

23   So, Mr. Sanchez, I'm showing you -- Ms. Dunlap, if

24   you could please mark this as Exhibit 1.

25             (Reporter marked Exhibit No. 1 for
```



Angel Sanchez                                          November 05, 2024
                                                       Page 42

```
 1              identification.)
 2       Q.   BY MS. WILFERT:   This is a Baldwin Park
 3   Police Department field interview card.
 4              Mr. Sanchez, do you recognize this?
 5              MS. LEAP:   I'll instruct my client not to
 6   answer on the basis that it implicates his Fifth
 7   Amendment privilege against self-incrimination and
 8   that it -- I'll leave it at that.
 9       Q.   BY MS. WILFERT:   Mr. Sanchez, are you
10   refusing to answer?
11       A.   Yes.
12              (Transcript marked.)
13       Q.   BY MS. WILFERT:   Mr. Sanchez, on this
14   card, Exhibit 1, that I'm showing you, it's two
15   pages.   And it's COPB 000346.   Has your name Angel
16   Francisco Sanchez at the top.
17              Do you see that?
18              MS. LEAP:   I'll instruct my client not to
19   answer on the basis that it implicates his Fifth
20   Amendment privilege against self-incrimination.
21              (Transcript marked.)
22       Q.   BY MS. WILFERT:   And, Mr. Sanchez,
23   under -- on the second line where it says
24   "monikers," it says, "Serio," S-e-r-i-o.
25              Do you see that, Mr. Sanchez?
```



Angel Sanchez

November 05, 2024
Page 43

```
1              MS. LEAP:  I'll instruct my client not to
2   answer on the basis that it implicates his Fifth
3   Amendment privilege against self-incrimination.
4   And the question is not reasonably calculated to
5   lead to admissible evidence.
6              (Transcript marked.)
7       Q.   BY MS. WILFERT:  And I'm scrolling down to
8   the second page, and it's COP -- COBP 000347.  And
9   you were contacted -- it says an associate, Xavier
10  Mercado.
11             Do you see that, Mr. Sanchez?
12             MS. LEAP:  And I'll instruct my client not
13  to answer on the basis that it implicates his Fifth
14  Amendment privilege against self-incrimination.
15  And the -- and it lacks foundation and calls for
16  speculation.
17      Q.   BY MS. WILFERT:  Mr. Sanchez, are you
18  refusing to answer?
19      A.   Yes, I am.
20             (Transcript marked.)
21      Q.   BY MS. WILFERT:  And, Mr. Sanchez, you see
22  the date on this card, 3/26/2021, and the officer
23  is Officer Castro?  Do you see that?
24             MS. LEAP:  I'll instruct my client not to
25  answer on the basis that it implicates his Fifth
```



Angel Sanchez

November 05, 2024
Page 44

1    Amendment privilege against self-incrimination, and

2    that the -- that the question lacks foundation and

3    calls for speculation.

4        Q.    BY MS. WILFERT:   And you're refusing to

5    answer, Mr. Sanchez?

6        A.    Yes, I am.

7            (Transcript marked.)

8        Q.    BY MS. WILFERT:   Mr. Sanchez, do you

9    remember on March 26, 2021, admitting to Officer

10   Castro that you were an NSBP gang member who goes

11   by the name of Serio?

12           MS. LEAP:   Objection.   Lacks foundation

13   and calls for speculation.   Not reasonably

14   calculated to lead to admissible evidence.   And

15   I'll instruct my client not to answer on the basis

16   that it implicates his Fifth Amendment privilege

17   against self-incrimination.

18       Q.    BY MS. WILFERT:   And you're refusing to

19   answer?

20       A.    Yes, I am.

21           (Transcript marked.)

22       Q.    BY MS. WILFERT:   So, Mr. Sanchez, do you

23   know who Jesus Aldaco is?

24       A.    Yeah.

25       Q.    Who is Jesus Aldaco?



 1       A.    I know who he is, but I don't know him too

 2    well.

 3       Q.    Does Jesus Aldaco go by another name?

 4             MS. LEAP:  Lacks foundation and calls for

 5    speculation and vague and ambiguous.

 6             But he can answer if he knows.

 7             MS. WILFERT:  And, Ms. Leap, let me

 8    rephrase that.

 9       Q.    Do you know, Mr. Sanchez, if Jesus Aldaco

10    goes by another name, a nickname?

11             MS. LEAP:  Vague and ambiguous as to

12    "nickname."  And again, calls for speculation and

13    lacks foundation.

14             THE WITNESS:  I don't -- I don't remember.

15       Q.    BY MS. WILFERT:  Does Jesus Aldaco go by

16    the name of Chooch?

17             MS. LEAP:  I'll instruct my client not to

18    answer on the basis that it implicates his Fifth

19    Amendment privilege against self-incrimination.

20    And it is vague and ambiguous and calls for

21    speculation.  And asked and answered.

22       Q.    BY MS. WILFERT:  You can answer if you

23    know.

24             MS. LEAP:  And I instruct him not to

25    answer.



Angel Sanchez

November 05, 2024
Page 46

```
 1        Q.   BY MS. WILFERT:  So you're refusing to
 2   answer, Mr. Sanchez?
 3        A.   Yes, I am.
 4             (Transcript marked.)
 5        Q.   BY MS. WILFERT:  So, Mr. Sanchez, how long
 6   have you -- or how long have you known Jesus
 7   Aldaco?
 8        A.   I don't know.
 9        Q.   Did you just meet Jesus Aldaco the night
10   of the incident?
11        A.   I've seen him around before.
12        Q.   Is Jesus Aldaco a Northside Bolen Parque
13   Gang member?
14             MS. LEAP:  Calls for speculation and lacks
15   foundation.  Vague and ambiguous.  Not reasonably
16   calculated to lead to admissible evidence and not
17   relevant to any parties' claims or defenses.  And
18   I'll instruct my client not to answer on the basis
19   that it implicates his Fifth Amendment privilege
20   against self-incrimination.
21        Q.   BY MS. WILFERT:  And you're refusing to
22   answer, Mr. Sanchez?
23        A.   Yes, I am.
24             (Transcript marked.)
25        Q.   BY MS. WILFERT:  Mr. Sanchez, do you know
```



Angel Sanchez                                      November 05, 2024
                                                        Page 47

1    if Jesus Aldaco is a Northside Bolen Parque Gang

2    member?

3          MS. LEAP:  I'll instruct my client not to

4    answer on the basis that it implicates his Fifth

5    Amendment privilege against self-incrimination.

6    And the question lacks foundation and is vague and

7    ambiguous and was just asked as well.  And it is

8    not relevant to any parties' claim or defense and

9    not reasonably calculated to lead to admissible

10   evidence.

11         MS. WILFERT:  Mr. Sanchez, I'm showing

12   you -- we can mark this, Ms. Dunlap, as Exhibit 2.

13   It's a photograph, and it's COBP 001232.

14            (Reporter marked Exhibit No. 2 for

15             identification.)

16   Q.    BY MS. WILFERT:  Mr. Sanchez, do you

17   recognize the individual in this photograph?

18   A.    Yes, I do.

19   Q.    Who is that individual in the photograph,

20   do you know?

21   A.    I believe it's Jesus.

22   Q.    And isn't it true that Mr. Aldaco has

23   Northside Bolen Parque tattoos on his body?

24         MS. LEAP:  I'll in -- I'll instruct my

25   client not to answer on the basis that it



Angel Sanchez                                    November 05, 2024
                                                 Page 48

1   implicates his Fifth Amendment privilege against

2   self-incrimination.   The question also is vague and

3   ambiguous.  Lacks foundation.  And calls for

4   speculation.  And it's not relevant to any parties'

5   claim or defense, and is not reasonably calculated

6   to lead to admissible evidence.

7       Q.   BY MS. WILFERT:  Are you refusing to

8   answer?

9       A.   Yes, I am.

10             (Transcript marked.)

11      Q.  BY MS. WILFERT:  Mr. Sanchez, do you have

12  Mr. Aldaco's contact information?

13      A.   I don't think so, no.

14      Q.   When is the last time you talked to him?

15      A.   I don't remember.

16      Q.   When was the last time you texted him on

17  the phone?

18          MS. LEAP:  Lacks foundation and calls for

19  speculation.

20          But he can answer.

21          THE WITNESS:  I don't remember either.

22      Q.   BY MS. WILFERT:  Have you ever told

23  Mr. Aldaco not to testify related to this incident?

24          MS. LEAP:  Lacks foundation and calls for

25  speculation.  Vague and ambiguous.  And I'll



Angel Sanchez                                              November 05, 2024
                                                               Page 49

 1   instruct my client not to answer on the basis that

 2   it implicates his Fifth Amendment privilege against

 3   self-incrimination.

 4                   (Transcript marked.)

 5       Q.    BY MS. WILFERT:  On the date of the

 6   incident you were with Mr. Aldaco; is that correct?

 7       A.    Yeah, I was.

 8       Q.    So what's -- what time did you meet with

 9   Mr. Aldaco on the date of the incident?

10       A.    The time, I'm not sure of the time.

11       Q.    Did Mr. Aldaco pick you up that day?

12       A.    Like -- like, from my house?  Or what do

13   you mean in the question?

14       Q.    Like, when was the first time you saw

15   Mr. Aldaco on the date of the incident?

16       A.    I believe I saw him first at the cemetery.

17       Q.    And you were at the cemetery why, if you

18   can explain?

19       A.    It was the first birthday since my best

20   friend had passed away, so his family did, like --

21   they had -- they had a band who played his favorite

22   music and just food and stuff like that.

23       Q.    So you saw Mr. Aldaco at the cemetery on

24   the date of the incident?

25       A.    Yes, I did.



Angel Sanchez

November 05, 2024
Page 50

1    Q.    And after you left the cemetery on the

2    date of the incident, did you leave with

3    Mr. Aldaco?

4    A.    I don't think I did.

5    Q.    Did you meet up with Mr. Aldaco at another

6    time on the date of the incident after the

7    cemetery?

8    A.    Yeah, I believe I ran into him again.

9    Q.    And where did you run into Mr. Aldaco?

10   A.    At the house of the parents where my best

11   friend had passed away.  There was -- the band

12   moved over there once the cemetery closed.

13   Q.    And what is the address to that house of

14   your friend's family that you went to?

15   A.    I don't remember the exact address.

16   Q.    Do you know what street it's on?

17   A.    Yes, I do.

18   Q.    What street is it on?

19   A.    I believe it was Phelan.

20   Q.    And what time did you go to that house on

21   Phelan -- at your friend's family's house?  What

22   time did you go there?

23   A.    I'm not sure of the exact time, but it was

24   after the cemetery closed.

25   Q.    Do you have an idea of the time at all?



Angel Sanchez                                    November 05, 2024
                                                        Page 51

```
 1        A.    Maybe -- maybe, like, 7:00 p.m. or
 2   6:00 p.m.  I'm not too sure.
 3        Q.    So you go to your friend's family's house
 4   on Phelan; is that accurate?
 5        A.    Yes.
 6        Q.    And you see Mr. Aldaco at the party; is
 7   that correct?
 8        A.    Yes, I saw him there.
 9        Q.    Did you talk to Mr. Aldaco?
10        A.    Yeah.  I think I ended up talking to him,
11   yeah.
12        Q.    And did you ever leave the house with
13   Mr. Aldaco on the date of the incident?
14        A.    Yes, I did.
15        Q.    And what time did you leave the house with
16   Mr. Aldaco on the date of the incident?
17        A.    I'm not sure.  I didn't check the time.
18        Q.    And why did you leave?  Where were you
19   going?
20        A.    To the -- like, the mick -- sorry -- like,
21   the market down the street.
22        Q.    And how did you get to the market down the
23   street when you left the house with Mr. Aldaco?
24        A.    In a car.
25        Q.    What kind of car?
```



Angel Sanchez

November 05, 2024
Page 52

```
 1        A.    I believe it was -- it was, like, a big
 2   car.  It was, like, a Tahoe.
 3        Q.    Who was driving when you left the house to
 4   go to the store?
 5        A.    I believe it was his -- I don't know if it
 6   was his girlfriend or what.  I assumed it was his
 7   girlfriend.
 8        Q.    And do you know his girlfriend's name?
 9        A.    I believe her name is Ingrid.
10        Q.    And where did Mr. Aldaco sit in the car
11   that you left in?
12        A.    I believe it was the front passenger seat.
13        Q.    And had you ever met Ingrid before?
14        A.    No.
15        Q.    So on the night -- the date of the
16   incident, that was the first time you met Ingrid;
17   is that accurate?
18        A.    Yeah, I believe so.
19        MS. WILFERT:  I'm showing you what's been
20   marked -- if we can please mark this, Ms. Dunlap,
21   as Exhibit 3.
22             (Reporter marked Exhibit No. 3 for
23             identification.)
24        Q.    BY MS. WILFERT:  Do you recognize this
25   photograph, Mr. Sanchez?
```



Angel Sanchez                                        November 05, 2024
                                                     Page 53

```
 1        A.    Yes, I do.
 2        Q.    And who is this a photograph of?
 3        A.    I believe it is Ingrid.
 4        Q.    And was this the individual who was with
 5   you on the night of the incident?
 6        A.    Yes.
 7        Q.    And was this individual, Ingrid, who drove
 8   the -- the vehicle that you left in on the date of
 9   the incident?
10        A.    Yes.
11        Q.    So Ingrid was the driver, correct?
12        A.    Yes.
13        Q.    And Mr. Aldaco was the front passenger; is
14   that accurate?
15        A.    Yes.
16        Q.    So when you left the house on Phelan, what
17   seat of the vehicle did you get into?
18        A.    I believe it was the back passenger's
19   seat.
20        Q.    Were you sitting behind Ingrid, or were
21   you sitting behind Mr. Aldaco?
22        A.    I believe I was sitting behind Mr. Aldaco.
23        Q.    And when you first got -- and do you know
24   who the vehicle belonged to?
25        A.    No, I don't know.
```



Angel Sanchez

```
 1        Q.   Can you -- go ahead.  Sorry to talk over
 2   you.  Go ahead.
 3        A.   I was going to say I assumed it was
 4   Ingrid's.  She was driving it.
 5        Q.   And can you describe how this vehicle
 6   looked that you got into?
 7        A.   Big car, black.  Pretty much it.
 8        Q.   So when you got into the car, you got into
 9   the passenger seat, right?
10        A.   The back passenger seat.
11        Q.   And you were sitting behind who?  Do you
12   remember?
13        A.   Mr. Aldaco.
14        Q.   And when you got into the rear passenger's
15   seat behind Mr. Aldaco, did you have a conversation
16   with -- with Mr. Aldaco or Ingrid?
17        A.   At that -- I don't remember.  I don't
18   think so.
19        Q.   So when you got into this black car that
20   you got into on Phelan on the date of the incident,
21   did you have the loaded firearm with you?
22        A.   When I was in the car?
23        Q.   When you first got in the car, did you
24   have the loaded firearm with you?
25        A.   Yes, I did.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 55

```
 1        Q.    And where was it?
 2        A.    On the way to the store, do you mean?  I'm
 3   sorry.
 4        Q.    When you're first stepping in, if you
 5   could envision when you're first stepping into that
 6   rear passenger seat behind Mr. Aldaco, when you're
 7   about to sit down, where's the loaded firearm?
 8        A.    So going into the car, it was on my
 9   person.  And then in the car, under the seat.
10        Q.    So when you got into the car -- let's go
11   back to when it's on your person.
12              Where was it on your person initially?
13        A.    I don't remember if it was -- it might
14   have been in my pocket, but I'm not too sure.
15        Q.    What pocket was it in?  Were you wearing a
16   jacket that night?
17        A.    I think I was.
18        Q.    Do you know what pocket -- if you could go
19   back to when you first got into that black car,
20   where did you feel the gun?  Where was it at?
21        A.    I believe it was on my right side.
22        Q.    And are you right-handed?
23        A.    Yes, I am.
24        Q.    And was there a round in the chamber?
25        A.    No, I don't think there was.
```



Angel Sanchez                                      November 05, 2024
                                                   Page 56

 1        Q.   Do you know how to put a round in the

 2   chamber?

 3        A.   Yes, I do.

 4        Q.   And do you know how to take the magazine

 5   out to see if it's loaded?

 6        A.   Yes, I do.

 7             MS. WILFERT:  So I'm sharing my screen.

 8   If we can please mark this as exhibit -- and

 9   there's multiple photographs in this exhibit -- as

10   Exhibit 4.

11                  (Reporter marked Exhibit No. 4 for

12                   identification.)

13        Q.   BY MS. WILFERT:  And this is COPB -- I'm

14   sorry -- COBP 001798.

15             Do you recognize this photograph,

16   Mr. Sanchez?

17        A.   Yes.  I believe, yeah.

18        Q.   And what is this a photograph of?

19        A.   The -- the car I was in.

20        Q.   So it appears to be a Tahoe; is that

21   accurate?  And the color of this vehicle we're

22   looking at is black; is that correct?

23        A.   Yes.

24        Q.   I have my pointer pointing to the rear

25   passenger's side door.



```
 1            Is this the door you got into on the night
 2    of the incident?
 3        A.    Yeah, I believe so.
 4        Q.    So once you got into this vehicle, did you
 5    take the gun out of your right pocket and place it
 6    under the seat?
 7        A.    Yeah, I believe so.
 8        Q.    And why did you place the gun under the
 9    seat?
10        A.    Just it's better to have it there instead
11    of my pocket.  It's safer.
12            MS. WILFERT:  So I just want to check in.
13    Is everyone -- does anyone need a break at all?
14            THE WITNESS:  I'm okay.
15            MS. LEAP:  I'm okay as well.
16                (Discussion off the record.)
17        Q.    BY MS. WILFERT:  So isn't it true that on
18    the date of the incident, Mr. Sanchez, that when
19    you saw that black Dodge Charger, you knew it was a
20    police vehicle; is that right?
21            MS. LEAP:  The question lacks foundation.
22    And it's vague and ambiguous.
23            But he can answer.
24            THE WITNESS:  It was -- I got the "low
25    network."  I couldn't hear your full question.
```



Angel Sanchez

1      Q.   BY MS. WILFERT:  Let me -- let me rephrase

2   it, okay?

3          So on the date of the incident you were --

4   or you were with Mr. Aldaco and Ingrid, correct?

5      A.   Yes.

6      Q.   And at a certain point did you see a

7   vehicle that you believed was a police vehicle?

8      A.   Yes.

9      Q.   And that vehicle, was it a black Dodge

10  Charger?

11     A.   Yes.

12     Q.   And the vehicle had the spotlights on the

13  side of it, right?

14     A.   I believe it did.

15     Q.   And you had seen that black Dodge Charger

16  before, correct?

17          MS. LEAP:  Lacks foundation and calls for

18  speculation.  And I'll instruct my client not to

19  answer on the basis that it implicates his Fifth

20  Amendment privilege against self-incrimination.

21     Q.   BY MS. WILFERT:  So are you refusing to

22  answer, Mr. Sanchez?

23     A.   Yes, I am.

24          (Transcript marked.)

25     Q.   BY MS. WILFERT:  So, Mr. Sanchez, you knew



Angel Sanchez                                      November 05, 2024
                                                   Page 59

```
 1   the -- when you initially saw the black Dodge
 2   Charger on the night of the incident, did you get
 3   worried about having that loaded firearm with you?
 4        A.   I mean, yeah, I was worried.
 5        Q.   And if you could take me to the point when
 6   you initially saw that black Dodge Charger police
 7   vehicle, where were you at?
 8        A.   I believe we were arriving to a stop sign
 9   on Cavette and Phelan.
10        Q.   When you're -- when the vehicle was at the
11   stop sign on Cavette and Phelan, did you see the
12   black Dodge Charger to your right?
13        A.   Yes, I did.
14        Q.   And it was on Phelan Avenue, correct?
15        A.   Yes, it was.
16        Q.   And what did Ingrid do at the stop sign?
17        A.   She stopped a couple seconds like a
18   normal -- normal when you stop at a stop sign, and
19   then she made a left.
20        Q.   So she stopped two seconds, is what your
21   testimony is?
22        A.   I didn't say two seconds.
23        Q.   How long was the black Tahoe stopped at
24   the intersection of Cavette, at the stop sign, and
25   Phelan?
```



Angel Sanchez

November 05, 2024
Page 60

```
 1       A.    I didn't count, but it felt like a regular
 2  when you're going through -- you pass a stop sign,
 3  a regular amount.
 4       Q.    And when Ms. Molina's vehicle stopped at
 5  the stop sign, did you -- did anyone say anything
 6  in the car when -- did anyone have any
 7  conversations in the car?
 8       A.    I don't remember.
 9       Q.    Did you -- you said you saw the Dodge
10  Charger, the black Dodge Charger police car, right?
11       A.    Yes, I did.
12       Q.    Did you say anything to Mr. Aldaco when
13  you saw the black Dodge Charger?
14       A.    I don't remember.
15       Q.    Did you say anything to Ms. Molina when
16  you saw the black Dodge Charger?
17       A.    I don't remember if I said anything.
18       Q.    Did you see the black Dodge Charger stop
19  at the stop sign on Cavette?
20       A.    It was already stopped when we got there,
21  yeah.
22       Q.    And you testified that Ms. Molina made a
23  turn, right?
24       A.    Yeah.  Left turn.
25       Q.    Did she turn her blinker on?
```



Angel Sanchez

November 05, 2024
Page 61

```
 1        A.   I don't know.  I wasn't looking at her
 2   blinkers.
 3        Q.   Do you remember if she turned her blinker
 4   on?
 5        A.   I'm sorry.  What?
 6             MS. LEAP:  I just want to lodge an
 7   objection that it calls for speculation.
 8             But he can answer if he knows.
 9        Q.   BY MS. WILFERT:  Do you remember if she
10   turned her blinker on?  I'm sorry to talk over.  Go
11   ahead.
12        A.   I was saying I don't remember if she did.
13        Q.   And do you remember if the vehicle, that
14   black Chevy Tahoe, did it have tinted windows?  Do
15   you know?
16        A.   I don't know.  I don't remember.
17        Q.   Do you know whether that windshield was
18   tinted?  Do you know?
19        A.   I don't know.  I didn't really check out
20   the car.
21        Q.   Did you ever see any lights being shined
22   into that black Chevy Tahoe from the black Dodge
23   Charger?
24        A.   Yeah, I did.
25        Q.   And when you saw that flash of light, were
```



1    you still stopped at -- on Cavette Street and

2    Phelan?

3         A.    As we were arriving to the stop sign,

4    yeah, they flashed us.

5         Q.    And when they flashed you, then did

6    Ms. Molina then stop at the stop sign?

7         A.    She was already in the process of stopping

8    at the stop sign.

9         Q.    And she stopped at the stop sign, and she

10   waited; is that accurate?

11        A.    Yeah.   Like you're supposed to do at a

12   stop sign.

13        Q.    And then she made a left turn; is that

14   correct?

15        A.    Yeah, I believe so.

16        Q.    And then you saw the red and blue lights

17   from that black Dodge Charger, correct?

18        A.    Yeah.

19        Q.    Now, in your complaint -- now, is it

20   true -- like, this -- this is what you wrote in

21   your complaint, that -- I want to know if it's true

22   or not -- that Defendants Castro and Camacho drove

23   an unmarked black Dodge Charger in the area; is

24   that -- is that true?

25        A.    If they drove it?   Like, if they were



 1  driving it that day?  Is that what you're asking?

 2      Q.   What I'm asking is, you wrote in your

 3  complaint that it was an unmarked black Dodge

 4  Charger.  But that's not true, right, because it

 5  had police lights on the side, correct?

 6          MS. LEAP:  Vague and ambiguous.  Lacks

 7  foundation and calls for speculation and misstates

 8  his testimony.

 9          But he can answer.

10          THE WITNESS:  I thought "unmarked" meant,

11  like, black and white with the big police thing on

12  it.

13      Q.   BY MS. WILFERT:  But you had -- but the

14  black Dodge Charger had spotlights on it, correct?

15      A.   I believe it does.

16      Q.   And it has red and blue lights, right?

17      A.   If they turn them on, yeah, I believe so.

18      Q.   And is it true that you were stopped by

19  the officers without reasonable suspicion when they

20  activated their red and blue lights?

21          MS. LEAP:  Calls for a legal conclusion.

22          And he can answer to the extent that he

23  knows what "reasonable suspicion" is in a legal

24  sense.

25          MS. WILFERT:  Let me rephrase it.  That's



 1    fair enough.  Let me rephrase it.

 2        Q.   I don't want you to guess.

 3             So, Mr. Sanchez, do you know why the

 4    officers were stopping that black Tahoe?

 5             MS. LEAP:  Calls for speculation.

 6             THE WITNESS:  I -- I don't know why they

 7    were stopping us.

 8        Q.   BY MS. WILFERT:  But you did see when the

 9    officers were stopping you, you saw the red and

10    blue flashing lights; is that accurate?

11        A.   Yes, I did.

12        Q.   And Ingrid did not pull the vehicle over

13    right away; is that accurate?

14             MS. LEAP:  Vague and ambiguous as to

15    "right away."

16             But he can answer.

17             THE WITNESS:  Yeah.  I believe there was

18    nowhere to stop.

19        Q.   BY MS. WILFERT:  Did she attempt to pull

20    over to the side of the road as soon as you saw

21    those red-and-blue lights?

22        A.   She was looking for a spot to pull over.

23    But like I said, there was no open spots.

24        Q.   So she continued -- Ms. Molina continued

25    driving without stopping, right?



Angel Sanchez

```
 1          MS. LEAP:  Vague and ambiguous.  Asked and
 2   answered.
 3          But he can answer.
 4          THE WITNESS:  She drove slowly until she
 5   found a spot to pull over, and then she stopped.
 6      Q.   BY MS. WILFERT:  During that time when you
 7   saw the red and blue lights flashing, were you
 8   aware that the officers were initiating a traffic
 9   stop?
10      A.   I mean, yeah.  That's what the lights
11   mean.
12      Q.   Did you tell Ms. Molina to keep driving?
13      A.   No, I don't think I did.
14      Q.   Did you tell Ms. Molina that you had a gun
15   on you?
16      A.   No, I don't think I did.
17      Q.   Did you tell Mr. Aldaco that you had a gun
18   on you?
19      A.   I don't think I did.
20      Q.   Did you say anything to anyone in the car
21   about the gun that you had on your person?
22      A.   I don't believe so.
23      Q.   Did you tell Ms. Molina that you put the
24   gun under the passenger seat in front of you?
25      A.   I don't believe so.
```



Angel Sanchez                                          November 05, 2024
                                                              Page 66

```
 1            MS. LEAP:  Misstates testimony, but just a
 2   belated objection.
 3       Q.   BY MS. WILFERT:  So how much time passed,
 4   if you can estimate, from the time that you saw the
 5   red and blue flashing lights from the police
 6   vehicle to the point that Ms. Molina pulled over?
 7   How much time passed?
 8       A.   Maybe a couple seconds.
 9       Q.   So when -- now, did the -- did the Tahoe
10   eventually stop?
11       A.   Yes, it did.
12       Q.   And where did it stop at?
13       A.   Next to -- I -- I don't know the exact
14   address where it stopped.
15       Q.   And did you see an officer exit that black
16   Dodge Charger, the police vehicle?
17       A.   No, I did not.
18       Q.   So when the Tahoe stopped, you didn't see
19   an officer exit the police black Dodge Charger?
20       A.   No, I did not.
21       Q.   Is it true that an officer, Officer
22   Camacho, approached the Tahoe with his firearm
23   drawn?
24            MS. LEAP:  Calls for speculation and lacks
25   foundation and -- but he can answer if he knows.
```



```
 1            THE WITNESS:  I didn't see him.
 2      Q.    BY MS. WILFERT:  Do you have any evidence
 3  to support that Officer Camacho approached the
 4  Tahoe with his firearm drawn?
 5            MS. LEAP:  Objection to the extent that
 6  that calls for a -- a legal conclusion or expert
 7  opinion and is --
 8            He can answer if he knows.
 9            THE WITNESS:  I don't.  I'm sorry.
10      Q.    BY MS. WILFERT:  So when the Tahoe
11  stopped, you were in that rear passenger's seat
12  behind Mr. Aldaco, right?
13      A.    Yes.
14      Q.    And you opened the door, that rear
15  passenger door, of the Tahoe; is that accurate?
16      A.    Yeah, it is.
17      Q.    And you stepped out of the -- the Tahoe;
18  is that correct?
19      A.    Yes, I did.
20      Q.    Did you turn to look to your right when
21  you stepped out of the Tahoe?
22      A.    When I got out, I was facing -- I don't
23  know what -- I was facing towards -- there was
24  houses on the sides.
25      Q.    So when you first got out -- and I can put
```



Angel Sanchez                                                November 05, 2024
                                                                    Page 68

1    up one of the photographs.  Just give me one

2    minute.  My apologies.

3              Let me ask you this:  Have you ever been

4    pulled over by the police before?

5              MS. LEAP:  I will instruct my client not

6    to answer on the basis that it implicates his Fifth

7    Amendment privilege against self-incrimination.

8    And is also vague and ambiguous.

9              (Transcript marked.)

10       Q.   BY MS. WILFERT:  Have you ever been

11   involved in a pursuit with law enforcement before?

12             MS. LEAP:  I'll instruct my client not to

13   answer on the basis that it implicates his Fifth

14   Amendment privilege against self-incrimination.

15   Calls for a legal conclusion and is vague and

16   ambiguous.

17             (Transcript marked.)

18       Q.   BY MS. WILFERT:  Were you involved in an

19   incident with Xavier Mercado, where he possessed a

20   gun and you were involved in a pursuit with law

21   enforcement?

22             MS. LEAP:  I will instruct my client not

23   to answer on the basis that it implicates his Fifth

24   Amendment privilege against self-incrimination.

25       Q.   BY MS. WILFERT:  Are you refusing to



Angel Sanchez

November 05, 2024
Page 69

```
 1   answer?

 2       A.    Yes, I am.

 3             (Transcript marked.)

 4       MS. LEAP:  I'll also add that the question

 5   lacks foundation.

 6       Q.    BY MS. WILFERT:  And, Mr. Sanchez, when

 7   you were involved in that pursuit with law

 8   enforcement, did you injure someone during the

 9   pursuit?

10             MS. LEAP:  Lacks foundation.  Vague and

11   ambiguous as to "pursuit."  Calls for a legal

12   conclusion as to "pursuit."  And I will instruct my

13   client not to answer on the basis that it

14   implicates his Fifth Amendment privilege against

15   self-incrimination.

16             (Transcript marked.)

17       Q.    BY MS. WILFERT:  And do you know what a

18   pursuit is, Mr. Sanchez?

19       A.    Yeah.

20       Q.    What is it?

21       A.    When you're trying to go after somebody, I

22   believe.

23       Q.    So when law enforcement is attempting to

24   make a traffic stop and someone is not stopping, is

25   that your understanding of a pursuit?
```



 1        A.   Doesn't have to be law enforcement.  Could
 2   be a dog trying to get a cat; they're in pursuit of
 3   a cat.  I believe that's what it means.
 4        Q.   So I want to go back to where you were at
 5   the -- the Tahoe is stopped.
 6             And what location did the Tahoe stop?
 7        A.   Like I said earlier, I don't know the
 8   exact address where it stopped.
 9        Q.   So once the Tahoe stopped, you got out of
10   the car, right?
11        A.   Yes.
12        Q.   Why did you get out of the car?
13        A.   My plan was to run and hide the gun so I
14   didn't get in trouble for it.
15        Q.   So I want to take you back to where you're
16   about to get out of the car.
17             So you retrieved the gun from under the
18   seat; is that accurate?
19             MS. LEAP:  I'm sorry, Counsel.  You cut
20   out for the first part of your question.  I didn't
21   hear it.
22             THE WITNESS:  Me neither.
23             MS. WILFERT:  I want to go back to where
24   he's about to get out of the Tahoe after it
25   stopped, and this is on the date of the incident.



Angel Sanchez                                          November 05, 2024
                                                       Page 71

```
 1        Q.    Did you reach under that passenger seat to

 2   get the gun?

 3        A.    Yes, I did.

 4        Q.    After you got the gun from under the

 5   passenger seat, where -- what hand was it in?

 6        A.    I believe it was on my right hand.

 7        Q.    So then I want you to envision as you're

 8   trying to get out of the car, you have a gun in

 9   your right hand.  Do you open the -- the car door

10   with your left hand?

11        A.    Yeah, I believe I did.

12        Q.    And you pushed the car door open with your

13   left hand, right?  Is that accurate?

14        A.    Yeah.

15        Q.    And when you get out of the Tahoe, do

16   you -- describe.  Is it your right foot?  Does your

17   right foot hit the ground first?

18        A.    I don't remember.

19        Q.    So you get out of the Tahoe.  You have a

20   gun in your right hand.

21              And is the gun pointing forward towards

22   the houses?

23        A.    No.

24        Q.    Where is the gun pointed?

25        A.    Down.
```



Angel Sanchez                                        November 05, 2024
                                                              Page 72

1        Q.    Down.   The barrel of the gun is pointing

2    down?

3        A.    Yes.

4        Q.    And you turn to your right to look at

5    Officer Camacho; is that accurate?

6        A.    No.

7        Q.    Did you ever turn to look to the right?

8        A.    No.

9        Q.    You never saw anyone to your right?

10       A.    No.

11       Q.    And you heard -- before you got out of the

12   car -- let me back up -- you heard an officer

13   giving you commands, correct?

14       A.    No.   I didn't hear anything.

15       Q.    So you step out of the car, gun in your

16   right hand, you don't look to your right, and the

17   barrel's pointing down to the ground.

18            And then what do you do next?

19       A.    I run towards the direction of the houses.

20   I don't know what -- if it's north or west or what,

21   but the direction of the houses.  I took a couple

22   steps, and I threw the gun, and then I felt the

23   shots.

24       Q.    So when you stepped out of the car, you

25   heard an officer giving you commands at that point,



Angel Sanchez                                November 05, 2024
                                                   Page 73

```
 1   correct?
 2       A.   I already said I didn't.
 3            MS. LEAP:  Asked and answered.  And
 4   misstates testimony.
 5       Q.   BY MS. WILFERT:  And you decided to run,
 6   right?  So you ran away from where the black
 7   Charger was, right?
 8       A.   Yes.
 9       Q.   And did you ever look to your right to see
10   what uniforms the officers are wearing or -- did
11   you ever look to your right?
12       A.   No.
13            MS. LEAP:  Asked and answered.
14       Q.   BY MS. WILFERT:  So were you pretty
15   nervous that day?
16            MS. LEAP:  Vague as to time.
17            MS. WILFERT:  Let me rephrase it.
18       Q.   On the date of the incident when you were
19   getting out of the car, do you know -- hold on one
20   second.  I'm sorry.
21            When you were getting out of the car, were
22   you nervous?
23       A.   I wouldn't say nervous.  I would say more
24   worried.  I didn't want to get in trouble for
25   having it.
```



Angel Sanchez                                                November 05, 2024
                                                                    Page 74

```
 1        Q.    So you were scared?

 2        A.    Not scared.  Like I said, worried.

 3        Q.    And did you hear anything that -- or

 4   did -- before you got out of a car, did Ingrid say

 5   anything to you?

 6        A.    I don't think so.

 7        Q.    Did Mr. Aldaco say anything to you?

 8        A.    I don't believe so.

 9        Q.    And you did not hear any commands from

10   officers before you --

11        A.    No.

12        Q.    -- got out of the car?

13              And after you got out of the car, you ran

14   away from where the black Dodge Charger was,

15   correct?

16        A.    Yes.

17        Q.    Do you know how much time passed between

18   when you got out of the car with a gun in your

19   right hand to the point that you heard the shots?

20        A.    I can't give you an exact time.  I wasn't

21   counting.  But it was -- as I threw the gun, I felt

22   the shots.

23        Q.    So you have -- you don't know the exact

24   time?

25        A.    No.
```



Angel Sanchez

November 05, 2024
Page 75

1      Q.    You have the gun in your right hand.   And
2  when you ran, did you drop the gun down and start
3  to run?
4      A.    It was pointing down, yes.
5      Q.    Was it pointing down at your waist level,
6  or was it all the way down to the ground?
7      A.    I -- I don't understand the question.
8      Q.    If you could demonstrate on the video
9  exactly how you were holding the gun as soon as you
10  exited the passenger's side of the Tahoe.   If you
11  could stand up and show me exactly how you were
12  holding it.
13      A.    Sorry.   I don't -- so I had it like this.
14  It was lowered.   I guess I -- goddamn it, I don't
15  know how to -- sorry.   I'm trying to --
16          MS. LEAP:   Yeah.   I'll just object to the
17  extent that this demonstrative is unable to capture
18  exactly how someone would be leaving a vehicle.
19          And I'll also object to the extent that it
20  -- Mr. Sanchez has injuries in his legs, and it
21  might make it difficult for him to do that
22  demonstration.
23          But if he's able to, then we can try.
24      Q.    BY MS. WILFERT:   Well, Mr. Sanchez, you
25  can -- you can sit down if you're more comfortable.



Angel Sanchez                                    November 05, 2024
                                                 Page 76

```
 1   I don't want you to be uncomfortable demonstrating
 2   to us how you were holding the gun that day.  But
 3   I'd like to see with your hands how you were
 4   holding the gun.
 5          So if you could just demonstrate with your
 6   hands the direction the barrel of the gun was
 7   pointing.
 8          Was it pointing down all the way to the
 9   ground, or was it pointing up at waist level?  If
10   you can do that with your --
11      A.   Yeah.  So let's say this was the barrel.
12      Q.   Yes.
13      A.   Like that, down.
14      Q.   So it was on your right side?
15      A.   Yeah.  It was like -- actually, let me
16   try -- I'll try to show you guys.  Let's see.  Like
17   this.  Can you see my thigh, my right thigh?
18      Q.   Uh-huh.
19      A.   Pointing down.
20      Q.   When you exited the car -- thank you,
21   Mr. Sanchez.
22          When you exited the car, are you saying
23   that you had your left hand on the door and you had
24   the gun in your right hand, right?  Are you saying
25   when you exited the car that the gun was -- let me
```



Angel Sanchez                                      November 05, 2024
                                                   Page 77

```
 1  back up.
 2          Before you exited the car, you opened the
 3  door.  You had a gun in your right hand.
 4          Was the gun all the way straight down in
 5  the car before you got out, or was it up?
 6      A.   I can't say for certain.  I believe it was
 7  pointing down.
 8      Q.   It was pointing down before you got out of
 9  the car?
10      A.   No.
11      Q.   Was there a moment as you got out of the
12  car that the gun was at a higher level than
13  straight down?  Was there a moment?
14          MS. LEAP:  Vague and ambiguous as to time.
15  And asked and answered.
16          But he can answer.
17          THE WITNESS:  I don't believe it was ever
18  pointing up.
19      Q.   BY MS. WILFERT:  Was it at waist level as
20  you got out of the car?
21      A.   Do you mean the direction of the barrel --
22      Q.   Yes.
23      A.   -- or the gun?
24      Q.   The direction of the barrel of the gun.
25  So if you have it in your hand like this, when you
```



 1    initially got out of the car, was it at waist level

 2    and then you dropped it down?

 3         A.    No.  It was pointing down the whole time.

 4         Q.    Even before you got out of the car is what

 5    you're saying?

 6         A.    Yeah.

 7         Q.    So in your complaint, Mr. Camacho, you

 8    allege that Mr. -- or Officer Castro and Officer

 9    Camacho were dressed in plain clothes; is that

10    true?

11         A.    I believe so, yeah.

12         Q.    But your testimony is after you got out of

13    the Tahoe, you didn't look to your right at them.

14         A.    Well, I saw them when I was on the ground.

15         Q.    But did you see them when you first got

16    out?

17         A.    No, I did not.

18         Q.    So the first time that you're testifying

19    that you saw officers was after you were shot?

20         A.    Yes.

21         MS. LEAP:  It's been another half hour.

22    Should we take a break or -- take a break soon?

23         MS. WILFERT:  Yeah, I'm -- if you need a

24    break, no problem.  I was just going to show

25    another exhibit, but we can -- we can break.



1          MS. LEAP:  Okay.  Thank you.

2          THE VIDEOGRAPHER:  We are off record at

3     1:17.

4               (The noon recess was taken.)

5                    ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Angel Sanchez                                              November 05, 2024
                                                                    Page 80

```
 1         REMOTE VIA ZOOM, CALIFORNIA, NOVEMBER 5, 2025
 2                    AFTERNOON SESSION
 3                        ---o0o---
 4         THE VIDEOGRAPHER:  We are back on record
 5    at 1:37.
 6      Q.   BY MS. WILFERT:  And, Mr. Sanchez, you
 7    remember you're still under oath, right?
 8      A.   Yes, I do.
 9      Q.   Thank you.
10         So on the date of the incident, I know you
11    testified you were --
12              (Discussion off the record.)
13      Q.   BY MS. WILFERT:  You were a passenger in
14    the black Chevy Tahoe, and you were sitting behind
15    Mr. Aldaco; is that accurate?
16      A.   Yes, it is.
17      Q.   And that black Dodge Charger that you saw
18    initially at the intersection of Cavette and
19    Phelan, you knew that was a Baldwin Park Police
20    Department undercover vehicle, right?
21         MS. LEAP:  Calls for speculation and lacks
22    foundation and vague and ambiguous and calls for a
23    legal conclusion.
24         But to the extent that he knows, he can
25    answer.
```



Angel Sanchez                                    November 05, 2024
                                                          Page 81

```
 1              THE WITNESS:  I knew it was the police
 2     because they flashed the bright white light at us.
 3         Q.   BY MS. WILFERT:  And had you seen that
 4     black Dodge Charger in the area before?
 5         A.   I believe I've seen it before.
 6         Q.   And are you aware -- this is only if
 7     you're aware -- that that black Dodge Charger does
 8     gang enforcement in the City of Baldwin Park?
 9              Are you aware of that?
10         A.   I figured it could be detectives as well.
11         Q.   So you knew the black Dodge Charger, when
12     it flashed you, the light, you knew it was a police
13     car, right?
14         A.   Yes.
15         Q.   Now, I just want to talk to you.  After
16     the traffic stop, when you got out of that black
17     Chevy Tahoe, you knew that there were officers to
18     the right of you in that black Dodge Charger,
19     correct?
20         A.   I knew there was a car behind us.
21         Q.   You knew that that car had officers,
22     right?
23         A.   I didn't know if there was officer or
24     officers.
25         Q.   But you knew it was law enforcement,
```



Angel Sanchez                                    November 05, 2024
Page 82

```
 1   right?
 2         A.    Yes, I did.
 3         Q.    And you testified earlier, though, when
 4   you exited that black Chevy Tahoe initially, you
 5   didn't look to your right, and you didn't see
 6   Officer Castro and Officer Camacho; is that
 7   accurate?
 8         A.    Correct, I didn't see any of them.
 9         Q.    So you didn't see the clothing that
10   Officer Castro or Officer Camacho was wearing when
11   you looked -- or when you exited that black Chevy
12   Tahoe?
13         A.    When I exited the vehicle, I did not see
14   them at all.
15         Q.    Now, when you exited the -- the black
16   Chevy Tahoe, did you talk to Jesus Aldaco and say
17   anything about being worried about having this gun
18   on you?
19         A.    I don't think I did.
20         Q.    Did you say anything to -- to Ms. Ingrid
21   Molina?  Did you say anything to her that you had a
22   gun on you and you were going to run?
23               Did you say anything like that?
24         A.    I don't believe so.
25         Q.    Did you tell Mr. Aldaco or Ms. Molina
```



Angel Sanchez                                                          November 05, 2024
                                                                               Page 83

```
 1   before you exited the black Chevy Tahoe at the

 2   traffic stop that you were going to run?

 3       A.    I don't believe I did.

 4       Q.    And have you ever been contacted by police

 5   officers before in your lifetime?

 6              MS. LEAP:  I'm going to instruct my

 7   client not to answer on the basis that it

 8   implicates his Fifth Amendment privilege against

 9   self-incrimination, and is vague and ambiguous.

10   That's all.

11       Q.    BY MS. WILFERT:  Are you refusing to

12   answer, Mr. Sanchez?

13       A.    Yes, I am.

14              (Transcript marked.)

15       Q.    BY MS. WILFERT:  So, Mr. Sanchez, when --

16   hypothetically, when an officer gives you orders,

17   do you have to follow them?

18              MS. LEAP:  Calls for a legal conclusion.

19   Incomplete hypothetical.  Vague and ambiguous.

20              He can answer to the extent that he knows.

21              THE WITNESS:  Yeah.

22       Q.    BY MS. WILFERT:  So if an officer,

23   hypothetically, tells you to stay in a vehicle,

24   then are you supposed to follow that officer's

25   orders?
```



1          MS. LEAP:  Incomplete hypothetical.  Calls

2     for a legal conclusion and expert opinion and is

3     vague and ambiguous.  It also lacks foundation and

4     calls for speculation.

5          To the extent that he knows as a civilian,

6     he can answer.

7          THE WITNESS:  Yeah.

8     Q.   BY MS. WILFERT:  Did you hear -- when you

9     exited the Chevy Tahoe, did you hear Officer

10    Camacho give you orders to stay in the car?

11    A.   No.

12    Q.   Did you ever see Officer Camacho exit the

13    Dodge Charger and approach the black Chevy Tahoe?

14    A.   I'm sorry.  You cut off for me a little

15    bit.

16    Q.   Did you ever see Officer Camacho exit that

17    black Dodge Charger and approach the black Chevy

18    Tahoe?

19    A.   No, I did not.

20    Q.   Did you ever see Officer Camacho have his

21    firearm drawn as he approached the Tahoe?

22    A.   No, I did not.

23    Q.   So when you opened the passenger -- rear

24    passenger door of the black Chevy Tahoe, you

25    started to run away from Officer Camacho; is that



1    accurate?

2         A.    I started to run, yes.

3         Q.    And who were you running from?

4         A.    The cop car behind us.

5         Q.    When you're on a traffic stop like that,

6    are you supposed to run from the vehicle that

7    you're in?

8               MS. LEAP:  Objection.  Calls for a legal

9    conclusion.  Lacks foundation and calls for

10   speculation.  Calls for an expert opinion.

11              But to the extent that he knows, he can

12   answer.

13              THE WITNESS:  I don't believe so.

14        Q.    BY MS. WILFERT:  So you are aware you're

15   not supposed to run from the police, but you ran

16   anyways; is that accurate?

17              MS. LEAP:  Misstates testimony.

18              But he can answer.

19              THE WITNESS:  I'm sorry.  Can you repeat

20   the question?

21        Q.    BY MS. WILFERT:  So you're aware that

22   you're not supposed to run from police, right, when

23   they contact you on a traffic stop?

24        A.    Yeah.

25        Q.    But you ran anyway?



1    A.   Yeah.  Because I didn't want to get in

2  trouble.

3    Q.   Now, when you ran away from the officers,

4  you were aware that that's against the law, right?

5         MS. LEAP:  Vague and ambiguous and lacks

6  foundation.  Calls for speculation.

7         But he can answer if he knows.

8         THE WITNESS:  I believe it is.

9    Q.   BY MS. WILFERT:  And what direction did

10 you run in when you ran away from officers on the

11 date of the incident?  In what direction did you

12 run in?

13   A.   Away from the cop car.

14   Q.   And did you hear anything after you ran --

15 or did you hear anything after you got out of the

16 rear passenger door of the Chevy Tahoe?

17   A.   I didn't hear anything, and so I threw the

18 gun.  All I heard was shots.

19   Q.   How many shots did you hear?

20   A.   It was a lot.  Maybe, like, seven.

21   Q.   Do you have any evidence or witnesses that

22 support that?

23        MS. LEAP:  Calls for a legal conclusion as

24 to "evidence."  Vague and ambiguous.

25        But to the extent that he knows, you can



Angel Sanchez                                    November 05, 2024
                                                      Page 87

```
 1   answer.
 2          THE WITNESS:  Do I -- I don't think so.
 3   The other people that were there, I guess.
 4       Q.   BY MS. WILFERT:  Are you referring to
 5   Ingrid Molina and Jesus Aldaco?
 6       A.   Yeah.
 7       Q.   When you ran away from the cop cars, did
 8   you run into -- (digital interference) --
 9              (Discussion off the record.)
10       Q.   BY MS. WILFERT:  When you ran away from
11   the officers, did you ever run into Phelan Street?
12       A.   We were on Phelan Street.
13       Q.   Right.  But did you run towards the
14   street?  Like, when you were running, were you on
15   the sidewalk?
16       A.   Yeah, on the sidewalk.
17       Q.   Did you ever enter the street when you
18   were --
19       A.   No, I don't think so.
20       Q.   And when you were running, were you
21   running the whole time with the gun pointed down at
22   the ground?
23       A.   Yeah.  I had it pointed down to the
24   ground, and it was -- I was trying to hide it,
25   like, so nobody could see, like, in my right -- I
```



Angel Sanchez                                    November 05, 2024
                                                        Page 88

 1    had it in my right hand on my right thigh, like, in

 2    front of it.

 3        Q.   So you took the gun that was on your side,

 4    and you moved it to the front of your right thigh.

 5    Then you ran?

 6        A.   Exit the car --

 7             MS. LEAP:  Vague -- sorry.  Vague as to

 8    time.

 9             THE WITNESS:  I took the car [sic] from

10    under the seat.  It was in my right hand.  Pointed

11    it down.  I got out, ran, and I had it -- because I

12    didn't want them to see it.  It was like -- like,

13    hitting where my thigh was.  I was trying to use my

14    thigh to hide it.

15        Q.   BY MS. WILFERT:  So then you exited -- let

16    me get this straight.  You exited the Tahoe -- this

17    is after the traffic stop.  You exited the Tahoe.

18    You get out of the Tahoe.  You don't say anything

19    to anybody.  And then you don't hear any officers

20    saying anything to you.  And the gun is in your

21    right hand to your side; is that accurate?

22        A.   Yeah.

23        Q.   And then you start running.  Do you turn

24    to run?

25             MS. LEAP:  Vague and ambiguous.



Angel Sanchez                                    November 05, 2024
                                                        Page 89

```
 1        Q.   BY MS. WILFERT:  Let me rephrase it.
 2             When you start running, do you have to
 3   turn your body?
 4             MS. LEAP:  Same objection.
 5             THE WITNESS:  I was facing the -- so I got
 6   out.  I was facing the -- like, at an angle, the
 7   houses that were on the side, and then I ran up the
 8   street.
 9        Q.   BY MS. WILFERT:  So did you -- sorry to
10   interrupt you.  Go ahead.
11        A.   No, that's fine.  Go ahead.
12        Q.   You said you ran up the street and you...
13        A.   And I threw the gun.
14        Q.   So when you threw the gun, you had to lift
15   it up into the air; is that accurate?
16        A.   More like I threw it at an angle, like,
17   not straight up like that.  I threw it at an angle.
18        Q.   So you're demonstrating.  You're at waist
19   level -- or sorry -- chest level.  And you're -- is
20   it at chest level or no?
21        A.   No.  It's because I'm sitting down.
22   That's why it's at chest level.
23        Q.   So what level was it at, if you can
24   describe?
25        A.   Like I said, below my waist, like, kind of
```




Angel Sanchez                                    November 05, 2024
                                                Page 90

1    by my thigh.

2        Q.    So below your waist by your thigh.  Then

3    you threw it over a fence, right?  Is that what

4    you're testifying to?

5        A.    Yes.  Correct.

6        Q.    Did you see anyone on the street after you

7    exited the Tahoe and started running?  Did you see

8    any other people on the street?

9        A.    I don't -- I'm not sure.

10       Q.    Do you remember seeing anyone?

11       A.    I don't remember.

12       Q.    Sorry.  One moment, please.

13            So after you -- after you heard the -- on

14   the date of the incident, after you heard the

15   gunshots, what happened after that, if you could

16   tell me?

17       A.    Well, I was -- I got struck by the

18   gunshots.

19       Q.    And if you can describe where you were

20   struck.

21       A.    Behind -- like, behind my leg.

22       Q.    Anywhere else on your body?

23       A.    Yeah.  I felt on my right, like, in the

24   back of my thigh, my butt, yeah.

25       Q.    And after you were struck, what happened?



Angel Sanchez

1  What happened next?

2      A.    I ended up falling on the ground.  I fell,

3  like -- like, not face -- well, yeah, face first,

4  like, stomach first.  And I -- I rolled over,

5  because he told me to put my hands in the air.

6  That's what I did.  And he just had the gun pointed

7  at me.  And he just kept screaming, "Where's the

8  gun?  Where's the gun?"

9          And I told him, "What gun?"  And then he

10  just kept the gun pointed at me and told me to keep

11  my hands up, which I did.

12          And then once -- I think -- once the

13  other -- yeah, once the other officers arrived, he

14  approached me slowly.  He dragged me by my foot.

15  He dragged me forward, and he realized there was no

16  gun there.  And he was, like, sweating, panicking,

17  saying, "Where's the gun?  Where's the gun?"

18          And then he put a -- once he realized it

19  wasn't there and all the backup was there, he put a

20  tourniquet on me.  And then when the other officers

21  came to help render aid and the firefighters, they

22  realized he put the tourniquet wrong on me, and I

23  was bleeding more.

24          And then I think they fixed the tourniquet

25  and placed a new one.  They cut my clothes.  And I



 1    think that's when the EMTs arrived, and they took

 2    me to the hospital.

 3        Q.    So when the officer -- on the date of the

 4    incident when the officer, you said, dragged you by

 5    your foot?

 6        A.    Yeah, he grabbed my leg.  Like, from my

 7    ankle, he grabbed me and dragged me.

 8        Q.    So what ankle did the officer grab?

 9        A.    It was -- I believe it was my left leg,

10    yeah.

11        Q.    And did the officer -- did an officer

12    search you right after that?

13        A.    I think they did, yeah.

14        Q.    So they searched to see if they could find

15    a weapon on you, right?

16        A.    Yeah.

17        Q.    Did you have any other weapons on you that

18    night?

19        A.    No.

20        Q.    Did you have a knife on you that night?

21        A.    No.

22            MS. WILFERT:  I'm showing you -- I think

23    we're on Exhibit 5 now.

24            Is that accurate, Ms. Dunlap?

25            COURT REPORTER:  Yes, it is.



Angel Sanchez                                      November 05, 2024
                                                          Page 93

```
 1              MS. WILFERT:  Thank you.
 2                   (Reporter marked Exhibit No. 5 for
 3                    identification.)
 4       Q.   BY MS. WILFERT:  So I'm showing you what's
 5   been marked as Exhibit 5.
 6              Do you recognize this individual in the
 7   photograph?
 8       A.   I mean, he has a mask on, but I can see
 9   his name, Camacho.
10       Q.   I'm showing you COBP 001185.  And I'm
11   going to page 2 of that.  It's COPB -- BP 001186.
12              So you recognize this as Officer Camacho;
13   is that accurate?
14       A.   Yeah.
15       Q.   And is this a fair and accurate depiction
16   of how Officer Camacho looked on the -- at the time
17   of the incident?
18       A.   I mean -- I mean, yeah.  I mean, I don't
19   really check him out.  I don't -- I'm pretty sure,
20   yeah.
21       Q.   And after when you said you were contacted
22   by the officers after you were shot, did you see
23   the officers' uniforms at that time?
24       A.   Yeah.  I saw when he was -- I was on the
25   ground, and he was pointing the gun at me.
```



MAGNA
LEGAL SERVICES

Angel Sanchez

1    Q.    So you saw "police" on his vest, correct?

2    A.    Yes.  After I was already on the ground.

3    Q.    And you saw a badge; is that accurate?

4    A.    Yes.  After I was already shot.

5    Q.    And I'm showing you -- and was Officer

6   Camacho the one that placed the tourniquet on you?

7    A.    Yeah.  He placed a tourniquet incorrectly

8   on me.

9    Q.    Mr. Sanchez, do you have any medical

10  background -- or do you have a medical background?

11   A.    Like, did I go to law school -- I mean med

12  school?  Is that what you're asking?

13   Q.    Med school or any sort of medical

14  background.

15   A.    When I was in high school, I took -- what

16  was that class called?  I forgot.  It was a medical

17  class, medical care, something like that.

18   Q.    But do you have any certifications at all

19  in medicine?

20   A.    No, ma'am.

21   Q.    Any medical training, background?

22   A.    No, ma'am.

23        MS. WILFERT:  So I'm showing you another

24  exhibit.  This is Exhibit 6.

25            (Reporter marked Exhibit No. 6 for



Angel Sanchez

November 05, 2024
Page 95

```
 1                    identification.)
 2       Q.   BY MS. WILFERT:  Mr. Sanchez, do you
 3   recognize the individual in this photograph?
 4       A.   Yes, I do.
 5       Q.   And -- and who is this individual; do you
 6   know?
 7       A.   I believe Officer Castro.
 8       Q.   And have you had contact with Officer
 9   Castro before?
10            MS. LEAP:  I'll instruct my client not to
11   answer that on the basis that it implicates his
12   Fifth Amendment privilege against
13   self-incrimination.
14       Q.   BY MS. WILFERT:  Are you refusing to
15   answer, Mr. Sanchez?
16       A.   Yes, I am.
17                 (Transcript marked.)
18       Q.   BY MS. WILFERT:  Now, Mr. Sanchez, in the
19   photograph -- or actually, let me back up.
20            On the date of the incident, did you
21   see -- when was the first time you saw Officer
22   Camacho?
23       A.   Camacho?
24       Q.   Castro.  Thank you.  Castro.
25       A.   When I was on the ground.  He was pointing
```



```
 1   the flashlight at me.  Yeah.  He was also on the
 2   street, and he was pointing it at me too.  I
 3   believe the flashlight was on his gun.  They both
 4   had their guns.
 5        Q.   So let's go back to when you initially saw
 6   Officer Castro in the street.
 7             Where was he standing?  Can you describe
 8   it?
 9        A.   I don't know exactly where.  I just know
10   he was on the street.
11        Q.   Was this after you exited the black Chevy
12   Tahoe?
13        A.   I was on the ground already.  I had been
14   shot.
15        Q.   So when you're on the ground, the first
16   time you see Officer Castro is when he's in the
17   street?
18        A.   Yeah.
19        Q.   And you see Officer Castro's uniform?
20        A.   I saw that he was wearing blue jeans,
21   yeah.
22        Q.   And you saw the black vest that he was
23   wearing?
24        A.   Yeah.  After I was shot.
25        Q.   And you saw "police" written across the
```



Angel Sanchez                                          November 05, 2024
                                                              Page 97

 1   front of it; is that accurate?

 2        A.   Yes.  When I was on the ground.

 3        Q.   And did you hear Officer Castro give you

 4   any orders on the night of the incident?

 5        A.   I think he just -- I'm not sure.  I just

 6   kept hearing, "Keep your hands up," and "Where's

 7   the gun?"  Mostly, it was just Camacho.  I don't

 8   know if I heard Castro say anything.

 9             MS. WILFERT:  So just to let you know, I'm

10   going to show photographs from the scene of the

11   incident.

12             And, Ms. Dunlap, the last exhibit with

13   Officer Castro, could you please mark that as 6.

14             This will be Exhibit 7.  One moment.  I'm

15   sharing my screen.

16                  (Reporter marked Exhibit No. 7 for

17                   identification.)

18        Q.   BY MS. WILFERT:  So this is -- I'm showing

19   you what's been marked as exhibit -- I believe this

20   is 7.  It consists of 99 photographs from the

21   scene.

22             So this first photograph, COBP 001855, do

23   you recognize this photograph, Mr. Sanchez?

24        A.   Yeah, I do.

25        Q.   And what is this a photograph of, if you



Angel Sanchez                                    November 05, 2024
Page 98

```
 1  could tell us?
 2      A.   Where I was shot.
 3      Q.   And is this a fair and accurate depiction
 4  of how the scene looked on the night of the
 5  incident?
 6      A.   For the most part, yeah, I guess.
 7      Q.   So on the left side of the picture,
 8  there's the Chevy Tahoe.
 9           Do you see that?
10      A.   Yes, I do.
11      Q.   Can you tell us where you were when you
12  first threw the gun on the night of the incident,
13  the location you were in this photograph.
14      A.   Like, by the street.  I don't -- I don't
15  know where -- how to show you.
16      Q.   So you said you were by the street; is
17  that accurate?
18      A.   No.  I mean on the sidewalk, I mean.
19      Q.   You were on the sidewalk.
20           Is there an item in the photograph that I
21  can use my pointer -- and I can hold it over that
22  area.  If you can describe a particular area in the
23  photograph of where you were when you initially
24  threw the gun.
25           MS. LEAP:  And I'll just object to the
```



Angel Sanchez                                        November 05, 2024
                                                               Page 99

1   extent that this photo is a two-dimensional
2   representation from behind the Tahoe and is not
3   very easy to see --
4               THE WITNESS:  Yes.
5               MS. LEAP:  -- where things are.
6               But to the extent that he is able to
7   estimate, he -- he can.
8               THE WITNESS:  I mean, like she said, it's
9   kind of hard to -- maybe, like, a couple steps.  I
10  don't know.  Like, a couple steps.  So a couple
11  steps from the passenger car going up, the back
12  passenger, where I was sitting, as far as --
13      Q.  You say a couple of steps on the sidewalk,
14  is that right, from where the back passenger's side
15  door is?
16      A.  Where I was sitting.
17      Q.  So when you exited the -- the Tahoe, you
18  were -- were you facing straight ahead, this white
19  metal fence?
20      A.  Yeah.  Kind of toward an angle.  Not --
21  toward an angle facing the other way, going up the
22  street.
23      Q.  So when you first exited, you were facing
24  somewhat of an angle; is that right?
25      A.  Yeah, to the -- to the house.



Angel Sanchez                                    November 05, 2024
                                                 Page 100

 1        Q.   And your right hand was down your right
 2   side, right?
 3        A.   Correct.
 4        Q.   So to the right of where your right hand
 5   was, there was the police vehicle, right?
 6        A.   I'm not sure where it was at.  I didn't
 7   see it.
 8        Q.   You remember the traffic stop, right,
 9   Mr. -- Mr. Sanchez?  You -- you remember the
10   traffic stop, right?
11        A.   Yeah.
12        Q.   And you remember the police vehicle that
13   was directly behind the Tahoe?  Do you remember
14   that?
15        A.   I don't know how far they were from us.  I
16   never looked back.  I didn't look in the direction.
17        Q.   But you knew that to the right there
18   were -- there was a police vehicle; is that
19   accurate?
20        A.   I mean, behind us, there was.
21             MS. LEAP:  Mis -- yeah.  Misstates
22   testimony and the evidence in the record so far.
23             But to the extent that he can answer, he
24   can.
25             THE WITNESS:  Yeah.  Like I said, I knew



Angel Sanchez                                        November 05, 2024
Page 101

```
 1   there was a police vehicle behind us.
 2       Q.   BY MS. WILFERT:  So the gun is at your
 3   right side.  You're at an angle.
 4            And do you turn to run down the sidewalk
 5   past the front part of the Tahoe?  Is that --
 6       A.   Yeah.  That was my -- the direction I was
 7   heading towards.
 8       Q.   And at what point did you throw the gun as
 9   you're running?  What location were you at?
10       A.   About where I said, a couple steps up the
11   sidewalk past the passenger's seat.
12       Q.   So right about here, where the clothing is
13   on the ground, the white shirt?
14       A.   It is a hard picture to look at, but,
15   like, if you want an estimate --
16       Q.   Let me see if I can fix it for you, okay.
17   Let's go to photograph 2, which is COBP 001856.
18            Do you see that?  Is that a better view?
19   And it's showing a black Tahoe to the left and this
20   white fence to your right.
21            Do you see that photograph?
22       A.   Yeah.
23       Q.   And do you recognize the scene from the
24   night of the incident?
25       A.   Yes, I do.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 102

1        Q.    And is this a fair and accurate depiction
2   of the scene how it looked on the night of the
3   incident?
4        A.    Yeah.
5        Q.    So can you see the white roses that are in
6   this photograph?  It's right next to a white
7   pillar.
8        A.    Yes, I do.
9        Q.    Did you throw the gun past these white
10  roses up towards -- away from where the police
11  vehicle was?
12       A.    No.  I threw it at, like, a -- like, a
13  2:00 angle.  I threw it like that.
14       Q.    And were you right by the white roses
15  here, or were you past it when you threw the gun?
16       A.    I wasn't even -- I was past it.
17       Q.    You're past it.
18             So were you at this next pillar past these
19  white roses when you threw the gun?
20       A.    It could have -- estimation, yeah.  It
21  could have been right there.
22       Q.    So in this photograph, there's -- past the
23  white roses, there's a white pillar where this
24  white iron fence is.
25             So it's your testimony that you're about



```
1    right here when you threw the gun, correct?

2         A.    An estimate.

3         Q.    That's at the -- the white pillar past the

4    white roses.

5              Now, I want to go back to where you said

6    you were.  After you were shot, the officer dragged

7    you by your left leg asking you where the gun

8    was -- or your left ankle asking you where the gun

9    was.

10             From the point where you were shot to the

11   point where Officer Camacho applied a tourniquet,

12   how much time passed, if you know?

13        A.    I was not counting.  I thought I was going

14   to die.

15        Q.    Do you know how much time had passed from

16   the point that you were shot to the point that

17   additional officers arrived at the scene, other

18   than Officers Camacho and Castro?  Do you know how

19   much time passed?

20        A.    I'm not sure.  For me, it felt like

21   forever, but I'm not sure.

22        Q.    Do you know how much time passed, if you

23   can estimate, Mr. Sanchez, from the point that you

24   were shot to the point that the first paramedic

25   arrived at the location and started rendering aid
```



```
 1   to you?
 2        A.    I'm not sure.  It felt like a long time to
 3   me, but I'm not sure.
 4        Q.    Do you know how much time passed -- or do
 5   you know if after you were shot, if the fire
 6   department arrived first or the paramedics?
 7        A.    The fire department did arrive first.
 8        Q.    So do you know how much time passed from
 9   the point that you were shot to the point the fire
10   department arrived?
11        A.    I'm not sure how long it took.
12        Q.    So it's fair to say that Officer Camacho
13   rendered medical care to you; is that accurate?
14             MS. LEAP:  Objection to the extent that
15   the question calls for an expert opinion and a
16   legal conclusion.
17             But to the extent that he knows, he can --
18   he can answer.  It's also vague and ambiguous.
19             But he can answer.
20             THE WITNESS:  After a good while of
21   pointing a gun at me, yeah, he did.
22        Q.    BY MS. WILFERT:  So how much time passed,
23   Mr. Sanchez, between when you were shot to the
24   point that Officer Camacho applied a tourniquet?
25   How much time passed?
```



Angel Sanchez                                      November 05, 2024
                                                   Page 105

```
 1        A.   I mean, like I said, I wasn't taking the
 2   time, but it felt like forever.  He just kept it
 3   pointed at me.  And before he rendered aid, he
 4   dragged me by my leg.
 5        Q.   And when the officer dragged you by your
 6   ankle, he was asking you where the gun was at; is
 7   that fair to say?
 8        A.   He just kept screaming it.  Right -- right
 9   when I dropped it, he just told me to put my hands
10   up, and he just kept screaming, "Where's the gun?
11   Where's the gun?"
12        Q.   Did you tell Officer Camacho where the gun
13   was?
14        A.   I told him "What gun?"
15        Q.   Did you lie to Officer Camacho?
16             MS. LEAP:  Vague and ambiguous.
17             But he can answer to the extent that he's
18   able.
19             THE WITNESS:  I just said, "What gun?"
20        Q.   BY MS. WILFERT:  So did you lie to Officer
21   Camacho?
22        A.   I mean, I didn't have it on me at that
23   point, so...
24        Q.   Did you -- why didn't you tell Officer
25   Camacho where the gun was?
```



```
 1        A.   That kind of beats the purpose of -- I was
 2   trying to hide it.  I was trying to throw it and
 3   hide it.
 4        Q.   And where did you throw the gun, do you
 5   know?
 6        A.   It was over the fence to a -- yeah, it was
 7   over a fence.
 8        Q.   And when you threw that gun over the
 9   fence, was there a house on the other side of the
10   fence?
11        A.   I believe so, yeah.
12        Q.   One moment.  One moment, please.  Sorry.
13             Mr. Sanchez, do you have any tattoos at
14   all?
15        A.   No, I do not.
16        Q.   Did you have any other weapons on you at
17   the time of the incident?
18             MS. LEAP:  Asked and answered.
19             But you can answer again.
20             THE WITNESS:  No, I did not.
21        Q.   BY MS. WILFERT:  So this is -- I'm showing
22   you Exhibit 7.  This is on page 41, COBP 001895.
23             Mr. Sanchez, do you see what's in this
24   photograph here?
25        A.   I mean, I don't know.  It looks like a
```



Angel Sanchez                                          November 05, 2024
                                                       Page 107

```
 1  stick, like dog poop.  I can't really see it.
 2      Q.    Let me try to get a closer view.
 3            Do you see where it appears to be where
 4  these rose petals are?
 5      A.    Yeah.
 6      Q.    Do you recognize -- I'm showing you
 7  Exhibit 7.  It's COBP 001897.  Do you recognize
 8  what's in this photograph?
 9      A.    Looks like some kind of knife to me.
10      Q.    Is this -- is this your knife?
11      A.    No.
12      Q.    Sorry.  One moment.  I'm just pulling up
13  an exhibit.
14            So, Mr. Sanchez, I'm showing you Exhibit 7
15  again.  We are at COBP 001930.
16            Do you see that white gate in the
17  photograph on the left side?
18      A.    Yeah.
19      Q.    And it's fair to say that the Chevy Tahoe
20  is on the other side of that fence, right, from the
21  photographs we've seen?
22      A.    If it's the same fence, then yeah.
23      Q.    And did you see this marker here in the
24  back, 6?  Do you see that?
25      A.    Yeah, I do.
```



Angel Sanchez                                         November 05, 2024
                                                      Page 108

1        Q.    Let me go to the next photograph.

2              Do you see it closer in the next

3    photograph?  I'm showing you COBP 001931.

4              Do you see the number 6?

5        A.    Yes, I do.

6        Q.    And I'm going through, showing you

7    COBP 00932.

8              Do you recognize anything in the

9    photograph?

10       A.    Pretty far, but looks like a gun.

11       Q.    Does that look like your gun that you had

12   on the night of the incident?

13       A.    Yeah.

14       Q.    I can do a little closer photograph.  This

15   is COBP 001933.

16             So, Mr. Sanchez, do you recognize what's

17   in this photograph?

18       A.    Yes, I do.

19       Q.    Now, is this your gun that you had on the

20   date of the incident that was involved in this

21   incident?

22       A.    That is -- yes, it is.

23       Q.    So this is the gun that you threw over

24   that fence; is that accurate?

25       A.    Yeah.



Angel Sanchez                                             November 05, 2024
                                                          Page 109

1        Q.    And in that photograph the magazine is

2   inserted.

3              Do you see that?  Is that accurate?

4        A.    Yeah.

5        Q.    And you said that there was ammunition in

6   the magazine, right?

7        A.    I believe so.

8        Q.    What's that?

9        A.    I believe so.

10       Q.    Do you know if there's ammunition in the

11  gun?

12       A.    Yeah.

13       Q.    So there was ammunition in the gun, right?

14       A.    Yeah.

15       Q.    And was there a round in the chamber when

16  you threw this gun over the fence?

17       A.    I don't think so.

18       Q.    Did you ever put your finger on the

19  trigger as you exited the rear passenger's side of

20  the Chevy Tahoe?

21       A.    No, I did not.

22       Q.    Did you ever pull the trigger when you

23  exited the rear of that black Chevy Tahoe on the

24  date of the incident?

25       A.    I'm sorry.  I didn't hear the first part



Angel Sanchez                                    November 05, 2024
                                                 Page 110

```
 1    of your question.
 2        Q.   On the date of the incident when you
 3    exited the black Chevy Tahoe, did you pull the
 4    trigger of this gun?
 5        A.   No, I did not.
 6        Q.   So the photograph that I'm looking at,
 7    COBP 001933, this is your firearm, correct?
 8        A.   Yes.  Correct.
 9        Q.   Do you have any firearms registered in
10    your name?
11             MS. LEAP:  I'll object to the -- sorry.
12             I'll instruct my client not to answer on
13    the basis that it implicates his Fifth Amendment
14    privilege against self-incrimination.
15        Q.   BY MS. WILFERT:  Are you refusing to
16    answer, Mr. Sanchez?
17        A.   Yes, I am.
18                  (Transcript marked.)
19        Q.   BY MS. WILFERT:  Have you ever -- other
20    than the incident, have you ever possessed a
21    firearm before?
22             MS. LEAP:  And I'll instruct my client not
23    to answer on the basis that it implicates his Fifth
24    Amendment privilege against self-incrimination.
25        Q.   BY MS. WILFERT:  Are you refusing to
```



Angel Sanchez                                      November 05, 2024
                                                             Page 111

```
 1   answer?
 2       A.   Yes, I am.
 3              (Transcript marked.)
 4       Q.   BY MS. WILFERT:  Have you attended any
 5   firearms classes?
 6       A.   No.
 7       Q.   Do you have any specialized firearm
 8   training?
 9       A.   No.
10       Q.   Have you ever gone to a shooting range?
11       A.   No.
12       Q.   Have you ever practiced shooting a gun
13   before?
14       A.   No.
15       Q.   Have you ever used the gun that you
16   possessed on the date of the incident in any other
17   crimes?
18            MS. LEAP:  I'll instruct my client not to
19   answer on the basis that that question implicates
20   his Fifth Amendment privilege against
21   self-incrimination.
22       Q.   BY MS. WILFERT:  And you're refusing to
23   answer?
24       A.   Yes, I am.
25              (Transcript marked.)
```



Angel Sanchez                                      November 05, 2024
                                                   Page 112

1        Q.   BY MS. WILFERT:  And do you know what a
2   ghost gun -- ghost gun is?  Do you know what that
3   is, a ghost gun?
4        A.   I think I've heard the phrase before.
5        Q.   What is it?
6             MS. LEAP:  Just an objection to the extent
7   that it calls for a legal -- legal term or a legal
8   conclusion.  Lacks foundation and calls for
9   speculation.
10            But he can answer to the extent that he --
11  he knows.
12            THE WITNESS:  I think I read an article
13  online.  I think it's, like, maybe a -- I think it
14  was a gun without a -- or I'm not sure.  I forgot.
15  Maybe one that was -- I -- maybe one that was
16  homemade or something like that.
17       Q.   BY MS. WILFERT:  Have you ever ordered
18  firearm parts online?
19            MS. LEAP:  And I'll instruct my client not
20  to answer on the basis that it implicates his Fifth
21  Amendment privilege against self-incrimination.
22            (Transcript marked.)
23       Q.   BY MS. WILFERT:  And do you know how many
24  rounds were in the gun that you carried on the
25  night of the incident?



Angel Sanchez                                          November 05, 2024
                                                      Page 113

```
 1                MS. LEAP:  Calls for speculation and lacks
 2      foundation.
 3                But if he knows, he can answer.
 4                THE WITNESS:  I don't recall.
 5           Q.   BY MS. WILFERT:  Let me back up.  Let me
 6      lay a foundation.
 7                Do you know what ammunition is?
 8           A.   Yes.
 9           Q.   What is ammunition?
10           A.   Bullets.
11           Q.   So they're -- do you put bullets into a
12      gun?  Is that not the purpose of them?
13                MS. LEAP:  Vague and ambiguous.
14                But you can answer.
15                THE WITNESS:  I believe, yeah, people put
16      bullets in guns.
17           Q.   BY MS. WILFERT:  How many times have you
18      handled ammunition?
19           A.   I don't know.
20           Q.   Have you seen ammunition before?
21           A.   Yeah.
22           Q.   How many times?
23           A.   I'm not sure.
24           Q.   Do you know how bullets look?
25           A.   Yes, I do.
```



Angel Sanchez                                        November 05, 2024
                                                     Page 114

```
 1        Q.   How many times have you seen bullets?
 2        A.   I don't know.
 3        Q.   One time?
 4        A.   I said I don't know.  I don't count.
 5        Q.   Have you seen it more than ten times?
 6        A.   No, I don't think so.
 7        Q.   So can you give me an estimate on how many
 8   times you've seen bullets?
 9        A.   I don't know.  Like, throughout my whole
10   lifetime?
11        Q.   Yes.  Yeah, if you could give me an
12   estimate, you know.
13        A.   I don't know.  Maybe, like, five times.
14        Q.   How many times?
15        A.   Maybe, like, five times.
16        Q.   So you'd seen it five times, bullets.  You
17   know how they look.  If you saw a bullet, you would
18   recognize what it is; is that fair to say?
19        A.   Yeah.
20        Q.   So -- so on the date of the incident, it's
21   your testimony here today that you did not point
22   the firearm that you possessed at Officer Camacho.
23             Is that your testimony here today?
24        A.   Correct.  I did not point it at him.
25        Q.   One moment.  I'm just reviewing my notes
```



Angel Sanchez                                    November 05, 2024
                                                      Page 115

```
 1    to see what else to cover.
 2            On the -- the date of the incident when
 3    you initially saw -- or when the officers initially
 4    turned on the red and blue flashing lights to
 5    conduct a traffic stop, did you hear a siren?
 6        A.   I don't remember if I heard it.  I don't
 7    know.  I know -- I just know I saw the lights.
 8        Q.   So you don't remember a siren?
 9        A.   No.  I just seen the lights.  I don't
10    remember.
11        Q.   And on the date of the incident, did you
12    ingest any narcotics?
13            MS. LEAP:  And I'll instruct my client not
14    to answer on the basis that it implicates his Fifth
15    Amendment privilege against self-incrimination.
16    And lacks foundation and is vague and ambiguous.
17    But that's all.
18        Q.   BY MS. WILFERT:  Are you refusing to
19    answer?
20        A.   Yes, I am.
21            (Transcript marked.)
22        Q.   BY MS. WILFERT:  Mr. Sanchez, do you know
23    what narcotics are?
24            MS. LEAP:  Vague and ambiguous.
25            But to the extent that he can -- he knows,
```



Angel Sanchez

November 05, 2024
Page 116

1    he can answer.

2              THE WITNESS:  Yeah.

3         Q.   BY MS. WILFERT:  What are they?

4         A.   Like, drugs.

5         Q.   What kinds of drugs?

6         A.   I -- I don't know.  I just know they're

7    drugs.

8         Q.   Have you -- do you know what

9    methamphetamine is?

10        A.   Yeah, I've heard of it.

11        Q.   Do you -- have you ever seen

12   methamphetamine?

13             MS. LEAP:  I'll instruct my client not to

14   answer on the basis that it implicates his Fifth

15   Amendment privilege against self-incrimination.

16        Q.   BY MS. WILFERT:  Are you refusing to

17   answer?

18        A.   Yes.

19             (Transcript marked.)

20        Q.   BY MS. WILFERT:  On the date of the

21   incident, did you use methamphetamine?

22             MS. LEAP:  And I'm instructing my client

23   not to answer on the basis that it implicates his

24   Fifth Amendment privilege against

25   self-incrimination.



Angel Sanchez                                    November 05, 2024
                                                Page 117

1        Q.    BY MS. WILFERT:  Are you refusing to

2     answer, Mr. Sanchez?

3        A.    Yes, I am.

4              (Transcript marked.)

5        Q.    BY MS. WILFERT:  And, Mr. Sanchez, do you

6     know what cocaine is?

7        A.    Yeah, I've heard of it.

8        Q.    Have you seen it before?

9              MS. LEAP:  I'll instruct my client not to

10    answer on the basis that it implicates his Fifth

11    Amendment privilege against self-incrimination.

12       Q.    BY MS. WILFERT:  Are you refusing to

13    answer?

14       A.    Yes, I am.

15             (Transcript marked.)

16       Q.    BY MS. WILFERT:  Have you -- on the date

17    of the incident, did you use cocaine?

18             MS. LEAP:  And I'll instruct my client not

19    to answer on the basis that it implicates his Fifth

20    Amendment privilege against self-incrimination.

21             (Transcript marked.)

22       Q.    BY MS. WILFERT:  Do you know what Fentanyl

23    is, Mr. Sanchez?

24       A.    Yeah, I've heard of it.

25       Q.    What is Fentanyl?



Angel Sanchez

November 05, 2024
Page 118

```
 1        A.    I mean, I think it's, like, a super-deadly
 2   drug.  I see on the news that people would die of
 3   overdose all the time.
 4        Q.    Have you seen Fentanyl before?
 5              MS. LEAP:  I'll instruct my client not to
 6   answer on the basis that it implicates his Fifth
 7   Amendment privilege against self-incrimination.
 8        Q.    BY MS. WILFERT:  You're refusing to
 9   answer, Mr. Sanchez?
10        A.    Yes, I am.
11              (Transcript marked.)
12        Q.    BY MS. WILFERT:  Mr. Sanchez, did you use
13   Fentanyl on the date of the incident?
14              MS. LEAP:  And I'll instruct my client not
15   to answer on the basis that it implicates his Fifth
16   Amendment privilege against self-incrimination.
17              (Transcript marked.)
18        Q.    BY MS. WILFERT:  And, Mr. Sanchez, do you
19   know what heroin is?
20        A.    Yeah, I've heard of it.
21        Q.    Have you seen it before?
22              MS. LEAP:  I'll instruct my client not to
23   answer on the basis that it implicates his Fifth
24   Amendment privilege against self-incrimination.
25              (Transcript marked.)
```



Angel Sanchez                                      November 05, 2024
                                                          Page 119

```
 1      Q.   BY MS. WILFERT:  Have you ever used heroin
 2   before?
 3           MS. LEAP:  I'll instruct my client not to
 4   answer on the basis that it implicates his Fifth
 5   Amendment privilege against self-incrimination.
 6      Q.   BY MS. WILFERT:  Are you refusing to
 7   answer, Mr. Sanchez?
 8      A.   Yes, I am.
 9           (Transcript marked.)
10      Q.   BY MS. WILFERT:  Have you used marijuana?
11   Do you know what marijuana is?
12      A.   Yes, I've heard of it before.
13      Q.   And have you seen it before?
14           MS. LEAP:  I'll instruct my client not to
15   answer on the basis that it implicates his Fifth
16   Amendment privilege against self-incrimination.
17           (Transcript marked.)
18      Q.   BY MS. WILFERT:  Have you used marijuana
19   before?
20           MS. LEAP:  And I'll instruct my client not
21   to answer on the basis that it implicates his Fifth
22   Amendment privilege against self-incrimination.
23           (Transcript marked.)
24      Q.   BY MS. WILFERT:  Did you use marijuana on
25   the date of the incident?
```



Angel Sanchez                                        November 05, 2024
                                                     Page 120

 1              MS. LEAP:  And I'll instruct my client not
 2       to answer on the basis that it implicates his Fifth
 3       Amendment privilege against self --
 4       self-incrimination.
 5                   (Transcript marked.)
 6       Q.    BY MS. WILFERT:  Did you drink any
 7    alcohol -- do you know what alcoholic beverages
 8    are?
 9       A.    Yes, I do know what they are.
10       Q.    Did you drink any alcoholic beverages on
11    the date of the incident?
12       A.    I think I had a couple beers.
13       Q.    What kind of beer?
14       A.    I think it was Modelo.
15       Q.    How many ounces?
16       A.    I don't count.  I don't know.  It was only
17    a couple.
18       Q.    Was it a tall can?
19       A.    I think it was -- I think it was a tall
20    can.
21       Q.    Did you drink anything else after you had
22    two tall-can Modelos?
23       A.    Not that I remember.  I don't remember.
24       Q.    Now, the tall-can Modelos are what,
25    24 ounces?



Angel Sanchez                                            November 05, 2024
                                                         Page 121

```
 1        A.    I'm not sure.

 2        Q.    What time did you start drinking?

 3        A.    I'm not sure of the time either.  I don't

 4   remember.

 5        Q.    Did you start drinking before the -- the

 6   ceremony at the funeral or after?

 7        A.    I think I might have had one drink at the

 8   cemetery.

 9        Q.    So you had one 24-ounce Modelo beer at the

10   cemetery.

11              Did you have another one when you get back

12   to the house?

13        A.    Yeah, I think I did.  But I don't think I

14   finished it at the house.  I think that's when we

15   left.

16        Q.    And why did you leave the house?

17        A.    To go to the store.

18        Q.    To do what?

19        A.    I went to withdraw cash.

20        Q.    So you withdrew cash.

21              Did you go anywhere else?

22        A.    No, I don't think so.

23        Q.    What store did you go to to withdraw cash?

24        A.    I believe it was called Jensen's Market.

25        Q.    So you went to Jensen's Market.  Is that
```



1  in the city of Baldwin Park?

2       A.   Yes.

3       Q.   And did you buy anything at Jensen's

4  Market?

5       A.   I don't remember.

6       Q.   Were you -- did you ever drink alcohol in

7  the car, in the Tahoe?

8       A.   In the car?

9       Q.   Yeah.

10       A.   No.

11       Q.   So you didn't drink any alcohol in the

12  car?

13       A.   Not that I remember.

14       Q.   And did you -- would you ever drink

15  alcohol in a car and drive?  Would you ever do

16  that?

17            MS. LEAP:  I'll instruct -- he can answer.

18            THE WITNESS:  I don't drive.

19       Q.   BY MS. WILFERT:  Would you ever open a

20  container in someone else's car and drink alcohol

21  in the car?  Would you do that?

22            MS. LEAP:  Incomplete hypothetical.  And

23  vague and ambiguous.  Lacks foundation and calls

24  for speculation.  Asked and answered.

25            And he can answer to the extent that he



Angel Sanchez                                    November 05, 2024
                                                 Page 123

```
 1    knows.
 2              THE WITNESS:  I don't think I would.
 3              MS. WILFERT:  I think we are on Exhibit 8.
 4              COURT REPORTER:  That is correct.
 5                  (Reporter marked Exhibit No. 8 for
 6                   identification.)
 7       Q.   BY MS. WILFERT:  Mr. Sanchez, do you
 8    recognize this photograph?  This is COBP 001833.
 9              Do you recognize this?
10       A.   No, I don't.
11       Q.   Do you remember there being a case of
12    White Claw in that black Chevy Tahoe on the date of
13    the incident?
14       A.   If there was, I didn't see it.
15       Q.   Did you drink any of the White Claw in the
16    car?
17       A.   I didn't know --
18              MS. LEAP:  Asked and answered.
19              THE WITNESS:  Yeah, I didn't know they
20    were there.
21              MS. WILFERT:  I'm sorry about that.
22              Ms. Leap, did you say something?
23              MS. LEAP:  I objected as asked and
24    answered.  And I think his answer -- he can say his
25    answer again.
```



Angel Sanchez                                    November 05, 2024
                                                 Page 124

```
 1              THE WITNESS:  I didn't know they were in
 2      there.
 3         Q.   BY MS. WILFERT:  So Mr. -- was anyone else
 4      drinking alcohol in the car?
 5              MS. LEAP:  Calls for speculation.
 6              MS. WILFERT:  Hmm?
 7              MS. LEAP:  Calls for speculation.
 8         Q.   BY MS. WILFERT:  Do you know if anyone
 9      else was drinking alcohol in the car?
10         A.   Not that I know of.
11         Q.   Now, do you know if this is where
12      Mr. Aldaco was sitting?  That's COBP 001840.
13         A.   What -- what seat is that?  I'd have to
14      see a door.
15         Q.   I know the photograph is turned on its
16      side.  Let me see if I can turn it around.
17              Do you see that?
18         A.   Yeah, I do.
19         Q.   So did you see anyone else drinking in the
20      car on the night of the incident?
21         A.   Not that I noticed.
22         Q.   So there's a Modelo.  I'm showing you COBP
23      00 -- or BP 001844.
24              Do you see the Modelo in the center
25      console?
```



Angel Sanchez                                        November 05, 2024
                                                     Page 125

```
 1        A.    Yeah, I see it.

 2        Q.    So there were open containers of alcohol

 3   in the car; is that fair to say from these

 4   photographs?

 5        A.    Yeah, if there was, I didn't see them.

 6        Q.    So you didn't see Mr. Aldaco drinking a

 7   White Claw?

 8        A.    I didn't see.  I was in the back.

 9        Q.    Did you hand Mr. Aldaco a White Claw?

10        A.    No, not that I remember.

11        Q.    So your testimony was that you only had

12   two beers to drink on the night of the incident;

13   that's it?

14        A.    I don't remember exactly.  It was an

15   estimate.

16        Q.    Did you take any medication on the night

17   of the incident?

18        A.    I don't remember.

19        Q.    Were you prescribed any medication on

20   the -- at the time of the incident?

21        A.    I don't remember.

22        Q.    How many times have you been contacted by

23   law enforcement?

24              MS. LEAP:  I'll instruct my client not to

25   answer on the basis that it implicates his Fifth
```



Angel Sanchez                                        November 05, 2024
                                                     Page 126

1    Amendment privilege against self-incrimination.

2        Q.   BY MS. WILFERT:  Are you refusing to -- to

3    answer the question, Mr. Sanchez?

4        A.   Yes, I am.

5                (Transcript marked.)

6        Q.   BY MS. WILFERT:  So on March 26, 2021,

7    were you arrested, Mr. Sanchez, for Penal Code

8    Section 148(a)(1), obstructing a police officer?

9            MS. LEAP:  I'll instruct my client not to

10   answer on the basis that it implicates his Fifth

11   Amendment privilege against self-incrimination.

12       Q.   BY MS. WILFERT:  Are you refusing to

13   answer?

14       A.   Yes, I am.

15               (Transcript marked.)

16       Q.   BY MS. WILFERT:  Can you tell us what

17   happened on March 26, 2021?

18           MS. LEAP:  I'll instruct my client not to

19   answer on the basis that it implicates his Fifth

20   Amendment privilege against self-incrimination.

21               (Transcript marked.)

22       Q.   BY MS. WILFERT:  What's your date of

23   birth, Mr. Sanchez?  How old are you now?

24       A.   October 28, 2001.  I just turned 23.

25       Q.   And at the time of the incident, how old



Angel Sanchez                                                November 05, 2024
                                                             Page 127

```
 1    were you?
 2         A.    I believe I was 19 years old.
 3         Q.    And do you have a California driver's
 4    license?
 5         A.    No, I do not.
 6         Q.    Do you have a California ID card,
 7    identification card?
 8         A.    Yes, I do.
 9         Q.    And did you ever get a driver's license or
10    anything?  No?
11         A.    No.
12         Q.    And what is your California identification
13    card number?  Do you know it by heart?
14         A.    No.
15         Q.    Do you recall what it is right now?
16              MS. LEAP:  Asked and answered.  He said he
17    doesn't know it.
18         Q.    BY MS. WILFERT:  Do you have -- what is
19    your Social Security number?
20              MS. LEAP:  I'll instruct my client not to
21    answer on the basis that that calls for private and
22    privileged information.
23                   (Transcript marked.)
24         Q.    BY MS. WILFERT:  Where do you currently
25    live?
```



```
 1        A.    Like, the full address?

 2        Q.    Yes.

 3        A.    I live at ████████████████, Baldwin

 4   Park, California.

 5        Q.    And who do you live there with?

 6        A.    My mother.

 7        Q.    Do you live with anyone else?

 8        A.    My brother.  And then my other brother

 9   is -- comes and goes.  He's dorming at UCLA.

10        Q.    And what are your brothers' names?

11        A.    Adan and Juan Sanchez.

12        Q.    How do you spell -- it's Al -- what's your

13   first brother?

14        A.    A-d-a-n.

15        Q.    Adan Sanchez.

16              And then your other brother?

17        A.    Juan.

18        Q.    Juan Sanchez?

19        A.    Yes.

20        Q.    What is your mother's name?

21        A.    Santana Echeverria.

22        Q.    And how long have you lived at this

23   ████████████████ address?

24        A.    My whole life.

25        Q.    And is this a house?
```



```
 1        A.    Yes.

 2        Q.    And this was your -- this was your

 3   residence at the time of the incident?  I'm sorry.

 4   I get -- I have this cough that will not go away.

 5             Was this your residence -- the ██████████

 6   ████████  address, was this your residence at the time

 7   of the incident?

 8        A.    Yes, it was.

 9        Q.    Do you have any plans to move any time in

10   the near future?

11        A.    Not until the day I can buy a house, no, I

12   don't.

13        Q.    And what is your current phone number?

14        A.    I don't have it memorized.  I can go

15   check.  I don't have it memorized.

16        Q.    Maybe at the next break if you want.

17             And on the date of the incident, did you

18   have the same phone number?

19        A.    No.

20        Q.    You didn't.  What was your phone number on

21   the date of the incident?

22        A.    I don't have it memorized either.  I don't

23   know.

24        Q.    Do you know -- so your phone from the date

25   of the incident, what service provider was that
```



Angel Sanchez                                    November 05, 2024
                                                 Page 130

 1   through?  Verizon, T-Mobile, AT&T?

 2        A.   I'm not sure.  I would just -- I knew I

 3   was under my mom's plan, and I would just give her

 4   for the monthly -- I'm not sure of the amount.  I

 5   didn't deal with that.  I don't know.  I'm not even

 6   sure.

 7        Q.   And the phone that you had on the date of

 8   the incident, what kind of phone was it?

 9        A.   It was an iPhone, I believe.

10        Q.   So did it have, like, a camera; you could

11   take pictures and recordings?

12        A.   Yeah.

13        Q.   And did you have iCloud?

14        A.   I don't know.

15        Q.   How did you back up your phone from the

16   date of the incident?

17        A.   I'm sorry?

18        Q.   Are you -- how did you back up your phone

19   from the date of the incident?  Did you back it up,

20   like, on your -- did you have, like, an iCloud

21   account so you didn't lose all your photographs and

22   all that?

23        A.   I didn't --

24             MS. LEAP:  Yeah, lacks foundation.

25             MS. WILFERT:  What's that?



Angel Sanchez                                            November 05, 2024
                                                         Page 131

```
 1            MS. LEAP:  My objection is that it lacks
 2   foundation.
 3       Q.   BY MS. WILFERT:  You can answer if you
 4   know.
 5            MS. LEAP:  Yeah, you can answer.
 6            THE WITNESS:  Oh, no, I lost everything.
 7   Yeah, I lost everything.  I don't have iCloud.
 8       Q.   BY MS. WILFERT:  Where did your phone from
 9   the date of the incident go?
10            MS. LEAP:  It calls for speculation.
11            But if -- if he knows, he can answer.
12       Q.   BY MS. WILFERT:  Do you know where your
13   phone is from the date of the incident?
14       A.   I believe it was taken into custody.
15       Q.   By who?
16       A.   I don't know.  Whoever took my stuff.  I
17   don't know what sheriff it was.
18       Q.   Do you know if the police took your phone?
19       A.   I'm pretty sure.
20       Q.   On the date of the incident, did you make
21   any phone calls to anyone?
22       A.   Like, all day?
23       Q.   Yes.
24       A.   Yeah.
25       Q.   Do you remember who you called that day?
```



Angel Sanchez                                        November 05, 2024
                                                     Page 132

```
 1        A.    I think I talked to my mom.  I don't
 2   remember everybody I talked to.  I don't know.
 3        Q.    Do you remember receiving any phone calls
 4   on the date of the incident?
 5        A.    I think so.
 6        Q.    And who did you receive phone calls from,
 7   if you remember?
 8        A.    I don't remember too well.
 9        Q.    Do you remember anything as far as, like,
10   who you received any calls from?
11        A.    Not really.  I wasn't really paying
12   attention to that, but I just -- I know I talked to
13   my mom.
14        Q.    And what did you talk to your mom about on
15   the day of the incident?
16        A.    She was at work, so just talking about how
17   her day was.  It's pretty normal stuff.
18        Q.    And where does your mom work at?
19        A.    She works at a hospital.
20        Q.    And what -- is she a nurse, or what does
21   she do?
22        A.    She's a nurse assistant.
23        Q.    And has she done that for a long time?
24        A.    Since before I was born.
25        Q.    And do you know what kind of patients she
```



Angel Sanchez                                   November 05, 2024
                                                Page 133

1   cares for?

2       A.   They put her in different places.

3   Emergency, ICU, just kind of patients, I guess.

4       Q.   And do you know how many years she's been

5   doing that?

6       A.   I'd say at least -- estimate, at least 30.

7   I'm not sure of the number exactly.

8       Q.   That's a long time.

9       A.   Yeah.

10      Q.   So did you receive any text messages at

11  all on the day of the incident?

12      A.   I don't remember.

13      Q.   Do you remember sending any text messages?

14      A.   I don't remember.  Like I said, I wasn't

15  really focused on my phone.

16      Q.   Did you ever use anything like Instagram

17  on the day of the incident?

18      A.   I don't remember.  Possibly.

19      Q.   Do you have an Instagram account?

20      A.   Yeah.

21      Q.   And what is -- I'm a little bit older.  I

22  don't know how -- what's your name or what is it

23  called, your...

24      A.   I don't use it no more.  I had one, but I

25  don't have no Instagram anymore.



Angel Sanchez                                    November 05, 2024
                                                 Page 134

1          Q.   What was your account name when you had

2     it?  I know I'm not saying this right, but I don't

3     know Instagram that well.  I'm a little bit older.

4          A.   I don't remember.

5          Q.   Okay.  What about -- what's that other

6     one, Facebook?  Do people use that anymore?

7               No?  Okay.  See, I'm dating myself.

8               What about X, once formerly known as

9     Twitter?

10         A.   I don't have Twitter.

11         Q.   Okay.  Never had -- and you don't have an

12    X account?

13         A.   No.

14         Q.   What about Snapchat, did you have a

15    Snapchat account on the day of the incident?  Do

16    people still use Snapchat?

17         A.   Not as much now.  I think I did have one

18    during that time.

19         Q.   Did you send any messages on Snapchat on

20    the day of the incident?

21         A.   I really don't remember.

22         Q.   What about email addresses, what is your

23    email?

24               MS. LEAP:  He can be contacted through

25    plaintiff's counsel.



Angel Sanchez                                    November 05, 2024
Page 135

1       Q.   BY MS. WILFERT:   Okay.   Any other -- did
2   you receive anything via email --
3       A.   Uh --
4       Q.   Let me finish, Mr. Sanchez.   Because I
5   know you have an attorney.
6            Did you receive anything via email related
7   to this incident other than -- I don't want you to
8   tell me about anything that your attorney gave you.
9   But did you see anything or receive any emails
10  incident-related other than what your attorney has
11  sent you via email?
12      A.   I don't think so.   I'm not 100 -- I don't
13  know.   I don't think so, though.
14      Q.   And have you sent any emails
15  incident-related other than your communications
16  with your attorney to anyone, sent any emails
17  whatsoever?
18      A.   I don't know.
19      Q.   Do you know or?
20      A.   I said I don't know.
21      Q.   Don't know.   Okay.   What about -- we kind
22  of talked a little bit about social media, but let
23  me ask this, okay.   At any time on any medium,
24  including social media, emails, text messages,
25  websites, blogs, logs -- log, paper, letter, notes,



Angel Sanchez                                                November 05, 2024
Page 136

```
 1   anything whatsoever, did you write anything down
 2   related to this incident?
 3       A.   Like if I talked about it, are you asking?
 4   Or like --
 5       Q.   Yeah.  Like if you posted -- and I want to
 6   make sure that I preface this, that I don't want
 7   you to disclose any communications with your
 8   attorney.  I'm asking if you posted anything on
 9   social media related to this incident.
10       A.   I don't remember.
11       Q.   Did you post anything on any website
12   related to this incident?
13       A.   No.  I don't -- I don't know how to post
14   on websites, no.  I don't think so.
15       Q.   What about did you write anything down on
16   any, like, paper or notes related to this incident
17   other than communications with your attorney?
18       A.   I'm not sure.  I don't know.
19       Q.   So you told me the name of your mother.
20   Is it Santa An --
21       A.   It's like...
22       Q.   Your mother's name?
23       A.   It's Santana, like the city Santa Anna,
24   but just put together.
25       Q.   Santana.  You told me about your brothers.
```



```
 1             What about your father, what's your
 2   father's name?
 3       A.    Juan Sanchez.
 4       Q.    And does he live with you?
 5       A.    No.
 6             MS. LEAP:  I'll need to take a short break
 7   soon.  I have an ex parte opposition due this
 8   afternoon, and I just need to file it.  But I
 9   don't -- I just want to give everyone a heads-up.
10   If you want to finish this line of questioning,
11   that's fine.  But I'll need to take a break in a
12   few minutes.
13             MS. WILFERT:  Okay.  If we could just
14   finish a few more questions about his family.
15             MS. LEAP:  Sure.
16       Q.    BY MS. WILFERT:  When is the last time you
17   saw your father?
18       A.    I think I went to go visit him last year.
19       Q.    And where does he live?
20       A.    I don't know the address.  He just -- I
21   only went to go see him because he had a stroke.  I
22   don't know the address or anything.
23       Q.    Do you know what city he lives in?
24       A.    I'm not sure.  Like, the Bellflower,
25   Downey area.  I'm not sure of the exact city.
```



Angel Sanchez                                           November 05, 2024
                                                        Page 138

```
 1        Q.    Did you grow up with your dad in -- in the
 2   household or no?
 3        A.    For a time.
 4        Q.    Were your -- did your parents separate at
 5   some point?
 6        A.    Yeah.
 7        Q.    How long were your parents married before
 8   they separated?
 9        A.    I don't know.  I -- I don't know.  I'm not
10   sure.
11        Q.    Do you know when your father moved out of
12   the household?
13        A.    I can give an estimate.  I don't know
14   exactly what year it was.
15        Q.    Yeah.  You can give me an estimate if you
16   feel comfortable with that.
17        A.    Maybe, like, 20 -- 2015, 2016 maybe.  I
18   was a freshman in high school.
19        Q.    And when was -- so you have two siblings.
20   You have two brothers.
21              Do you have any other siblings?
22        A.    Yeah.  But they're grown and moved out.
23        Q.    And what are their names?
24        A.    I have a sister.  Her name is Jenny
25   Calles.
```



Angel Sanchez                                    November 05, 2024
                                                 Page 139

1        Q.    Can you spell that for me?

2        A.    C-a-l-l-e-s.

3        Q.    And do you have another sibling?

4        A.    Yeah, I have a brother.  His name is

5   Javier D-e-r-a-s, Deras.

6        Q.    And where does Javier live?  What city?

7        A.    Kind of lives in the middle of nowhere.  I

8   don't know the name of the city.  It's by -- I

9   guess you would say the outskirts of Mammoth Lakes

10  in Central California.

11       Q.    Like Indio -- is it Indio County or...

12       A.    Yeah, right there.  In those little towns.

13  I don't know exactly what town, what it's called.

14       Q.    Bishop?

15       A.    It's near Bishop.  Yeah, it's right next

16  to Bishop.

17       Q.    And how old is he?

18       A.    Damn, I don't know.  I think he's, like,

19  35.

20       Q.    And did you -- what about your sister

21  Jenny, where does she live?

22       A.    Pomona.

23       Q.    And how old is she?

24       A.    Oh, damn.  I think she's 32 or 31.  I'm

25  not sure.  I feel bad.



Angel Sanchez                                          November 05, 2024
Page 140

1        Q.    And then what about your sibling -- you

2   said you had another brother; he goes to UCLA.   Is

3   his name Juan too?

4        A.    No, that's Adan.

5        Q.    Adan.   Okay.   And does he live on campus

6   now?

7        A.    Yeah, he -- he dorms on campus, and then,

8   like, once every two, three weeks, he'll come visit

9   and stay here.

10       Q.    And how old is he?   Is he, like, 18 or 19?

11  Did he just start?

12       A.    No.   He's, like, 20.   He's in his third

13  year, I think.

14       Q.    Okay.   Good.   And then you have another

15  brother Juan, right?

16       A.    Yes.

17       Q.    Is he a Juan, Jr.?

18       A.    According to him, no, but yeah.

19       Q.    Okay.   And how old is he?

20       A.    He's 24.

21       Q.    And where does Juan not Jr. live?

22       A.    Here in the same household as me.

23       Q.    And have you talked to your mom about this

24  incident?

25       A.    Yeah.   She was there.



Angel Sanchez                                    November 05, 2024
                                                      Page 141

1      Q.   And you talked to -- have you talked to

2    your brother Adan about this incident?

3      A.   Not really my siblings.

4      Q.   Did you talk to your other sibling, Juan

5    Sanchez?  No?

6      A.   They know.  They know about the incident,

7    but I never talked, like -- I never talked to them

8    about it.

9      Q.   Okay.  Did you talk to your older siblings

10   about the incident?

11          MS. WILFERT:  So we can break now,

12   Ms. Leap.  I know you needed just a -- you could go

13   a few more minutes.  I don't want to go longer than

14   that.  What do we say about ten minutes or so?

15   Would that work?  Or 15?  What do you need?  You

16   tell me.

17          MS. LEAP:  I think 15 would be ideal if

18   that works for everyone.

19          MS. WILFERT:  Yeah, that will work.  Thank

20   you.

21          MS. LEAP:  Okay.

22          THE VIDEOGRAPHER:  Okay.  We are off

23   record at 3:08.

24            (A recess was taken.)

25          THE VIDEOGRAPHER:  We are back on the



 1    record at 3:26.

 2              MS. WILFERT:   Thank you.

 3        Q.   Though, Mr. Sanchez, you're aware that

 4    you're still under oath, correct?

 5        A.   Yes, I am.

 6        Q.   Great.  So we were talking about your mom

 7    Santa -- Santana Echeverria.  And you talked to her

 8    about this -- this incident.

 9              Can you tell me what you told your mother

10    about this incident?

11        A.   I don't remember.  It was -- I don't

12    remember too well what we spoke about, just because

13    she was there.  I remember when they were putting

14    me in the ambulance, I could hear her cries.  But I

15    don't remember what we spoke about.

16        Q.   So your mother went to the scene of where

17    it happened?

18        A.   Yes, she did.

19        Q.   And who called -- do you know who notified

20    your mother?

21        A.   No, I'm not sure.

22        Q.   So your mother showed up.

23              And can you describe what was happening at

24    the time your mom showed up?

25        A.   I was still on the ground.  Like, the EMTs



Angel Sanchez                                              November 05, 2024
Page 143

```
 1   had got there.  They were loading me onto the
 2   stretcher.  And obviously I could recognize my
 3   mom's -- you know, she cries.  So I knew it was
 4   her.  And I just heard her, like, screaming and
 5   crying.
 6          I told -- I forgot who I told, if it was
 7   an officer or an EMT, if I could see her.  And they
 8   did not allow me to.  And then they took me to the
 9   hospital.
10     Q.   So did your mother go to the hospital
11   where you were at?
12     A.   I believe she did, but I didn't get to see
13   her.
14     Q.   So when was the first time that you saw
15   your mother after this incident?
16     A.   I don't remember.
17     Q.   Do you remember if you told your mother
18   what happened related to this incident?
19     A.   I told her that I was running, and I got
20   shot.
21     Q.   Did you tell her that you had a gun?
22     A.   I don't remember.
23     Q.   Did you tell her the gun was loaded?
24     A.   I don't remember.
25     Q.   Did you tell her that you had the gun in
```



Angel Sanchez                                              November 05, 2024
                                                          Page 144

 1    your right hand as you were exiting that black
 2    Tahoe on the night of the incident?
 3        A.    I really don't remember our conversation.
 4        Q.    Did you tell her anything else about this
 5    incident?
 6        A.    I don't remember.
 7        Q.    Did your -- so after -- did your mother
 8    ever render any care to you?  You said she was a
 9    nurse's -- a nursing assistant?
10        A.    Yeah.
11        Q.    Did your mother ever take care of you
12    after this incident?
13        A.    Yeah, she helped me out with certain
14    things.
15        Q.    So what did your mother do as far as
16    providing care to you?
17        A.    Like, my wounds even, she would just help
18    me with -- like, for example, when I -- when the
19    incident first happened, I still couldn't walk.  So
20    she would help me out, like, take a shower, like,
21    be able to go into the shower.  She helped, like,
22    put my socks on, just helped me with different
23    things.
24        Q.    And how long would you say your mother
25    provided care for you after the incident?  Like,



Angel Sanchez                                    November 05, 2024
                                                 Page 145

```
 1  how many -- if you could estimate a time period.
 2       A.   Well, I mean, technically, she still does
 3  to this day with my leg.  Like, she'll help me with
 4  my leg.
 5       Q.   What does she do to help you with your
 6  leg?
 7       A.   She helps me with the phys -- like, the
 8  physical therapy workouts, and she helps, like --
 9  because my toes are, like, stuck, so she helped me,
10  like, separate them, just kind of like the
11  workouts, the stretches, the massage, just stuff
12  like that.
13       Q.   And how often do you have to do the
14  physical therapy for your leg?
15       A.   I mean, I do the workouts here at home
16  almost every day.
17       Q.   Is it once a day?
18       A.   Yeah, about so.
19       Q.   Or twice?
20       A.   Now just probably like once a day I do my
21  workouts.
22       Q.   So do you see a physical therapist on a
23  regular basis?
24       A.   A physical therapist, no.
25       Q.   So let's talk about your education.  Can
```



1  you tell me about where you went to high school and

2  what education you had following high school.

3       A.   I went to Baldwin Park High School.  I

4  graduated in 2019.  I went to a -- right out of

5  high school, I went to LA Trade-Tech, but it got

6  too -- I didn't drive, and it was far.  So I ended

7  up trying to find a school closer, and I ended up

8  going to UEI College.  It was, like, a trade --

9  kind of like a trade school.

10      Q.   So you went to Baldwin Park.  You

11 graduated from there?

12      A.   Yes.

13      Q.   Do you have a diploma or --

14      A.   I have a diploma.

15      Q.   And the year you completed Baldwin Park,

16 2019, you said?

17      A.   Yes.

18      Q.   And then how long -- did you go to

19 LA Trade-Tech in 2019?

20      A.   I'm not sure.  It wasn't too long, because

21 it came a -- it became a hassle.  Like, it was just

22 too far.  And without the driving, and it was

23 just -- it was tough.  So I tried to find an option

24 closer.

25      Q.   And what does LA Trade-Tech teach?  What



Angel Sanchez                                      November 05, 2024
                                                   Page 147

1    kind of program is that?

2         A.    The program I was going to was, like, to

3    become -- what do they call them?  Kind of like an

4    electrician, like the linemans, people that work on

5    the power lines and stuff.

6         Q.    Will you -- how long -- oh, go ahead.  I'm

7    sorry.  Go ahead.

8         A.    No.  I was just going to say that's what I

9    was going there for.

10        Q.    And how long were you at LA Trade-Tech?

11   Can you give me an estimate?  A month, two months,

12   three months or longer?

13        A.    No.  Maybe -- I'm not sure.  I can

14   estimate maybe, like, a month before it became too

15   much.

16        Q.    And then you went to UEI.

17              And what kind of program is that, if you

18   could tell us?

19        A.    I was going there for HVAC, like heating,

20   ventilation, air-conditioning.  That's what I went

21   there for.

22        Q.    And how long were you there?

23        A.    I can't give an exact.  I'm not sure.

24   Couple months.

25        Q.    What year did you start?



Angel Sanchez                                      November 05, 2024
                                                  Page 148

```
 1        A.    2020 -- it was early 2021 or late 2020.
 2   I'm not sure of the exact date.
 3        Q.    And did you get any sort of, like,
 4   certificate from the program for HVAC?
 5        A.    I didn't complete it.
 6        Q.    Why didn't you complete it?
 7        A.    Because this incident occurred.
 8        Q.    So were you in this UEI program when this
 9   incident occurred?
10        A.    Yes, I was.
11        Q.    What about in March of 2021, were you in
12   the UEI program?
13        A.    I believe so, yeah.
14        Q.    And how long were you in the UEI program?
15        A.    Like I said, I can't -- like, I'm not sure
16   how long, but it was a couple months.
17        Q.    So did you start this program in, what,
18   April -- or I'm sorry -- March.  You started it in
19   March, and then you stopped in May?
20        A.    I'm not too sure of the dates exactly.
21        Q.    Did you attend college after high school
22   other than the UEI program and the LA Trade-Tech?
23        A.    No, I did not.
24        Q.    Did you receive any other certificate,
25   training after the UEI program?
```



Angel Sanchez                                          November 05, 2024
                                                       Page 149

 1        A.    No, I did not.

 2        Q.    So no further education after the UEI

 3   program?

 4        A.    No.  I've always wanted to do -- I've

 5   always been, like, a hands-on worker, and I can't

 6   do it anymore, so I haven't been able to get

 7   anything.

 8        Q.    Have you attended any sort of job

 9   retraining programs?

10        A.    No.

11        Q.    Have you attended any sort of vocational

12   rehabilitation?

13        A.    What is that?

14        Q.    Just related to your job based on whatever

15   sort of, I guess, restraints you have, some way

16   that you overcome it in order to find a new job.

17              Did you attend anything like that?

18        A.    No.  I didn't even know that was a thing.

19        Q.    Have you -- have you enrolled in college

20   since the incident to try and receive some sort of

21   retraining through the college?

22        A.    No, I didn't.  I don't know what to -- I'm

23   not good with computers and stuff.  I've always

24   been a hands-on worker.

25        Q.    What about any military experience,



Angel Sanchez                                        November 05, 2024
                                                     Page 150

1    anything like that?

2         A.   No.

3         Q.   Have you ever been any sort of party to

4    any sort of lawsuit where you had sued or...

5         A.   I think only -- they sent me something in

6    the mail for -- I guess they were suing Peacock,

7    you know, the streaming service, and they said I

8    qualified for that.  I think that's pretty much it.

9         Q.   Thank you for letting me know.

10             But have you been -- have you been sued at

11   all or anything like that that you're aware of?

12        A.   That I've been sued, no, I don't think so.

13        Q.   Have you -- let me ask you about your

14   employment history.  Are you currently employed?

15        A.   No, I'm not.

16        Q.   Are you receiving any Social Security

17   Disability?

18        A.   Not anymore, no.

19        Q.   Not anymore.

20             Did you receive it before?

21        A.   Not Social Security, but -- what's it

22   called, the State one?  I received EDD disability.

23        Q.   Is that related to employment?

24        A.   No.  It was disability.

25        Q.   Okay.  And what does the abbreviation



1    stand for; do you know?

2        A.    What, EDD?

3        Q.    Uh-huh.

4        A.    No, I don't.  I'm sorry.

5        Q.    And how long did you receive that?

6        A.    Not too long.  Only, like, a -- I can give

7    an estimate.  I'm not sure how much.  Maybe, like,

8    a year.

9        Q.    From what time period?  What year did it

10   start?  What year did it end?

11       A.    Like I said, I'm not exactly sure.  I can

12   give an estimate.  Maybe around the year of the

13   incident in 2021, probably into the next year.

14       Q.    So I want to ask you about all of the

15   places that you've been employed, okay.  So if we

16   start at your first job when you were 19 or 18

17   years old, did you have a job back then?

18       A.    I got my first job when I was 17.

19       Q.    Oh, okay.  What did you do?

20       A.    I worked at Norm's Restaurant.

21       Q.    And what was your position there?

22       A.    I started off as a cashier.  And then when

23   I turned 18, I became a server, like a waiter.

24       Q.    What years did you work there?

25       A.    2019, like, early 2019.  And then, like,



1    during COVID, like, late 2020, I left.

2        Q.   And why did you leave?

3        A.   It was bad with COVID.  There was not

4    really that much work there at the restaurant.

5        Q.   And when you left the restaurant in 2020,

6    how much were you being paid hourly?

7        A.   I don't remember what -- it was the

8    minimum wage at the time, but I don't remember how

9    much it was.  But the majority of my income was

10   from tips.

11       Q.   Do you know how much you made biweekly at

12   the restaurant?

13       A.   Biweekly, every two weeks...

14       Q.   Including tips, how much did you make?

15       A.   I could probably do the tips better than

16   the actual check.  I don't know how much my checks

17   would come out to.  On my tips I would make like --

18   maybe like a thousand, a thousand 200 biweekly in

19   tips.

20       Q.   And with that a thousand, a thousand 200,

21   you reported that income on your taxes?  You

22   reported --

23       A.   Yeah, I -- I reported on my taxes and

24   everything.  That's just an estimate.  It's not an

25   exact number, because tips vary.



Angel Sanchez                                          November 05, 2024
Page 153

```
 1        Q.   So how much did you make a year working at
 2   Norm's?
 3        A.   I'm not sure.  I would have to check my --
 4   my taxes papers.
 5        Q.   And how many hours a week did you work?
 6        A.   I worked five days a week, eight-hour
 7   days, sometimes shorter.  If it was slow, I would
 8   get cut.  I guess you could average 40, an
 9   estimate.
10        Q.   And what was the location of the Norm's
11   Restaurant, the location?
12        A.   El Monte.
13        Q.   And what was your next job after Norm's?
14        A.   After Norm's, I got a job quickly at a --
15   it was a temp agency.
16        Q.   What was the name of the temp agency?
17        A.   Newegg, I think, New-something.
18        Q.   And what job did you get through Newegg?
19        A.   It was at a warehouse.  I would -- like,
20   for car parts.  And I'll just be with the -- I
21   would just restock them, like, just restock or pick
22   orders, stuff like that.
23        Q.   And what was your hourly rate there?
24        A.   I don't remember.  I believe it was
25   minimum wage at that time.  I don't remember how
```



Angel Sanchez                                        November 05, 2024
                                                     Page 154

1    much it was.

2        Q.    How many hours did you work a week?

3        A.    There, minimum 40 a week and some overtime

4    here and there.

5        Q.    And what was the location of the

6    warehouse?

7        A.    In the City of Industry.

8        Q.    What were the dates of employment?

9        A.    I don't remember.  I don't remember the

10   exact dates.

11       Q.    Do you have an idea of the year?

12       A.    It was after -- right after I left Norm's,

13   so 2020, late 2020.

14       Q.    And why did you leave that job?

15       A.    I left that job because it was -- like I

16   said, I don't drive, and it was -- the City of

17   Industry is kind of far from here.  So I got

18   another temp agency job closer.

19       Q.    Where did you get your next job?

20       A.    In the City of Azusa.

21       Q.    What year was that?

22       A.    That was already 2021.  That was the last

23   job I worked.

24       Q.    And where did you get a job in the City of

25   Azusa?



Angel Sanchez                                    November 05, 2024
                                                 Page 155

1        A.    It was a -- it was, like, packing.  Like,

2    during COVID they had -- like, for the schools in

3    LA, we would just pack -- like, it was, like, a

4    line, and you just pack the lunches and box them

5    and -- that's what we were doing there.

6        Q.    Is it called Ready Pac?

7        A.    It might have been.  I don't remember the

8    exact name.  It might have been, though.

9        Q.    So you started in 2021.

10             And when did you stop working there?

11       A.    The day of the incident, like, 21st.

12       Q.    What was your hourly wage there?

13       A.    The same.  I don't remember what the

14   minimum wage was -- was at that time.

15       Q.    And did you ever work -- did you ever try

16   and get a job tree cutting?

17       A.    Yeah, I did.

18       Q.    Can you tell me about that?

19       A.    My friend that passed away, his dad is a

20   foreman for LADWP, and they cut trees for the power

21   lines.

22       Q.    And he --

23       A.    He offered.  Go ahead.

24       Q.    Sorry.  No, go ahead.  I'm sorry.

25       A.    He offered me the job, but I can't do it



Angel Sanchez                                      November 05, 2024
                                                   Page 156

```
1    physically.
2         Q.   And what is his name?
3         A.   I don't know his name.
4         Q.   His last name is Morales, right?
5         A.   Yeah.
6         Q.   So what's his first name; do you know?
7         A.   No.  I just call him Pa, like -- just a
8    saying, like -- like that kind of.  I don't know
9    his name.
10        Q.   So where does he live?  Do you know his
11   address?
12        A.   I don't know the address.
13        Q.   This is your best friend that you grew up
14   with, right, Brian Morales?  Is this his dad?
15        A.   Yes.
16        Q.   And did you ever go by his family's house
17   before?
18        A.   What do you mean?
19        Q.   Like, did -- did you ever go to the
20   family's house?
21             Did Brian Morales live with his parents?
22        A.   Oh, yeah.  I've been there before.
23        Q.   So where does -- where does the father
24   live?  Does the father live in the house where
25   Brian lived?
```



Angel Sanchez                                    November 05, 2024
                                                 Page 157

```
 1       A.   Yeah, on Phelan Street, but I don't know
 2   the number, the address.  I don't know it.
 3       Q.   But you do know the -- you do know the
 4   house, right, where they live?
 5       A.   Yeah.
 6       Q.   And do you know the father's first name?
 7       A.   No, I don't think so.
 8       Q.   And you grew up playing, like, football,
 9   right, Pop Warner football?
10       A.   Yeah.  I played football when we were
11   younger.
12       Q.   But did you ever meet the dad when you
13   played football with Brian?
14       A.   Yeah, I met him.  But it's kind of rude to
15   call somebody by their first name when they're
16   older, so I -- I never knew it.
17       Q.   But he did offer you a job with his
18   company, right?  The father did?
19       A.   Yeah.  He said he could get me in.
20       Q.   And did you learn his name when he offered
21   you the job?
22       A.   No.  I don't know his name.
23       Q.   So Mr. Morales, the person who offered you
24   the job, lives on Phelan Street; is that right?
25       A.   Correct.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 158

 1        Q.    Does he live on the street near where this
 2   incident happened?
 3        A.    I believe on the other side of, like --
 4   the other side of the street.
 5        Q.    Was that the house where they're having
 6   the -- the party?
 7        A.    The get-together, yeah.
 8        Q.    So he lives at that street, right -- or he
 9   lives at that house?
10        A.    Yes, ma'am.
11        Q.    So did you have any other jobs that you
12   worked in your lifetime, any other jobs?
13        A.    I don't think so.
14        Q.    Other than yourself, can you identify any
15   witnesses to this incident by name?
16        A.    By name, no.
17        Q.    What about -- earlier you mentioned
18   Mr. Aldaco, Jesus Aldaco.
19        A.    Oh, yeah.  I thought you meant besides
20   him.
21        Q.    So Mr. Aldaco was a witness to this
22   incident, right?  He was there?
23        A.    He was there, yeah.
24        Q.    And Ingrid Molina, she was a witness to
25   this incident?  She was there?



MAGNA
LEGAL SERVICES

Angel Sanchez                                    November 05, 2024
                                                 Page 159

1       A.    She was there, correct.

2       Q.    Your mom, she was a witness after the

3   incident when you were being placed in the

4   ambulance, right?

5       A.    Correct.

6       Q.    Was there any other people that you can

7   identify by name that were present at the time of

8   the incident?

9       A.    Just -- I think there was, like, people,

10  like, his family members outside the house I don't

11  know by name and -- and the officers.  Pretty much

12  it.

13      Q.    So how about we focus on the house where

14  Brian Morales lived.

15            You were at the house earlier that -- that

16  night on the date of the incident, right?

17      A.    Correct.

18      Q.    Can you name all the people that you saw

19  at the house on the night of the incident?

20      A.    I -- I wouldn't be able to name all of

21  them by name.  I didn't -- I didn't know most of

22  them.  I was there to spend time with the family.

23      Q.    So go through and name the people that you

24  know who were there, by name, please.

25      A.    There was a family friend.  I think his



Angel Sanchez                                           November 05, 2024
                                                        Page 160

 1  name was Brian Alvarez.  I think they had --
 2  actually, he had a cousin Mario.  I don't know them
 3  by their last names, so...
 4      Q.  If you could just name -- if you have
 5  their full name, that's great.  But if you only
 6  know by first name, if you could please name all of
 7  the people that you remember seeing at that party
 8  on Phelan, or the get-together on Phelan on the
 9  night of the incident.
10      A.  There was -- his sister was there.  Her
11  name is Mida.  What's his name...
12          I think -- I can't remember the name off
13  the top of my head.  I think that -- oh, no, she
14  wasn't there.  I think there was another family
15  friend named Hector.  One of the family members,
16  Liz, Lizette, or Liz -- Lizbeth.  I don't know how
17  to say her name.  Yeah.  I'm sorry.  I can't
18  remember off the top of my head.
19      Q.  About how many people would you estimate
20  that were at this get-together?
21      A.  Maybe, like, 20 to 30 maybe.  20 people, I
22  guess.
23      Q.  Are you aware of anyone that took any sort
24  of video of the incident?
25      A.  Not that I'm aware of.  I don't know.



Angel Sanchez                                    November 05, 2024
                                                    Page 161

```
 1        Q.   And have you spoken with anyone other than
 2    your attorneys related to this incident?
 3             MS. LEAP:  I believe asked and answered.
 4             But he can answer.
 5             THE WITNESS:  I don't -- I don't know.  I
 6    don't think so, just not details.
 7        Q.   BY MS. WILFERT:  Did you tell any of your
 8    friends about the incident?
 9        A.   Just -- basically, just that I ran and got
10    shot by the police.  That was pretty much it.
11        Q.   And what are your friends' names?
12        A.   I don't remember who I spoke to.  I think
13    I spoke to -- I think I told my friend Brian
14    Alvarez about it.
15        Q.   And where does he live?
16        A.   I don't know.
17        Q.   Do you have his phone number?
18        A.   No.
19        Q.   Who else did you speak to about it?
20        A.   I don't remember.
21        Q.   I'm sorry?
22        A.   I don't remember.
23        Q.   So only Brian Alvarez is all you
24    remember --
25        A.   Yeah.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 162

```
 1        Q.    -- I'm guessing?

 2              So, Mr. Sanchez, do you have a pending

 3    criminal case now?

 4        A.    Yeah, I do.

 5        Q.    And what courtroom is that -- or what

 6    courthouse is that case in?

 7        A.    Pomona courthouse.

 8        Q.    I'm sorry?

 9        A.    Pomona courthouse.

10        Q.    And what are the charges that are pending

11    against you?

12        A.    I believe it's an assault with a deadly

13    weapon on a peace officer.

14        Q.    And have you been arraigned in that case

15    yet?

16        A.    Yes, I have.

17        Q.    And have you had a preliminary hearing in

18    the criminal case?

19        A.    Yes, I have.

20        Q.    Did you testify at that preliminary

21    hearing?

22        A.    No, I did not.

23        Q.    You were present during the preliminary

24    hearing, though, right?

25        A.    Correct.
```



Angel Sanchez                                      November 05, 2024
                                                   Page 163

1        Q.    And you heard all the officers testify --
2    or you heard officers testify at the preliminary
3    hearing as to what happened, correct?
4        A.    I heard one officer testify.
5        Q.    And who testified?
6        A.    Officer Camacho.
7        Q.    So you heard the testimony of Officer
8    Camacho at the preliminary hearing, right?
9        A.    Yeah, I did.
10       Q.    And what day was that preliminary hearing?
11       A.    I don't remember.
12       Q.    Was it before this deposition that you're
13   sitting for here today?
14       A.    Yeah.
15       Q.    So you were able to listen to Officer
16   Camacho's testimony about what he observed on the
17   date of the incident, right?
18       A.    I did hear it, yeah.
19       Q.    And after that preliminary hearing, you
20   were held to answer; is that correct?
21       A.    Correct.
22       Q.    And they set a date for an information,
23   right?
24       A.    I believe so on that too.  I'm not too --
25   I don't know too much about it.



Angel Sanchez                                          November 05, 2024
                                                       Page 164

```
 1        Q.   So at the -- when you were arraigned on
 2   the information, did you -- did you receive -- did
 3   you receive another date to go to court after that?
 4        A.   Yes, I did.
 5        Q.   And what is the current status of your
 6   criminal case in Pomona court?
 7        A.   I'm -- I'm sorry.  I didn't hear you.  It
 8   cut off.
 9        Q.   What is the current status of your
10   criminal case in the Pomona court?
11             MS. LEAP:  I'll object just to the extent
12   that the question is vague and ambiguous.  And may
13   call for a legal conclusion.
14             But he can answer what his understanding
15   of the case -- of the case status is.
16             THE WITNESS:  I mean, it's pending still.
17        Q.   BY MS. WILFERT:  So when you appeared at
18   that hearing on the information where you were
19   arraigned, did you enter not guilty pleas to
20   everything?
21        A.   Yes, I did.
22        Q.   Was your case set for a pretrial setting
23   and conference, do you know?
24        A.   They set it for something.  It could have
25   been that.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 165

1        Q.    Did you appear in court on October 29th of

2   this year?

3        A.    Yes, I did.

4        Q.    And when you went to court on

5   October 29th, did you -- your case got continued

6   out to what -- or January 8th of 2025; is that

7   right?

8        A.    Correct.

9        Q.    And were you ever interviewed by probation

10  related to this criminal case?

11       A.    What do you -- like a probation officer?

12       Q.    Were you ever interviewed by a probation

13  officer?

14       A.    About this case, no.

15       Q.    Did they ask you about your criminal

16  history?

17             MS. LEAP:  Misstates his testimony.  And

18  lacks foundation.  He said he was not interviewed.

19       Q.    BY MS. WILFERT:  Were you released by the

20  Court on your own recognizance?

21       A.    With conditions.

22       Q.    And what are your terms of your release?

23       A.    Electronic monitoring -- monitoring.

24  Sorry.

25       Q.    So you have an ankle monitor on your leg?



Angel Sanchez                                    November 05, 2024
                                                 Page 166

 1       A.    Correct.

 2       Q.    What leg is the ankle monitor on?

 3       A.    My right.

 4       Q.    And are you on house arrest?

 5       A.    Yeah.  I can only go to doctors'

 6  appointments, church, and grocery shopping.

 7       Q.    Did they give you any other terms?  No

 8  weapons?

 9       A.    Oh, yeah.  No weapons.

10       Q.    Have you -- and when did you receive the

11  terms of your release from the Court?

12       A.    I'm not sure of the exact date.  Back in

13  March.

14       Q.    Have you ever violated those terms?

15       A.    No.

16       Q.    So I'd like to ask you about after the

17  incident when the fire department arrived.

18             Can you tell me what the fire department

19  did when they arrived?

20       A.    I believe they cut my clothes.  They

21  checked me for other injuries.  They just rendered

22  aid.  I think they -- I'm not certain if it was the

23  fire department or another police officer that took

24  off the tourniquet that Officer Camacho put on me

25  and they put a new one on, and then they just



```
 1   waited for the EMTs.
 2        Q.   So tell me what happened when the -- the
 3   paramedics or EMTs arrived?
 4        A.   They arrived.  They rendered aid, and they
 5   put me in the stretcher.  Put me in the stretcher,
 6   and they took me to the hospital.
 7        Q.   Do you know how long it took after the
 8   first tourniquet was placed on you to the point
 9   that you were being treated by emergency medical
10   services?  And when I say that, that can either be
11   firemen or paramedics.
12        A.   Like I said, I'm not sure of the time.  I
13   wasn't counting.
14        Q.   So after emergency medical services
15   treated you, what happened after that?
16        A.   They took me to the hospital.
17        Q.   And what hospital did you go to?
18        A.   LA County, USC Hospital.
19        Q.   Tell me what happened when you got to the
20   hospital.
21        A.   That's when I started to -- I don't
22   remember too much.  I started, like, fading.  I
23   remember we got there, and a bunch of doctors and
24   nurses were on me all over my wounds.  And then I
25   just remembered -- and then they put me under
```



Angel Sanchez                                        November 05, 2024
                                                     Page 168

 1   anesthesia.  I don't remember anything else.
 2       Q.   So what is your next memory after you went
 3   under anesthesia?  What's your next memory after
 4   that?
 5       A.   Waking up.
 6       Q.   And when you woke up, where were you at?
 7       A.   In a hospital bed in ICU.
 8       Q.   And you're still at the same hospital, LA
 9   USC?
10       A.   I believe so, yeah.
11       Q.   How long were you in ICU at the hospital?
12       A.   The ICU, I don't know.  Maybe a couple
13   weeks, like two weeks.  Oh, wait.  In the ICU,
14   actually?
15       Q.   Yes.
16       A.   No.  In the ICU -- in the ICU, I only
17   spent, like, a night or two.  And then they moved
18   me to a -- the jail ward part of the hospital, and
19   there I spent, like, two weeks.
20       Q.   And did you have any surgeries when you
21   were at the hospital at LA USC?
22       A.   I had three.
23       Q.   Can you tell me what the first surgery was
24   for?
25       A.   The first one was -- well, when I had got



Angel Sanchez                                        November 05, 2024
                                                     Page 169

```
 1   there, from all my wounds and my leg, they had to
 2   cut my leg open on both sides because one of the --
 3   the bullet got stuck in my muscle, and it turned --
 4   like, my leg got super big, and there was no blood
 5   going to my foot.
 6              So they had to cut my leg open on both
 7   sides to relieve pressure.  And if it didn't work,
 8   they were going to cut off my foot.  So that was
 9   the first surgery.
10        Q.   And then do you know what surgery you had
11   next?
12        A.   The next surgery they were going to see
13   if -- they were just going into my leg again.  Like
14   I said, it was open.  They closed one side of my
15   leg.
16        Q.   And did you have another procedure after
17   that, another surgery?
18        A.   Yes, I did.
19        Q.   Tell us about that.
20        A.   That's when they -- it finally, thank God,
21   started going down, and they closed the other side
22   of my leg.
23        Q.   Did you have any other surgeries when you
24   were at the hospital?
25        A.   No.  I believe it was just those three.
```



Angel Sanchez                                         November 05, 2024
                                                      Page 170

```
 1        Q.   Did you have any other surgeries after you
 2   left the hospital and went into the jail hospital?
 3        A.   That's where I had them, in the jail
 4   hospital.
 5        Q.   You had all of them in the jail hospital?
 6        A.   The second two.
 7        Q.   Okay.
 8        A.   The first one I had --
 9        Q.   I'm sorry.  Go ahead.
10        A.   So the first one I had when I first got
11   there.
12        Q.   Uh-huh.
13        A.   And then I was in the ICU for two days.
14   They left my leg open on both sides.  And they
15   moved me to the jail ward, which is just in --
16   it's, like, in the basement of the hospital, like,
17   on the bottom floor.
18        Q.   Uh-huh.
19        A.   And so it's still the same hospital.  And
20   then they did the other two when I was there.
21        Q.   Okay.  Now, can you describe -- I think
22   you briefly described before your injuries from the
23   shooting.
24             Can you describe them to us now?  What
25   were they -- what were your initial injuries?
```



Angel Sanchez                                              November 05, 2024
                                                          Page 171

1        A.    For like I just said right now, my -- my

2    left leg got damaged the most out of the shooting.

3    Then I have like a big -- like a big piece of meat

4    missing on my thigh.  It's like a hole.

5        Q.    Uh-huh.

6        A.    And then, like, on my butt I have -- it's

7    embarrassing -- like my crack, like the top, it's

8    pretty ugly.  It's like scarred up and stuff.

9        Q.    And did you take pictures of how your

10   injuries look now?

11       A.    Yes, I did.

12       Q.    And when did you take those photographs?

13       A.    I don't remember exactly when I took them.

14       Q.    And did you have any medical insurance at

15   the time of this incident?

16       A.    I believe I was under my mom's insurance.

17   I'm not sure.

18       Q.    Did you have any sort of Medi-Cal or

19   anything?

20       A.    Medi-Cal, I got it that same day when a

21   social worker came and talked to me, and I was --

22   the next day in the hospital, and I qualified for

23   Medi-Cal.

24       Q.    Do you know what kind of insurance your

25   mom has?



Angel Sanchez                                    November 05, 2024
                                                        Page 172

```
 1        A.    I don't know the name of it.

 2        Q.    Do you carry a card with you at all?

 3        A.    Now I do.  I have my Medi-Cal one.

 4        Q.    So I want to ask you about nerve damage.

 5              Now, was there any doctor that told you

 6   you had nerve damage?

 7        A.    Yes, there was.  Because I asked why my

 8   leg was, like, numb and stabbing pain and a sharp

 9   pain.  And they said it was nerve damage.

10        Q.    What doctor told you that?

11        A.    I don't remember.  It was the first doctor

12   that told me that.  It was at the hospital when

13   I -- that -- the first -- the next day after I was

14   wondering why I hurt so bad like that.  I don't

15   remember his name.  My family doctor also told me

16   as well it's nerve damage.

17        Q.    Did you have any prior injuries before

18   this incident?

19        A.    Before the incident, no.  Never broke a

20   bone, nothing.

21        Q.    What about numbness, did a doctor ever

22   tell you about that?  Did you ever have any

23   numbness?

24        A.    Before the incident?

25        Q.    No.  After the incident.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 173

```
 1      A.   Yeah.

 2      Q.   Where?

 3      A.   My left leg.  Like, basically, my knee and

 4  down, or a little lower than my knee and down, my

 5  whole leg, my shin, and my foot.

 6      Q.   And the hammer toe, you said your toes --

 7  toes are kind of curled in.

 8           What foot is that?  Is that your right or

 9  left?

10      A.   The left one.

11      Q.   So do you have any physical limitations on

12  what you can -- cannot do based on the injuries

13  that you have?

14      A.   Yeah, I do.

15      Q.   Can you describe?

16      A.   Well, the first thing is I can't run.  I

17  can't lift anything heavy.  It's -- I can't squat.

18  It hurts to squat.  I can't walk long periods of

19  time.  My leg -- I need my cane always.  It hurts

20  really bad.  I can't wear shoes.  I hate wearing

21  shoes.  It's too tight.  It hurts my toes really

22  bad.  Same with socks.  Just -- it hurts when I

23  sleep.

24      Q.   What hurts?

25      A.   My leg.  I get, like, from sharp -- the
```



Angel Sanchez                                       November 05, 2024
                                                    Page 174

```
 1   sharp and stabbing pains, like, the shocks.  It
 2   feels like electricity shocks.  I can't play sports
 3   anymore.  I can't run around with my nieces and
 4   nephews.  I can't climb.  I can't go hiking.  I
 5   can't fish no more.  Because if I go on the rocks,
 6   I'm going to slip and fall.
 7           I mean, I had to -- we put a thing on the
 8   showers that I have to hold onto so I don't fall.
 9   Those are some of the basic things I can't do
10   anymore.
11       Q.  Can you tell me the names of all the
12   doctors that you've seen related to this incident?
13       A.  All of them?  I wouldn't be able to tell
14   you all of them.  There's a lot.
15       Q.  Tell me -- can you tell me the ones that
16   you do remember?
17       A.  After, for checkups, there was -- the only
18   two I remember is Dr. Tomassian and Dr. -- what's
19   his name.  I went to go see him, like, two months
20   ago.  I think his name is Keling.  I don't remember
21   the names of the other doctors unfortunately.
22       Q.  And why you go to Dr. -- is it Tamson
23   or --
24       A.  Tomassian.
25       Q.  Tomassian.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 175

```
 1        A.   He was my first -- he was my main doctor
 2   until I switched to Medi-Cal, and then I got
 3   Dr. Keling.
 4        Q.   Can you spell his name?
 5        A.   Tomassian?
 6        Q.   Yes.
 7        A.   I -- I don't know how to spell it.  Sorry.
 8             (Discussion off the record.)
 9        Q.   BY MS. WILFERT:  So Tomassian.  What city
10   so we can at least...
11        A.   Glendora.
12        Q.   Glendora, okay.
13             And what about Dr. Keling?
14        A.   He's my new family doctor.  I just go to
15   check up for my foot, make sure there's still a
16   pulse, because I don't want to lose my foot.  Just,
17   like, sometime -- like, last time I went -- like,
18   sometimes I'll get more pain out of nowhere.  Like,
19   it got swollen.  He took X-rays, and it was
20   swollen.  Just checkups for the most part, yeah.
21        Q.   So after -- after you were released from
22   the hospital, the jail hospital, did they give you
23   instructions on how to take care of your -- your
24   injuries?
25        A.   Yeah.  The physical therapist would come
```



Angel Sanchez                                    November 05, 2024
                                                 Page 176

1    and see me, and he gave me -- he showed me the

2    workouts, and he gave me a packet.  And that's the

3    ones I been doing to this day.

4         Q.   Did doctors give you any other

5    instructions other than the physical therapy?

6         A.   Not that I remember.  I remember they just

7    told me if it didn't -- if the nerve pain didn't go

8    away in a year, then it was going to be permanent.

9    And it hasn't gone away, so it's permanent.

10        Q.   Do you know the name of your physical

11   therapist that you saw when you were released?

12        A.   No, I...

13        Q.   And what address -- oh, go ahead.  Go

14   ahead and finish.

15        A.   He's the -- he was the physical therapist

16   at the hospital.  He would go see me every day when

17   I was there.

18        Q.   Got it.  And did you see a physical

19   therapist after the hospital?

20        A.   There was -- just the same.  They just --

21   after when it -- no, I didn't.  Like, in an office

22   out here, no, I did not see one.  It was just in --

23   in -- when I was in custody and stuff, because I

24   already had the -- they gave me the information --

25   the workout plans and the packets, and I was able



Angel Sanchez                                    November 05, 2024
                                                 Page 177

 1  to do it with my mom's help.

 2      Q.    And do you still have the workout plan and

 3  the packet?

 4      A.    I -- I lost the packet, but I have it

 5  memorized.

 6      Q.    So why don't you tell me what you have to

 7  do per the orders of your physical therapist at the

 8  hospital.

 9      A.    So to try to regain strength on my leg, I

10  have to, like, lay down and kind of like -- you

11  know those arm-circle things that you -- like --

12      Q.    Uh-huh.

13      A.    -- kind of like that with the leg.  Bend

14  the knee and push out and then put, like, a thing,

15  get a band or, like, a sock, put it on my toes to

16  try to -- because if I don't work out, my toes are

17  going to get worse and worse.

18          So I have to, like, pull them back this

19  way, because they are crunched in like that.

20          What else?  Yeah.  Just mostly, like,

21  exercises and stretches, mostly stretches too,

22  because they get, like, swollen and stiff.

23      Q.    And you mentioned the cane.

24          Do you have to walk with a cane?

25      A.    Yeah.



Angel Sanchez                                          November 05, 2024
Page 178

```
 1      Q.   And do you hold the cane on your right or
 2  your left?
 3      A.   In my right hand.
 4      Q.   And do you take the cane everywhere with
 5  you?
 6      A.   For the most -- yeah, for the most part,
 7  yeah.
 8      Q.   Did the doctor tell you to walk with a
 9  cane for support?
10      A.   Yeah.  They prescribed me one at USC.
11      Q.   Do you know what doctor prescribed that to
12  you?
13      A.   I'm not sure.  It was the ortho clinic.
14  Every time I would go, it is a different doctor.
15      Q.   Have you sought any treatment after the
16  incident to try and improve, you know, your -- just
17  the pain that you're having?
18      A.   They said there was nothing they could do,
19  just meds.  They said if it didn't go away in a
20  year, that it will be permanent.  The only thing I
21  could have done is the workouts to make sure it
22  doesn't get worse.
23      Q.   Have you gone to another physical
24  therapist since you -- since the incident to just
25  check in to make sure that you're doing everything
```



Angel Sanchez                                    November 05, 2024
                                                 Page 179

```
 1   you can do to -- to treat your condition?
 2       A.   No.  I went to -- to see my regular doctor
 3   for a checkup.  And they told me that the stage of
 4   going to see a physical therapist would end, would
 5   be too much.  It's just working out, the workouts
 6   that I have, and try to prevent it from getting
 7   worse.
 8       Q.   And how's your gait when you walk?  Do you
 9   walk with a limp at all, or do you know --
10       A.   Oh, yeah.  If I don't --
11       Q.   -- if your gait --
12            How -- how is it when you walk?
13       A.   Exactly how you said it, with a limp if I
14   don't have my cane.  It's easier with my cane.  You
15   can only notice it a little bit.
16       Q.   So if you're comfortable doing it -- I
17   know you don't have a lot of space there -- but
18   could you walk from -- just stand up and just walk
19   a little, if you feel comfortable doing it.
20       A.   I can do a little bit.  Can you see that?
21       Q.   Yes.
22       A.   So it's pretty much like that, just a
23   little -- a little -- I don't have much space.  I'm
24   sorry.
25       Q.   No, it's okay.  I don't want you to -- I
```



Angel Sanchez                                              November 05, 2024
                                                          Page 180

```
 1   don't want to cause you any pain whatsoever.
 2       A.   It's just -- it's my left leg that it's --
 3   you notice.  Like, I have to carry it.  Can you
 4   see?
 5       Q.   Yes, I can see you.  Okay.  Thank you for
 6   demonstrating how you -- how your gait is.
 7       A.   It's just -- it's, like, I have to carry
 8   my left leg.
 9       Q.   Yeah.  Does the cane help?  When you walk
10   with a cane, it helps give you more support?
11       A.   Definitely.  I can put my weight while I'm
12   on the cane, so it's not so bad.
13       Q.   Do you know, just in total, how much all
14   of your medical bills were related to this
15   incident?  Do you have an idea of the cost?
16       A.   Like I said, Medi-Cal took care of it, but
17   I remember seeing one of the -- one of the surgery
18   bills was 70,000, I think.
19       Q.   And have you notified Medi-Cal that you
20   have this pending lawsuit?
21       A.   I didn't know I had to.  I haven't.
22       Q.   So I can't give you any advice.  You can
23   talk to your attorney.  I'm just asking a question
24   now.
25            So have you paid any money out of pocket
```



Angel Sanchez                                    November 05, 2024
                                                 Page 181

```
1   for your medical care?
2       A.   No.  Medi-Cal took care of all of it.
3       Q.   And what about income?  Since the
4   incident, have you been able to work?
5       A.   No.
6       Q.   Since the incident, did the criminal case
7   interfere with you getting employment?
8            MS. LEAP:  Calls for speculation.
9            But to the extent that he knows, he can
10  answer.
11           THE WITNESS:  It makes it harder.
12      Q.   BY MS. WILFERT:  I ask you that because
13  you have terms now, right, where --
14      A.   Yeah.
15      Q.   -- you have to stay in the house.  You can
16  only go to your doctor appointments.
17           So I'm asking if all of that interferes
18  with you getting employment?
19      A.   To an extent, yeah.
20      Q.   It's hard for you to -- to go on a job
21  interview right now, right?
22      A.   Yeah.  But, like, work-from-home positions
23  I try to look.  But everybody wants experience with
24  computers, and I don't have that.
25      Q.   Has anyone paid any of your medical bills?
```



1    Like, has your mom paid any of your medical bills?

2         A.   No.  I think it's just everything was

3    covered by Medi-Cal.

4         Q.   Do you have any anticipated -- let me

5    strike that.

6              So while you're -- have you applied for

7    any jobs since the incident?

8         A.   Yeah, I tried to get -- like, what's it

9    called?  Like, customer-service type, like, on the

10   computer, work from home.

11        Q.   And what company did you apply for?

12        A.   I tried Disney and Amazon.

13        Q.   So when did you apply for Disney?

14        A.   I don't remember the date when it was.  I

15   don't recall it back.

16        Q.   Was it in 2021?

17        A.   No.

18        Q.   And so you applied for, you said, Amazon?

19        A.   Yeah, I did as well.

20        Q.   So you applied for Disney and Amazon.

21             What position did you apply for Disney?

22        A.   I tried to do the customer service, you

23   know.  Like, if you need help, you just talk to the

24   little chat.  That...

25        Q.   But did you -- did you have an interview



Angel Sanchez                                          November 05, 2024
                                                       Page 183

 1    for that?

 2         A.    No.

 3         Q.    What about for Amazon, when did you apply

 4    for Amazon?

 5         A.    I did them, like, at the same time.

 6         Q.    Okay.  So did you get an interview for

 7    Amazon?  No?

 8         A.    No.

 9         Q.    Have you applied for any other jobs since

10    the incident other than Disney and Amazon?

11         A.    No.  I tried to look, but they all want

12    people with experience.  I don't have it.

13         Q.    I asked if you had any preexisting

14    conditions at all, like health or -- you said "no,"

15    right?

16         A.    Yeah.  No, no conditions.

17         Q.    What about any emotional injuries as a

18    result of the incident, like, have you gone to any

19    sort of, like, psychologist or counselor after this

20    incident happened?

21         A.    I have a psychiatrist.

22         Q.    Okay.  And who is that?

23         A.    Her name is Annie.  And I don't know how

24    to say her last name.

25         Q.    What city is she located in?



Angel Sanchez                                           November 05, 2024
                                                       Page 184

```
 1        A.    It's in the Inland Empire.  I don't know
 2   exactly what city it's called.  Inland Empire
 3   Psychiatric Medical Group.  I don't know what city
 4   it's in.
 5        Q.    Are you diagnosed with any sort of, like,
 6   mental disorder?
 7        A.    PTSD.
 8        Q.    Anything else?
 9        A.    Anxiety, insomnia.
10        Q.    When did you start -- oh, go ahead.
11        A.    I think that's it.  That's all I was going
12   to say.
13        Q.    When did you start seeing the
14   psychiatrist?
15        A.    I don't remember the exact date.
16        Q.    Was it before the incident?
17        A.    No.
18        Q.    It was after the incident?
19        A.    Yes.
20        Q.    And how often do you see her?
21        A.    Every, like, month and a half -- like,
22   every six weeks.
23        Q.    And has she prescribed any medication to
24   you?
25        A.    Yes.
```



Angel Sanchez                                    November 05, 2024
                                                         Page 185

 1       Q.   What medication did she prescribe to you?
 2       A.   By name, they are kind of hard to say.
 3   Hydroxyzine, Seroquel, prazosin, serotonin, I think
 4   it was called.
 5       Q.   So let's start with the first one.  You
 6   may have to go through that list for me again and
 7   spell anything that you know how to spell.  Because
 8   it sounds like they're kind of difficult names to
 9   pronounce, right?
10       A.   Yeah.  Definitely.
11       Q.   So let's start with the first medication.
12   What is it called?
13       A.   Hydro -- hydroxyzine I think is how you
14   say it.  I'm not 100 percent sure.
15       Q.   And what is that medication for?
16       A.   That one is for anxiety.
17       Q.   And what's the next -- and how often do
18   you take that?
19       A.   I take it at night and during the day.
20       Q.   And what is the next medication that you
21   have to take?
22       A.   Seroquel.
23       Q.   And how often do you take that medication?
24       A.   Once a day.
25       Q.   And can you tell us the next medication



Angel Sanchez                                        November 05, 2024
                                                     Page 186

 1   you have to take?

 2       A.   Prazosin.

 3       Q.   And can you describe what that medication

 4   is for?

 5       A.   That one is so I don't dream.

 6       Q.   And how long -- I may have asked you this

 7   before, but how long have you been seeing this

 8   psychiatrist?

 9       A.   I'm not sure of the exact date.  I just

10   know it was a couple -- maybe a couple months.  I

11   don't know.  It was -- it was, like, a couple

12   months after the incident, because I didn't want

13   to.  I didn't want to see a psychiatrist.  But I

14   had to because it was getting bad.

15       Q.   Did your mom recommend that you see

16   someone or...

17       A.   Yeah.  It was -- she convinced me, and it

18   worked out.

19       Q.   And since you started seeing the

20   psychiatrist and taking the medication, are you

21   feeling better?

22       A.   I could finally sleep.

23       Q.   So you're feeling better now that you

24   got -- that you received treatment, right?

25       A.   To an extent, yeah.



Angel Sanchez                                            November 05, 2024
                                                         Page 187

1        Q.    Do you have any limitations having been
2    diagnosed with anxiety, insomnia, PTSD?
3        A.    Yeah.  I do have -- when it first
4    happened, I didn't want to leave my house.
5        Q.    Why is that?
6        A.    I was scared.  I almost died.  I was
7    scared.  I don't know.  I was just scared.  I
8    didn't want to leave my house.  Even to this day,
9    if I go to church, I sit all the way in the back
10   row.
11       Q.    And why do you do that?
12       A.    I don't want people behind me anymore.
13       Q.    Did you have any type of kind of
14   preexisting, like, mental condition?  Like, did you
15   have a prior diagnosis?
16       A.    Not that I remember.
17       Q.    And do you -- can you estimate how much
18   you paid or your insurance has paid towards the
19   psychiatrist that you're seeing?
20       A.    To the psychiatrist or to the medication?
21       Q.    No, just the psychiatrist.  Just --
22   because you see the psychiatrist, what, every six
23   months or so?
24       A.    No, every six weeks.  Every, like, month
25   and a half.



Angel Sanchez                                          November 05, 2024
                                                       Page 188

```
 1        Q.    So how much would you say you paid so far
 2   since the incident to this psychiatrist?
 3        A.    I -- I wouldn't be able to answer that.
 4   I'm not sure.
 5        Q.    But you paid for this psychiatrist.
 6              Is that through Medi-Cal?
 7        A.    Medi-Cal pays it, yeah.
 8        Q.    Have you received any money from, like,
 9   Social Security Disability every month?
10        A.    From Social Security, no.  I don't receive
11   money every month.
12        Q.    Do you receive any sort of income every
13   month?
14        A.    No.
15        Q.    So did you -- after the incident, were you
16   interviewed?
17        A.    I believe I was.
18        Q.    And do you remember who you were
19   interviewed by?
20        A.    I think it was the sheriff's, sheriff's.
21        Q.    Do you remember a Detective Scott Lawler?
22   Do you remember that name?
23        A.    I think so.
24        Q.    And do you remember a Detective Robert
25   McGaughey from the sheriff's department?
```



Angel Sanchez                                      November 05, 2024
Page 189

```
 1        A.    I think so, yeah.
 2        Q.    And do you remember providing a statement
 3   to them about what happened?
 4        A.    To an extent.
 5        Q.    And when you -- do you remember it or...
 6        A.    It's a blur, but yeah.  I remember some of
 7   it.
 8        Q.    And do you remember -- and when you spoke
 9   to the detectives from the sheriff's department,
10   what you told them, was that truthful?
11        A.    My memory was kind of -- was groggy.
12        Q.    So when you spoke to the detectives, do
13   you remember, like, lying to them about anything
14   that happened?
15        A.    Lying?
16        Q.    Yeah.
17        A.    Not that I remember.
18        Q.    And can you briefly just tell me what you
19   told the detectives; do you remember?
20        A.    I remember I told them that I got out of
21   the car, I ran away, I didn't point the gun, I
22   didn't -- I wasn't in his direction, I didn't even
23   see him, I ran the other way, and I threw the gun.
24        Q.    Do you remember them asking you about the
25   gun and if you possibly pointed it at the officers
```



Angel Sanchez                                              November 05, 2024
                                                          Page 190

```
 1   for a brief period of time?  Do you remember that
 2   line of questioning?
 3       A.    To an extent.
 4       Q.    Here, let me -- isn't it true that --
 5   isn't it true that the detectives questioned you
 6   about that, about whether you pointed the gun at
 7   the officer?
 8       A.    They asked me, and I told them I didn't
 9   point it at him.
10           MS. WILFERT:  Can you give me a second?
11   I'll be right back.  I just want to pull up this
12   exhibit for a minute.  Can I get five minutes?
13           MS. LEAP:  Sure.
14           MS. WILFERT:  Great.  Thank you.
15           THE VIDEOGRAPHER:  Off record?  Okay.  We
16   are off record at 4:41.
17               (A recess was taken.)
18           THE VIDEOGRAPHER:  We are back on record
19   at 4:53.
20       Q.    BY MS. WILFERT:  Mr. Sanchez, you're aware
21   you're still under oath?
22       A.    Yes.
23           MS. WILFERT:  So, Mr. Sanchez, I'm showing
24   you -- I'm sorry for the break.  I had to pull this
25   up.  I'm showing you what's been marked for -- if
```



Angel Sanchez                                      November 05, 2024
                                                        Page 191

```
 1   we can please mark this, Ms. Court Reporter Dunlap,
 2   as Exhibit 8, I believe we're at.
 3                  (Discussion off the record.)
 4                  (Reporter marked Exhibit No. 9 for
 5                   identification.)
 6       Q.   BY MS. WILFERT:  Mr. Sanchez, I'm showing
 7   you what's been marked as Exhibit 8 [sic].
 8            Do you recognize this document?  It's 32
 9   pages.  And I will scroll down slowly through the
10   document.  And this is a transcript of your
11   interview with the LA Sheriff's Department
12   detectives.
13            Have you had a chance to review it?
14       A.   I think I -- maybe some of it.
15       Q.   Did you review it on the break?
16       A.   No.
17       Q.   So I'm just scrolling through so you can
18   see the whole document.  And the Bates stamp number
19   in the lower right corner is COBP 000265, and it
20   goes all the way to 296, and it's a total of 32
21   pages.
22            So before the break, I was asking you if
23   you were interviewed by the LA Sheriff's Department
24   detectives about whether you pointed the gun at
25   Officer Camacho.
```



Angel Sanchez                                          November 05, 2024
                                                       Page 192

 1              Do you remember that?

 2       A.    Yeah, I do.

 3       Q.    And do you remember what you told the

 4  officers when you were interviewed?

 5       A.    I told them that I ran away from the

 6  police car.  I didn't see nobody.  I didn't point a

 7  gun at nobody.  I didn't face in their direction.

 8  I ran, and I threw it.

 9       Q.    So I'm showing you the -- 15, and it's

10  COBP 000279.

11              So Detective McGaughey asks you -- and

12  this is line 24 -- (as read) "When you're getting

13  out of the car, were you kinda obviously getting

14  out quick, and you got burner in hand -- and are

15  facing the cop car at the first to get" out -- or

16  "get around."

17              And then you respond, "No, no."

18              Do you recall that?

19       A.    Yeah.

20       Q.    And then the detectives asked you --

21  Detective McGaughey -- I hope I'm saying his name

22  right.  This is line 30.  "No, no...just to get

23  around the door be -- before you started running up

24  past the car."

25              And you responded, Mr. Sanchez, "I just



MAGNA
LEGAL SERVICES

Angel Sanchez                                        November 05, 2024
                                                              Page 193

```
 1   opened the door and ran the opposite direction of
 2   the car."
 3              Do you remember that?
 4        A.    Yeah.
 5        Q.    And then the detective further questions
 6   you about your position.  And the detective in
 7   line 36 says, (as read) "Right.  But do you see how
 8   I'm saying like when you get out of the car, you're
 9   facing, because of the doors, the way the door
10   opens up, if you go straight out, you're going to
11   run into the end of the door, you know what I'm
12   saying?"
13              And you say, "Well, yeah."
14              And then the detective in line 43 asks
15   you, (as read) "So you're kind of tilted toward the
16   cop car as you're starting to -- as -- as soon as
17   you're getting out or no?"
18              And then you respond, line 46, (as read)
19   "So, like I don't -- maybe for a split" -- "a split
20   second."
21              So when you got out of the car, your body
22   was tilted maybe for a split second towards the cop
23   car; is that fair to say?
24        A.    The back of my body.
25        Q.    So you testified earlier about when
```



Angel Sanchez                                          November 05, 2024
                                                       Page 194

```
 1   getting out of the car, you have the gun to your
 2   right side pointed down towards the ground, right?
 3       A.   Correct.
 4       Q.   And when you step out of the car, did you
 5   step out with your face facing the fence, that
 6   white gate?
 7       A.   Like, at an angle.  I said that.
 8       Q.   So at an angle.  So when you're at an
 9   angle, your face is facing part of the gate and
10   down the sidewalk in the direction you're going to
11   run?
12       A.   Correct.
13       Q.   And the gun is to your side, right?  It's
14   to your right side.  You're saying it's pointed
15   down to the ground; is that accurate?
16       A.   Yeah.  Towards the side, kind of inside,
17   like, my thigh area.
18       Q.   So for a moment that gun was -- when it
19   was down to your side, was facing the direction of
20   where the police car was; is that right?
21       A.   No.
22       Q.   But it was exposed -- you didn't have the
23   gun covered when it was down to your side, was it?
24       A.   I was trying to hide it in front of my
25   thigh.
```



1      Q.   But initially you didn't hide it.  It was

2  fully exposed down to your right side, correct?

3           MS. LEAP:  Misstates testimony.

4           But he can answer.

5           THE WITNESS:  I hid it towards, like, the

6  inside of my thigh, like I said, like, on the side

7  but using my thigh to cover it.  Because I didn't

8  want him to see it.

9      Q.   BY MS. WILFERT:  But initially when you

10  got out of the car, you didn't have the gun

11  covered; is that fair to say?

12     A.   Covered, like --

13          MS. LEAP:  Vague and ambiguous as to

14  "covered."

15          But he can answer.

16          THE WITNESS:  Do you mean covered, like --

17  like, with a shirt or something?  No.  I don't

18  understand.

19     Q.   BY MS. WILFERT:  Initially, when you got

20  out of the black Tahoe, was the gun concealed in

21  your clothing?

22     A.   No.

23     Q.   And when it -- when you got out of the

24  black Tahoe, the gun -- you said you placed it down

25  to your right side, right?  And it was pointed at



Angel Sanchez                                          November 05, 2024
                                                       Page 196

 1   the ground?

 2        A.   To my right side using my thigh to cover

 3   it, to hide it.

 4        Q.   At what point did you move the gun up to

 5   your right thigh?

 6        A.   What do you mean?

 7        Q.   So when you got out of the car, was the

 8   gun pointed straight down to the ground alongside

 9   your right thigh?

10        A.   Yeah, it was pointed down.

11        Q.   And then at one point you move the gun

12   towards the front part of your right thigh; is that

13   right?

14        A.   It was kind of always in front of my

15   thigh.  I was using my thigh to try to hide it.  I

16   don't...

17        Q.   When you exited the car -- when you exited

18   the car, Mr. Sanchez, you had the gun in your right

19   hand; is that right?

20        A.   Correct.

21        Q.   And you're right-handed; is that correct?

22        A.   Correct.

23        Q.   Did you -- you used your left hand, and

24   you opened the back door of the car, right?

25        A.   Correct.



Angel Sanchez                                          November 05, 2024
                                                       Page 197

```
 1        Q.    You pushed the door open; is that right?
 2        A.    Correct.
 3        Q.    Did your left or right foot step out of
 4   the car first?
 5        A.    I already said I don't remember.
 6        Q.    So your foot -- or you stepped out of the
 7   car, right?
 8        A.    Correct.
 9        Q.    When you stepped out of the car, were you
10   facing the window of the car?
11        A.    I was facing towards the gate of the
12   house.
13        Q.    So you're facing towards the gate of the
14   house, and the gun is in your right hand, right?
15        A.    Correct.
16        Q.    And the cop car is behind the black Tahoe,
17   right?
18        A.    If -- yeah, I believe so.
19        Q.    And then you have to take a step past the
20   black Tahoe door, right?
21        A.    Okay.
22        Q.    So you take a step past the black Tahoe
23   door, and then is that when you start to turn your
24   body with the gun in your right hand to run down
25   the sidewalk?
```



Angel Sanchez                                    November 05, 2024
                                                       Page 198

```
 1        A.   I was already -- when I was coming out, I
 2   was at an angle, because I was trying to hide the
 3   gun.  I didn't want him to see it.  I never faced
 4   his direction.
 5        Q.   So when you say you were at an angle, I'm
 6   asking you to describe it.  It is kind of
 7   conclusionary when you say you were at an angle.
 8             Can you describe the exact position of
 9   your body when you exited that Tahoe?
10        A.   So I open the Tahoe, and there was the
11   house with the white fence.
12        Q.   Yes.
13        A.   I got out, and I was facing it.  Like, I
14   don't know how to explain the angle.
15        Q.   So you're facing straight ahead.  Your
16   face -- you see the white fence.  The gun is on
17   your right side.  The cop car is behind the Tahoe.
18   And then you turn your body, right?  You have to
19   turn your body, what, counterclockwise; is that
20   right, to run down the sidewalk?
21             So do you turn to the right or left?  I'm
22   sorry.  You turned to the left, right?  You're
23   turning counterclockwise to the left as you're
24   getting out of the Tahoe; is that accurate?
25        A.   To the left, yeah.
```



Angel Sanchez

1    Q.   And you have the gun in your right.   So
2    when you're turning, do you move the gun as you're
3    turning with your body or do you keep it along your
4    right thigh on the outside?
5    A.   I said I kept it -- like, trying to use my
6    thigh, my right thigh as a shield to cover it so he
7    wouldn't see it.
8    Q.   But when you got out of the car initially,
9    your hand is on the door handle, you have a gun in
10   your right hand.   Did you -- where was the position
11   of the gun before you got out of the car?   Where
12   was the gun?
13   A.   Before I got out?
14   Q.   Yeah.   Right before you opened -- when
15   your hand is on the door handle, before you got
16   out, where was the gun at?
17   A.   It was under the seat.
18   Q.   So your hand is on the door handle, and
19   you're reaching under the seat to get the gun?
20   A.   No.   I had got it first.
21   Q.   So you got the gun first in your right
22   hand, and then you're holding it in your right
23   hand.
24        What position is the gun in before you
25   open the door to the black Tahoe to get out?



Angel Sanchez                                    November 05, 2024
                                                 Page 200

 1      A.    Pointing down on my right side, my right

 2  thigh.

 3      Q.    Now, your right thigh, there's the front,

 4  there's the side, and there's the back.  So what

 5  part of your right thigh was the gun at when you

 6  opened that black Tahoe door with your left hand?

 7      A.    Kind of like in between the side and the

 8  front.

 9      Q.    So it is in between the side and the front

10  of your thigh.

11          And is it down on top of your thigh, or is

12  it at waist level, the gun?

13      A.    Lower -- lower than waist level.

14      Q.    So it's lower than waist level.  It's on

15  the side -- or it's not on the side.  It's between

16  the side and the front of your thigh, and the

17  barrel is pointing towards the door of the Tahoe.

18  This is before you're getting out.  So it's pointed

19  towards the door; is that right?

20      A.    Correct.

21      Q.    So then when you open the Tahoe door and

22  you go to step out, does the gun move at all?

23      A.    I don't remember.  It's --

24      Q.    Go ahead.  I'm sorry.  I don't mean to

25  talk over you.



Angel Sanchez                                    November 05, 2024
                                                 Page 201

```
 1        A.    I'm sorry.  Go ahead.

 2        Q.    No.  Go ahead.

 3        A.    Hello?

 4        Q.    Yeah.  I was going to let you reply.  I

 5   wasn't trying to talk over you.

 6              So you opened the door, and then you step

 7   out.  Does the gun move at all when you step out of

 8   the black Tahoe?

 9        A.    I don't remember.  I just know it was on

10   my right thigh.

11        Q.    Now, at this point you had had alcohol in

12   your system, right?

13        A.    A little bit.

14        Q.    And do you feel at this point that you

15   were impaired by alcohol in any way?

16        A.    No.

17        Q.    So you knew exactly what you were doing,

18   right?

19        A.    I knew that I was running away from the

20   cop.

21        Q.    You knew you didn't want to get caught

22   with the gun, right?  And you were trying to get

23   out of the car, and you had the gun out, right?

24        A.    Correct.

25        Q.    So as you step out of the car, you said
```



Angel Sanchez                                    November 05, 2024
                                                 Page 202

1    the gun is on your thigh in between the front and
2    the side of your thigh.
3              So when you stand up, where does -- does
4    the gun move at all?
5        A.   I don't believe it did.
6        Q.   So you hold it in that position, right?
7        A.   Yeah.  Because I didn't want him to see
8    it.  I was trying to hide it.
9        Q.   And you step out of the car -- you step
10   out of the black Tahoe, and the gun is still in
11   that position, and you're facing that white metal
12   gate, correct?
13       A.   Correct.
14       Q.   And then when you turn to your left to
15   run, is the gun still in that same position on the
16   side of your right -- let me correct myself.
17             Is the gun still in the same position on
18   your right thigh between the front and the side of
19   your thigh?
20       A.   I believe so.  I was trying to hide it
21   because I didn't want him to see it.
22       Q.   But it was exposed, right?  It was out in
23   the open, correct?  Mr. Sanchez?  Mr. Sanchez?
24             I think he's frozen.
25             (Discussion off the record.)



Angel Sanchez                                        November 05, 2024
                                                     Page 203

```
 1              THE VIDEOGRAPHER:  Did you want to go off
 2   record?
 3              MS. WILFERT:  Yeah, we should probably go
 4   off and give him a chance to get logged back on --
 5   logged back on.
 6              THE VIDEOGRAPHER:  Okay.  We're off -- oh,
 7   he's -- he's unfrozen now.
 8              THE WITNESS:  Sorry.  I got disconnected.
 9   I don't know what happened.
10              (Discussion off the record.)
11              THE VIDEOGRAPHER:  Okay.  We're still on
12   record.
13      Q.   BY MS. WILFERT:  Mr. Sanchez, why didn't
14   you just leave the gun in the car?
15      A.   I didn't want to get in trouble for it,
16   and I didn't want anybody to get in trouble for it.
17      Q.   Now -- so, Mr. Sanchez, when you're
18   interviewed by the -- by the sheriff's detectives,
19   if you look at page 16 -- it's COBP 000280, he
20   asked you if you -- or the detective asked you if
21   you had the gun in your right hand.  And that's
22   line 5.  And you said, "Fucking, the right."
23              And he says, "Your right hand?  So if you
24   kinda blade --"  And then you respond in line 11,
25   (as read) "Oh, I was trying to say that -- you want
```



Angel Sanchez                                         November 05, 2024
                                                      Page 204

1    to see if I tried to -- if I pointed -- is that"

2    why you're -- "is that what you're trying to say?"

3            And then the detective --

4            MS. LEAP:  I just wanted to object that

5    that's not an accurate reading of the line.

6            MS. WILFERT:  And I didn't do that

7    intentionally.  We have the exhibit here.

8        Q.  But please, I'm am not trying to trick you

9    in any way, Mr. Sanchez.  I have it right here so

10   you can see.  If I missed a word, I apologize.

11           So line 14, the detective asks you, (as

12   read) "Well, I'm trying to look at it from his

13   point of view, you know what I mean?  Could he --

14   could he have mistaken you getting out of the car

15   pointing -- I mean, you obviously had a gun in your

16   hand, kind of getting out that way.  What do" --

17   "what do you thinking?  Is that how you got out or

18   no?"

19           And you said, "Well, maybe for like I

20   said, for like a second."

21           Do you remember telling the detective

22   that?

23       A.  No.  I didn't really understand his

24   question.  He was confusing.  I was just out of

25   surgery, all the anesthesia.



Angel Sanchez                                              November 05, 2024
                                                          Page 205

1     Q.   So did you explain to the officer, the

2 detective, that you covered the gun or you tried to

3 cover the gun?

4     A.   Yeah.  I didn't want him to see it.

5     Q.   Did you tell the detective that?

6     A.   I don't remember.

7     Q.   Did you -- at any point after you got out

8 of the black Tahoe on the date of the incident, did

9 you cover the gun?

10     A.   With clothing?  No, I don't think so.

11     Q.   So at no point after you got out of the

12 black Tahoe did you attempt to conceal or cover the

13 gun with anything, right?

14     A.   I tried to conceal it with my thigh.

15 That's why I had it there.  I didn't want him to

16 see it.

17     Q.   That's not the question I asked you.  Did

18 you try and cover it with something after you got

19 out of the black Tahoe?

20     A.   No.

21     MS. WILFERT:  So, Ms. Leap, if we could

22 just take a -- I would say, like, a ten-minute

23 break.  Let me just go over my notes and see if

24 there's anything else that I wanted to ask

25 Mr. Sanchez.



Angel Sanchez                                         November 05, 2024
                                                     Page 206

```
 1              THE VIDEOGRAPHER:  Okay.  We are off
 2    record at 5:16.
 3                 (A recess was taken.)
 4              THE VIDEOGRAPHER:  We are back on record.
 5    It's 5:27.
 6       Q.   BY MS. WILFERT:  Do you -- Mr. Sanchez,
 7    you understand you're still under oath, correct?
 8       A.   Yes, I do.
 9       Q.   I wanted to ask you -- I know you're
10    young, but have you ever been married?
11       A.   No.
12       Q.   Do you have any kids?
13       A.   No, I do not.
14       Q.   Okay.  And what clothing were you wearing
15    on the night of the incident?
16       A.   I believe I was wearing jeans and a
17    jacket.
18       Q.   Were you wearing a hat?
19       A.   I think I was.
20       Q.   So what color were your jeans?
21       A.   I don't remember.
22       Q.   Do you remember the color shirt you were
23    wearing?
24       A.   I don't remember what color shirt I was
25    wearing either.
```



1      Q.   Do you remember, did you have a jacket on?

2      A.   Yeah, I had a jacket on.

3      Q.   Do you know what color jacket you were

4  wearing?

5      A.   I think it might have been black or gray.

6  I'm not 100 percent sure.

7      Q.   What about your hat, what color was your

8  hat?

9      A.   Not 100 percent sure.  Either blue or

10  black.  I don't remember.

11      Q.   And I don't want you to guess.  So if you

12  don't know, you can tell me you don't know.

13      A.   I don't know.  I don't remember.

14      Q.   So you don't know what color clothing you

15  were wearing that night?

16      A.   Not certain.  I'm not certain.

17      Q.   Now, could you -- could you demonstrate,

18  if you're able to -- I don't want to put you in a

19  position where you're in pain or anything, but

20  could you demonstrate how you attempted to conceal

21  the gun from the officers?  Can you stand up and

22  show me where you held the gun on your right thigh?

23      A.   So it's my right thigh, like, right here.

24  Can you see?  I don't know.

25      Q.   Can you tilt the camera down just a



```
 1   little?  Thank you.
 2        A.    Can you see this?
 3        Q.    Yes.
 4        A.    So like -- like, kind of like on the --
 5   like in between the front and the side, kind of
 6   like in the middle.
 7        Q.    Okay.  So you're showing me where you held
 8   the gun with your right hand on the night of the
 9   incident, right?
10        A.    Yeah.
11        Q.    Okay.  Can you turn to your right a little
12   so we can see on the camera where you held the gun
13   on the... Thank you, Mr. Sanchez.
14        A.    Like right here.
15        Q.    So that's after you exited the Tahoe, this
16   is where you held the gun on the night of the
17   incident?
18        A.    Yeah.
19        Q.    Is that accurate?
20        A.    Yeah.  I didn't want him to see it, so I
21   tried to, like, use my thigh to cover it.
22        Q.    Thank you.
23             MS. WILFERT:  I have no further questions
24   at this time.
25             Ms. Leap, do you have any questions you'd
```



```
 1   like to ask Mr. Sanchez?
 2          MS. LEAP:  No, not -- not at this time.
 3   Thank you.
 4          MS. WILFERT:  Well, thank you, everyone,
 5   for your time.  I do appreciate it.  I know this
 6   went a little bit longer.
 7          THE VIDEOGRAPHER:  Balinda, do you have
 8   anything you need to put on the record?
 9          COURT REPORTER:  No.  I can ask them
10   afterwards, Randy.
11          THE VIDEOGRAPHER:  Okay.  Ms. Leap, do you
12   need video?
13          MS. LEAP:  No, not at this time.
14          THE VIDEOGRAPHER:  Okay.  Is there
15   anything else that needs to go on the record?
16          MS. WILFERT:  Nothing else.  Thank you,
17   Mr. Young.
18          THE VIDEOGRAPHER:  Okay.  With that, we
19   are off record at 5:31, and this concludes Volume I
20   of the virtual deposition of Angel Francisco
21   Sanchez.
22          Today's deposition consists of eight media
23   files, which will be retained with Magna Legal
24   Services, whose office is located at 1635 Market
25   Street in Philadelphia, Pennsylvania.
```



Angel Sanchez

1          Thank you very much, everyone.

2          COURT REPORTER:  Ms. Leap, my only

3    question is, did you need to purchase a copy of the

4    transcript?

5          MS. LEAP:  Not at this time.  Thank you.

6             (The proceedings were concluded at

7             5:33 p.m.)

8                  ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Angel Sanchez                                          November 05, 2024
                                                       Page 211

1        I have read the foregoing deposition transcript

2           and by signing hereafter, approve same.

3     Dated_____.

4

5                     _____

6                     (Signature of Deponent)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Angel Sanchez                                    November 05, 2024
                                                 Page 212

```
1              DEPOSITION OFFICER'S CERTIFICATE

2                 (Civ. Proc. § 2025.520(e))

3    STATE OF CALIFORNIA        )

4                               )     Ss

5    COUNTY OF SAN FRANCISCO    )

6              I, BALINDA DUNLAP, CSR #10710, hereby

7    certify:

8              I am a duly qualified Certified Shorthand

9    Reporter, in the State of California, holder of

10   Certificate Number CSR 10710 issued by the Court

11   Reporters Board of California and which is in full

12   force and effect.  (Bus. & Prof. § 8016)

13             I am not financially interested in this

14   action and am not a relative or employee of any

15   attorney of the parties, or of any of the parties.

16   (Civ. Proc. § 2025.320(a))

17             I am authorized to administer oaths or

18   affirmations pursuant to California Code of Civil

19   Procedure, Section 2093(b) and prior to being

20   examined, the deponent was first placed under oath

21   or affirmation by me.  (Civ. Proc. §§ 2025.320,

22   2025.540(a))

23             I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition and the foregoing transcript
```



1   is a true record of the testimony given.  (Civ.

2   Proc. § 2025.540(a))

3           I have not, and shall not, offer or

4   provide any services or products to any party's

5   attorney or third party who is financing all or

6   part of the action without first offering same to

7   all parties or their attorneys attending the

8   deposition and making same available at the same

9   time to all parties or their attorneys.  (Civ.

10  Proc. § 2025.320(b))

11          I shall not provide any service or product

12  consisting of the deposition officer's notations or

13  comments regarding the demeanor of any witness,

14  attorney, or party present at the deposition to any

15  party or any party's attorney or third party who is

16  financing all or part of the action, nor shall I

17  collect any personal identifying information about

18  the witness as a service or product to be provided

19  to any party or third party who is financing all or

20  part of the action.  (Civ. Proc. § 2025.320(c))

21

22  Dated: November 22, 2024



23  _____

24

25



```
 1              DEPOSITION OFFICER'S CERTIFICATE
                   (Civ.Proc. § 2025.520(e))
 2
     STATE OF CALIFORNIA     )
 3                           )  Ss.
     COUNTY OF SAN FRANCISCO )
 4

 5                  I, Balinda Dunlap, hereby

 6   certify:

 7          I am the deposition officer that

 8   stenographically recorded the testimony in the

 9   foregoing deposition.

10          Written notice pursuant to Code of Civil

11   Procedure, Section 2025.520(a), having been sent,

12   the deponent took the following action within the

13   allotted period with respect to the transcript of

14   the deposition:

15          (  ) In person, at the office of the

16   deposition officer, made the changes set forth on

17   the original of the transcript.  (The parties

18   attending the deposition have been notified of said

19   changes.)

20          (  ) Approved the transcript by signing

21   it.

22          (  ) Refused to approve the transcript by

23   not signing it.

24          (  ) By means of a signed letter, made the

25   changes and approved or refused to approve the
```



```
 1    transcript as set forth therein.  (Said letter has

 2    been attached to the original transcript and copies

 3    thereof mailed to all parties attending the

 4    deposition.)

 5             (  ) Failed to approve the transcript

 6    within the allotted time period.

 7    Dated _____.

 8

 9

10    _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Angel Sanchez

November 05, 2024
Index: ---o0o---..5

## Exhibits

**Exhibit 1** 41:24,25 42:14

**Exhibit 2** 47:12,14

**Exhibit 3** 52:21,22

**Exhibit 4** 56:10,11

**Exhibit 5** 92:23 93:2,5

**Exhibit 6** 94:24,25

**Exhibit 9** 191:4

## -

**---o0o---** 6:2 79:5 80:3 210:8

## 0

**00** 124:23

**000265** 191:19

**000279** 192:10

**000280** 203:19

**000346** 42:15

**000347** 43:8

**001185** 93:10

**001186** 93:11

**001232** 47:13

**001798** 56:14

**001833** 123:8

**001840** 124:12

**001844** 124:23

**001855** 97:22

**001856** 101:17

**001895** 106:22

**001897** 107:7

**001930** 107:15

**001931** 108:3

**001933** 108:15 110:7

**00932** 108:7

## 1

**1** 6:10 41:24,25 42:14

**100** 30:23 135:12 185:14 207:6,9

**11** 203:24

**11:12** 6:5,24

**11:13** 7:15

**11:17** 7:18

**11:34** 20:17

**11:44** 20:20

**12:02** 33:16

**12:09** 33:19

**14** 204:11

**148(a)(1)** 126:8

**15** 141:15,17 192:9

**16** 203:19

**1635** 209:24

**17** 151:18

**18** 140:10 151:16,23

**19** 127:2 140:10 151:16

**1:17** 79:3

**1:37** 80:5

## 2

**2** 47:12,14 93:11 101:17

**20** 6:19 16:2 138:17 140:12 160:21

**200** 152:18,20

**2001** 126:24

**2015** 138:17

**2016** 138:17

**2019** 146:4,16,19 151:25

**2020** 31:11,14 148:1 152:1,5
154:13

**2021** 9:2 19:6,20 44:9 126:6,17
148:1,11 151:13 154:22 155:9
182:16

**2024** 6:1,4,19

**2025** 80:1 165:6

**21st** 9:2 19:5,20 31:11 155:11

**23** 126:24

**24** 17:2 120:25 140:20 192:12

**24-ounce** 121:9

**26** 26:13 44:9 126:6,17

**28** 126:24

**296** 191:20

**29th** 165:1,5

**2:00** 102:13

**2:23-cv-03807-dmg-mar** 6:15

## 3

**3** 52:21,22

**3/26/2021** 43:22

**30** 133:6 160:21 192:22

**30-mile-per-hour** 15:14

**31** 139:24

**32** 139:24 191:8,20

**35** 139:19

**36** 193:7

**3:08** 141:23

**3:26** 142:1

## 4

**4** 56:10,11

**40** 153:8 154:3

**41** 106:22

**43** 193:14

**46** 193:18

**4828** 128:3,23

**4:41** 190:16

**4:53** 190:19

## 5

**5** 6:1 80:1 92:23 93:2,5 203:22



**50** 15:14
**5:16** 206:2
**5:27** 206:5
**5:31** 209:19
**5:33** 210:7
**5th** 6:3,19

---

**6**

**6** 94:24,25 97:13 107:24 108:4
**6:00** 51:2

---

**7**

**7** 97:14,16,20 106:22 107:7,14
**70,000** 180:18
**7:00** 51:1

---

**8**

**8** 123:3,5 191:2,7
**8th** 165:6

---

**9**

**9** 191:4
**99** 97:20

---

**A**

**A-D-A-N** 128:14
**a.m.** 6:5,24
**abbreviation** 150:25
**ability** 17:2
**account** 130:21 133:19 134:1,12, 15
**accurate** 11:6 51:4 52:17 53:14 56:21 62:10 64:10,13 67:15 70:18 71:13 72:5 80:15 82:7 85:1,16 88:21 89:15 92:24 93:13,15 94:3 97:1 98:3,17 100:19 102:1 104:13 108:24 109:3 194:15 198:24 204:5 208:19

**act** 12:16
**activated** 63:20
**active** 19:6
**acts** 12:16
**actual** 22:16 152:16
**Adan** 128:11,15 140:4,5 141:2
**add** 69:4
**addition** 14:18
**additional** 103:17
**address** 50:13,15 66:14 70:8 128:1,23 129:6 137:20,22 156:11, 12 157:2 176:13
**addresses** 134:22
**admissible** 26:12 35:13 37:4 43:5 44:14 46:16 47:9 48:6
**admitting** 44:9
**advice** 18:10,24 19:14 180:22
**advises** 24:23
**affect** 10:20
**afternoon** 80:2 137:8
**agency** 153:15,16 154:18
**agree** 21:25
**agreed** 12:13
**agreeing** 22:2
**ahead** 54:1,2 61:11 89:10,11 99:18 147:6,7 155:23,24 170:19 176:13,14 184:10 198:15 200:24 201:1,2
**aid** 91:21 103:25 105:3 166:22 167:4
**aimed** 22:13
**air** 89:15 91:5
**air-conditioning** 147:20
**alcohol** 17:1 120:7 122:6,11,15,20 124:4,9 125:2 201:11,15
**alcoholic** 120:7,10
**Aldaco** 44:23,25 45:3,9,15 46:7,9, 12 47:1,22 48:23 49:6,9,11,15,23 50:3,5,9 51:6,9,13,16,23 52:10 53:13,21,22 54:13,15,16 55:6 58:4 60:12 65:17 67:12 74:7 80:15

82:16,25 87:5 124:12 125:6,9 158:18,21
**Aldaco's** 48:12
**allegations** 22:17
**allege** 78:8
**alleviate** 21:22
**alongside** 196:8
**Alvarez** 160:1 161:14,23
**Amazon** 182:12,18,20 183:3,4,7, 10
**ambiguous** 20:1 24:18 25:16 26:1,22 27:7,17,24 28:7 31:4 32:14,22 34:1,24 35:10 36:1,11 37:3 38:19 39:16 40:3,18 41:20 45:5,11,20 46:15 47:7 48:3,25 57:22 63:6 64:14 65:1 68:8,16 69:11 77:14 80:22 83:9,19 84:3 86:5,24 88:25 104:18 105:16 113:13 115:16,24 122:23 164:12 195:13
**ambulance** 142:14 159:4
**Amendment** 18:7,21 19:10 20:3 21:1,7 22:3 23:19 24:2,10,20 25:8, 18 26:3,16,25 27:10,20 28:1 29:7, 16 31:7 34:3,18 35:1,16 36:3 37:3, 14,24 38:11 39:7 40:20 41:8,19 42:7,20 43:3,14 44:1,16 45:19 46:19 47:5 48:1 49:2 58:20 68:7, 14,24 69:14 83:8 95:12 110:13,24 111:20 112:21 115:15 116:15,24 117:11,20 118:7,16,24 119:5,16,22 120:3 126:1,11,20
**ammunition** 28:18 39:15 109:5, 10,13 113:7,9,18,20
**amount** 60:3 130:4
**anesthesia** 168:1,3 204:25
**Angel** 6:11,13 7:4,22 18:1 42:15 209:20
**angle** 89:6,16,17 99:20,21,24 101:3 102:13 194:7,8,9 198:2,5,7, 14
**ankle** 92:7,8 103:8 105:6 165:25 166:2
**Anna** 136:23
**Annie** 183:23



**answers** 12:4

**anticipated** 182:4

**anxiety** 184:9 185:16 187:2

**anymore** 133:25 134:6 149:6 150:18,19 174:3,10 187:12

**apologies** 68:2

**apologize** 12:10 204:10

**appearance** 6:25

**appeared** 6:8 164:17

**appears** 56:20 107:3

**applied** 103:11 104:24 182:6,18, 20 183:9

**apply** 182:11,13,21 183:3

**appointments** 166:6 181:16

**approach** 84:13,17

**approached** 66:22 67:3 84:21 91:14

**April** 148:18

**area** 62:23 81:4 98:22 137:25 194:17

**arm-circle** 177:11

**arraigned** 162:14 164:1,19

**arrest** 166:4

**arrested** 30:14,16,17 126:7

**arrive** 104:7

**arrived** 91:13 92:1 103:17,25 104:6,10 166:17,19 167:3,4

**arriving** 59:8 62:3

**article** 112:12

**asks** 192:11 193:14 204:11

**aspects** 21:8

**assault** 162:12

**asserting** 21:7

**assistant** 132:22 144:9

**associate** 43:9

**assumed** 52:6 54:3

**AT&T** 130:1

**attempt** 21:13 64:19 205:12

**attempted** 207:20

**attempting** 69:23

**attend** 148:21 149:17

**attended** 111:4 149:8,11

**attention** 132:12

**attorney** 8:16 11:21 18:11,25 19:14 24:23 135:5,8,10,16 136:8, 17 180:23

**attorneys** 6:12 11:15,17 161:2

**audio** 17:23

**audiotapes** 17:6

**Avenue** 59:14

**average** 153:8

**aware** 9:3,21 15:5 22:15 33:20 39:21,25 65:8 81:6,7,9 85:14,21 86:4 142:3 150:11 160:23,25 190:20

**Azusa** 154:20,25

## B

**back** 7:17 20:19 21:5 22:23 23:11 33:10,18 38:25 53:18 54:10 55:11, 19 70:4,15,23 72:12 77:1 80:4 90:24 95:19 96:5 99:11,14 100:16 103:5 107:24 113:5 121:11 125:8 130:15,18,19 141:25 151:17 166:12 177:18 182:15 187:9 190:11,18 193:24 196:24 200:4 203:4,5 206:4

**background** 94:10,14,21

**backup** 91:19

**backyard** 29:24

**bad** 139:25 152:3 172:14 173:20, 22 180:12 186:14

**badge** 94:3

**Baldwin** 6:14 7:7 8:9 19:22 25:4 31:17 40:15 41:2,14 42:2 80:19 81:8 122:1 128:3 146:3,10,15

**Balinda** 6:6,21 209:7

**band** 49:21 50:11 177:15

**banging** 27:13

**barrel** 72:1 76:6,11 77:21,24 200:17

**barrel's** 72:17

**based** 18:10,24 19:12 21:2 149:14 173:12

**basement** 170:16

**basic** 174:9

**basically** 161:9 173:3

**basis** 18:6,20 19:9 20:2 23:18,20 24:1,9,19 25:7,18 26:2,15,24 27:9, 19,25 29:6,15 31:6 34:2,18,25 35:15 36:2 37:2,13,23 38:10 39:6 40:19 41:7,18 42:6,19 43:2,13,25 44:15 45:18 46:18 47:4,25 49:1 58:19 68:6,13,23 69:13 83:7 95:11 110:13,23 111:19 112:20 115:14 116:14,23 117:10,19 118:6,15,23 119:4,15,21 120:2 125:25 126:10, 19 127:21 145:23

**Bates** 191:18

**Beach** 30:20

**beats** 106:1

**bed** 168:7

**beer** 120:13 121:9

**beers** 120:12 125:12

**beginning** 6:10

**behalf** 6:12,21 7:3

**belated** 66:2

**believed** 58:7

**believes** 21:6

**Bellflower** 137:24

**belonged** 53:24

**Bend** 177:13

**beverages** 120:7,10

**big** 52:1 54:7 63:11 169:4 171:3

**bills** 180:14,18 181:25 182:1

**birth** 126:23

**birthday** 49:19

**Bishop** 139:14,15,16

**bit** 32:9 84:15 133:21 134:3 135:22 179:15,20 201:13 209:6



Angel Sanchez

November 05, 2024
Index: biweekly..Cavette

**biweekly** 152:11,13,18

**black** 32:8,9 54:7,19 55:19 56:22 57:19 58:9,15 59:1,6,12,23 60:10, 13,16,18 61:14,22 62:17,23 63:3, 11,14 64:4 66:15,19 73:6 74:14 80:14,17 81:4,7,11,16,18 82:4,11, 15 83:1 84:13,17,24 96:11,22 101:19 109:23 110:3 123:12 144:1 195:20,24 197:16,20,22 199:25 200:6 201:8 202:10 205:8,12,19 207:5,10

**blade** 203:24

**bleeding** 91:23

**blinker** 60:25 61:3,10

**blinkers** 61:2

**blogs** 135:25

**blood** 169:4

**blue** 62:16 63:16,20 64:10 65:7 66:5 96:20 115:4 207:9

**blur** 189:6

**body** 47:23 89:3 90:22 193:21,24 197:24 198:9,18,19 199:3

**Bolen** 18:18 19:6,21 23:16,24 24:6,15 25:3,12,22,23 26:8,20 27:4,23 29:11 34:13,22 35:9,24 40:14 46:12 47:1,23

**bone** 172:20

**born** 132:24

**bottom** 170:17

**Boulevard** 25:4

**box** 155:4

**BP** 93:11 124:23

**break** 16:3,5,8,10 20:12 33:12 57:13 78:22,24,25 129:16 137:6,11 141:11 190:24 191:15,22 205:23

**breaks** 15:25 16:4

**Brian** 30:2,3,5,8,13,18 31:2,10,15 156:14,21,25 157:13 159:14 160:1 161:13,23

**briefly** 170:22 189:18

**bright** 81:2

**broke** 172:19

**brother** 128:8,13,16 139:4 140:2, 15 141:2

**brothers** 136:25 138:20

**brothers'** 128:10

**bullet** 114:17 169:3

**bullets** 31:22 113:10,11,16,24 114:1,8,16

**bunch** 167:23

**burner** 192:14

**butt** 90:24 171:6

**buy** 36:25 122:3 129:11

---

**C**

**C-A-L-L-E-S** 139:2

**calculated** 26:12 35:13 37:4 43:4 44:14 46:16 47:9 48:5

**caliber** 28:15 31:20

**California** 6:1,5,8,17 80:1 127:3,6, 12 128:4 139:10

**call** 20:23 147:3 156:7 157:15 164:13

**called** 7:23 15:22 30:22 94:16 121:24 131:25 133:23 139:13 142:19 150:22 155:6 182:9 184:2 185:4,12

**Calles** 138:25

**calls** 18:22 19:24 23:20 24:2,11,17 25:9,15,24 26:10,22,24 27:5,16 28:12,21 29:5,13 30:9 31:5 32:13 33:25 34:15,23 35:12,25 36:12 37:25 38:20 40:4 41:4 43:15 44:3, 13 45:4,12,20 46:14 48:3,18,24 58:17 61:7 63:7,21 64:5 66:24 67:6 68:15 69:11 80:21,22 83:18 84:1,4 85:8,9,10 86:6,23 104:15 112:7,8 113:1 122:23 124:5,7 127:21 131:10,21 132:3,6,10 181:8

**Camacho** 7:8 8:10 34:12 62:22 66:22 67:3 72:5 78:7,9 82:6,10 84:10,12,16,20,25 93:9,12,16 94:6 95:22,23 97:7 103:11,18 104:12,24 105:12,15,21,25 114:22 163:6,8 166:24 191:25

**Camacho's** 163:16

**camera** 130:10 207:25 208:12

**campus** 140:5,7

**cane** 173:19 177:23,24 178:1,4,9 179:14 180:9,10,12

**capture** 75:17

**car** 51:24,25 52:2,10 54:7,8,19,22, 23 55:8,9,10,19 56:19 60:6,7,10 61:20 65:20 70:10,12,16 71:8,9,12 72:12,15,24 73:19,21 74:4,12,13, 18 76:20,22,25 77:2,5,9,12,20 78:1,4 81:13,20,21 84:10 85:4 86:13 88:6,9 99:11 122:7,8,12,15, 20,21 123:16 124:4,9,20 125:3 153:20 189:21 192:6,13,15,24 193:2,8,16,21,23 194:1,4,20 195:10 196:7,17,18,24 197:4,7,9, 10,16 198:17 199:8,11 201:23,25 202:9 203:14 204:14

**card** 42:3,14 43:22 127:6,7,13 172:2

**care** 94:17 104:13 144:8,11,16,25 175:23 180:16 181:1,2

**carefully** 12:5

**cares** 133:1

**carried** 38:7,14 112:24

**carry** 172:2 180:3,7

**carrying** 28:5,11 29:19 31:19 32:20 33:3 36:8,19 37:20

**cars** 87:7

**case** 6:15 34:17 123:11 162:3,6, 14,18 164:6,10,15,22 165:5,10,14 181:6

**cash** 121:19,20,23

**cashier** 151:22

**Castro** 7:8 8:10 43:23 44:10 62:22 78:8 82:6,10 95:7,9,24 96:6,16 97:3,8,13 103:18

**Castro's** 96:19

**cat** 70:2,3

**caught** 201:21

**caution** 14:19

**Cavette** 59:9,11,24 60:19 62:1 80:18





LEGAL SERVICES

**cemetery** 49:16,17,23 50:1,7,12, 24 121:8,10

**center** 124:24

**Central** 6:16 139:10

**ceremony** 121:6

**certificate** 148:4,24

**certifications** 94:18

**Certified** 6:6

**chamber** 55:24 56:2 109:15

**chance** 191:13 203:4

**changed** 11:1

**Charger** 57:19 58:10,15 59:2,6,12 60:10,13,16,18 61:23 62:17,23 63:4,14 66:16,19 73:7 74:14 80:17 81:4,7,11,18 84:13,17

**charges** 162:10

**chat** 182:24

**check** 32:1 51:17 57:12 61:19 93:19 129:15 152:16 153:3 175:15 178:25

**checked** 166:21

**checks** 152:16

**checkup** 179:3

**checkups** 174:17 175:20

**chest** 89:19,20,22

**Chevy** 61:14,22 80:14 81:17 82:4, 11,16 83:1 84:9,13,17,24 86:16 96:11 98:8 107:19 109:20,23 110:3 123:12

**choice** 22:7

**Chooch** 45:16

**church** 166:6 187:9

**circumstances** 12:17 13:19

**city** 6:14 7:7 8:9 30:22 31:15 40:15 81:8 122:1 136:23 137:23,25 139:6,8 154:7,16,20,24 175:9 183:25 184:2,3

**civilian** 84:5

**claim** 18:8 26:5 47:8 48:5

**claims** 46:17

**class** 94:16,17

**classes** 111:5

**Claw** 123:12,15 125:7,9

**clear** 24:23

**client** 18:5,19 19:8 20:1 23:17,25 24:8,19 25:6,17 26:2,14,23 27:8, 18,25 29:6,15 31:6 34:2,17,25 35:14 36:2 37:1,12,22 38:9 39:6 40:19 41:6,17 42:5,18 43:1,12,24 44:15 45:17 46:18 47:3,25 49:1 58:18 68:5,12,22 69:13 83:7 95:10 110:12,22 111:18 112:19 115:13 116:13,22 117:9,18 118:5,14,22 119:3,14,20 120:1 125:24 126:9,18 127:20

**clients** 21:8 22:18

**climb** 174:4

**clinic** 178:13

**closed** 50:12,24 169:14,21

**closer** 107:2 108:2,14 146:7,24 154:18

**clothes** 78:9 91:25 166:20

**clothing** 26:19 82:9 101:12 195:21 205:10 206:14 207:14

**COBP** 43:8 47:13 56:14 93:10 97:22 101:17 106:22 107:7,15 108:3,7,15 110:7 123:8 124:12,22 191:19 192:10 203:19

**cocaine** 117:6,17

**Code** 126:7

**collect** 15:9

**college** 146:8 148:21 149:19,21

**color** 32:6 56:21 206:20,22,24 207:3,7,14

**comfortable** 75:25 138:16 179:16, 19

**commands** 72:13,25 74:9

**commencing** 6:4

**commit** 34:22

**communications** 135:15 136:7, 17

**company** 157:18 182:11

**complaint** 22:17 62:19,21 63:3 78:7

**complete** 11:23 12:6 148:5,6

**completed** 146:15

**completion** 21:21

**computer** 182:10

**computers** 149:23 181:24

**conceal** 205:12,14 207:20

**concealed** 37:11 195:20

**conclude** 10:12

**concluded** 210:6

**concludes** 209:19

**conclusion** 15:8 63:21 67:6 68:15 69:12 80:23 83:18 84:2 85:9 86:23 104:16 112:8 164:13

**conclusionary** 198:7

**conclusory** 15:11

**condition** 179:1 187:14

**conditions** 165:21 183:14,16

**conduct** 22:7 115:5

**conference** 164:23

**conferred** 21:4

**conferring** 21:17

**confusing** 204:24

**consists** 97:20 209:22

**console** 124:25

**consult** 33:12

**consulting** 22:21

**contact** 48:12 85:23 95:8

**contacted** 19:22 20:22 33:5 41:2, 14 43:9 83:4 93:21 125:22 134:24

**container** 122:20

**containers** 125:2

**continue** 11:23 21:9

**continued** 64:24 165:5

**conversation** 9:15 54:15 144:3

**conversations** 60:7



convinced 186:17

cop 43:8 85:4 86:13 87:7 192:15
193:16,22 197:16 198:17 201:20

COPB 42:15 56:13 93:11

copy 210:3

corner 191:19

correct 8:21 10:16 14:14 24:7 32:3
33:3,21 38:16 49:6 51:7 53:11
56:22 58:4,16 59:14 62:14,17 63:5,
14 67:18 72:13 73:1 74:15 81:19
82:8 90:5 94:1 100:3 103:1 110:7,8
114:24 123:4 142:4 157:25 159:1,
5,17 162:25 163:3,20,21 165:8
166:1 194:3,12 195:2 196:20,21,
22,25 197:2,8,15 200:20 201:24
202:12,13,16,23 206:7

corrected 10:25

corrections 10:17

correctly 32:7

cost 180:15

cough 129:4

counsel 6:25 7:19 11:13 21:6,18
22:24 27:14 33:11 70:19 134:25

counselor 183:19

count 60:1 114:4 120:16

counterclockwise 198:19,23

counting 74:21 103:13 167:13

County 6:7 139:11 167:18

couple 59:17 66:8 72:21 99:9,10,
13 101:10 120:12,17 147:24
148:16 168:12 186:10,11

court 6:16,20 7:10,21 9:11 10:2,9
11:4,5 18:13 19:2 23:9 92:25 123:4
164:3,6,10 165:1,4,20 166:11
191:1 209:9 210:2

courthouse 162:6,7,9

courtroom 162:5

cousin 160:2

cover 115:1 195:7 196:2 199:6
205:3,9,12,18 208:21

covered 182:3 194:23 195:11,12,
14,16 205:2

COVID 152:1,3 155:2

crack 171:7

credibility 10:20

cries 142:14 143:3

crime 17:11

crimes 34:22 111:17

criminal 21:21 22:15 162:3,18
164:6,10 165:10,15 181:6

criticisms 13:8

crunched 177:19

crying 143:5

curled 173:7

current 129:13 164:5,9

custody 131:14 176:23

customer 182:22

customer-service 182:9

cut 70:19 84:14 91:25 153:8
155:20 164:8 166:20 169:2,6,8

cutting 36:15 155:16

---

## D

D-E-R-A-S 139:5

dad 138:1 155:19 156:14 157:12

Dale 7:3

damage 172:4,6,9,16

damaged 171:2

damn 139:18,24

dangerous 39:15,17 40:1,10

date 28:4,11 29:2,20 31:18,25
32:19 33:2 34:9 36:8,17 38:8 43:22
49:5,9,15,24 50:2,6 51:13,16 52:15
53:8 54:20 57:18 58:3 70:25 73:18
80:10 86:11 90:14 92:3 95:20
108:20 109:24 110:2 111:16
114:20 115:2,11 116:20 117:16
118:13 119:25 120:11 123:12
126:22 129:17,21,24 130:7,16,19
131:9,13,20 132:4 148:2 159:16
163:17,22 164:3 166:12 182:14
184:15 186:9 205:8

dates 148:20 154:8,10

dating 134:7

day 6:4 28:18 31:13 49:11 63:1
73:15 76:2 129:11 131:22,25
132:15,17 133:11,17 134:15,20
145:3,16,17,20 155:11 163:10
171:20,22 172:13 176:3,16 185:19,
24 187:8

days 153:6,7 170:13

deadly 162:12

deal 130:5

decided 73:5

defendant's 22:7

defendants 6:12,15 7:6 8:9 62:22

defense 7:23 18:8 22:14 26:5 47:8
48:5

defenses 46:17

demonstrate 75:8 76:5 207:17,20

demonstrating 76:1 89:18 180:6

demonstration 75:22

demonstrative 75:17

department 19:23 42:3 80:20
104:6,7,10 166:17,18,23 188:25
189:9 191:11,23

depiction 93:15 98:3 102:1

deposed 8:22 9:5

deposition 6:11,18 8:12,13,16,20,
24 9:14,17,20 10:4,12,13 11:6,12
12:2,15 13:14,17 15:5,9 16:4 17:8
21:11,17 22:8 23:8 163:12 209:20,
22

Deras 139:5

describe 17:12 32:5 54:5 71:16
89:24 90:19 96:7 98:22 142:23
170:21,24 173:15 186:3 198:6,8

desk 14:3,9

details 161:6

detective 188:21,24 192:11,21
193:5,6,14 203:20 204:3,11,21
205:2,5

detectives 81:10 189:9,12,19
190:5 191:12,24 192:20 203:18



Angel Sanchez

**diagnosed** 184:5 187:2

**diagnosis** 187:15

**die** 103:14 118:2

**died** 187:6

**difference** 13:25 14:16 15:2,16

**difficult** 75:21 185:8

**digital** 87:8

**diploma** 146:13,14

**directed** 11:14

**direction** 72:19,21 76:6 77:21,24
86:9,11 100:16 101:6 189:22 192:7
193:1 194:10,19 198:4

**directly** 100:13

**disability** 150:17,22,24 188:9

**disclose** 136:7

**disconnected** 203:8

**discussion** 7:12 23:2 57:16 80:12
87:9 175:8 191:3 202:25 203:10

**Disney** 182:12,13,20,21 183:10

**disorder** 184:6

**District** 6:16

**doctor** 172:5,10,11,15,21 175:1,14
178:8,11,14 179:2 181:16

**doctors** 167:23 174:12,21 176:4

**doctors'** 166:5

**document** 191:8,10,18

**documented** 10:8

**documents** 17:7,20

**Dodge** 57:19 58:9,15 59:1,6,12
60:9,10,13,16,18 61:22 62:17,23
63:3,14 66:16,19 74:14 80:17 81:4,
7,11,18 84:13,17

**dog** 70:2 107:1

**door** 56:25 57:1 67:14,15 71:9,12
76:23 77:3 84:24 86:16 99:15
124:14 192:23 193:1,9,11 196:24
197:1,20,23 199:9,15,18,25 200:6,
17,19,21 201:6

**doors** 193:9

**dorming** 128:9

**dorms** 140:7

**Downey** 137:25

**dragged** 91:14,15 92:4,7 103:6
105:4,5

**drawn** 66:23 67:4 84:21

**dream** 186:5

**dress** 27:4

**dressed** 78:9

**drink** 120:6,10,21 121:7 122:6,11,
14,20 123:15 125:12

**drinking** 121:2,5 124:4,9,19 125:6

**drive** 122:15,18 146:6 154:16

**driver** 53:11

**driver's** 127:3,9

**driving** 15:14 52:3 54:4 63:1 64:25
65:12 146:22

**drop** 75:2

**dropped** 78:2 105:9

**drove** 53:7 62:22,25 65:4

**drug** 118:2

**drugs** 17:1 116:4,5,7

**due** 137:7

**Dunlap** 6:6,21 19:16 20:8 23:4
38:24 41:23 47:12 52:20 92:24
97:12 191:1

---

**E**

---

**earlier** 70:7 82:3 158:17 159:15
193:25

**early** 148:1 151:25

**easier** 179:14

**Eastside** 25:22,23

**easy** 99:3

**Echeverria** 128:21 142:7

**EDD** 150:22 151:2

**education** 145:25 146:2 149:2

**eight-hour** 153:6

**El** 153:12

**electrician** 147:4

**electricity** 174:2

**Electronic** 165:23

**Elizabeth** 128:3,23 129:5

**else's** 122:20

**email** 134:22,23 135:2,6,11

**emails** 135:9,14,16,24

**embarrassing** 171:7

**emergency** 133:3 167:9,14

**emotional** 183:17

**Empire** 184:1,2

**employed** 150:14 151:15

**employment** 150:14,23 154:8
181:7,18

**EMT** 143:7

**EMTS** 92:1 142:25 167:1,3

**end** 151:10 179:4 193:11

**ended** 51:10 91:2 146:6,7

**enforcement** 9:1 41:3,15 68:11,
21 69:8,23 70:1 81:8,25 125:23

**enrolled** 149:19

**enter** 87:17 164:19

**entitled** 10:22 12:18 13:22 15:6

**envision** 55:5 71:7

**errors** 10:16

**estimate** 13:16,25 14:4,10,13 66:4
99:7 101:15 103:2,23 114:7,12
125:15 133:6 138:13,15 145:1
147:11,14 151:7,12 152:24 153:9
160:19 187:17

**estimation** 102:20

**et al** 6:14

**etiquette** 11:5

**events** 12:16 13:18

**eventually** 66:10

**evidence** 26:12 34:16 35:13 37:5
43:5 44:14 46:16 47:10 48:6 67:2
86:21,24 100:22

**exact** 15:21 50:15,23 66:13 70:8



Angel Sanchez

74:20,23 137:25 147:23 148:2
152:15 154:10 155:8 166:12
184:15 186:9 198:8

**EXAMINATION** 8:2

**examined** 7:25

**exercise** 22:13

**exercises** 177:21

**exhibit** 41:24,25 42:14 47:12,14
52:21,22 56:8,9,10,11 78:25 92:23
93:2,5 94:24,25 97:12,14,16,19
106:22 107:7,13,14 123:3,5 190:12
191:2,4,7 204:7

**exit** 66:15,19 84:12,16 88:6

**exited** 75:10 76:20,22,25 77:2
82:4,11,13,15 83:1 84:9 88:15,16,
17 90:7 96:11 99:17,23 109:19,23
110:3 196:17 198:9 208:15

**exiting** 144:1

**experience** 149:25 181:23 183:12

**expert** 67:6 84:2 85:10 104:15

**explain** 49:18 198:14 205:1

**exposed** 194:22 195:2 202:22

**extent** 22:4 32:15 63:22 67:5
75:17,19 80:24 83:20 84:5 85:11
86:25 99:1,6 100:23 104:14,17
105:17 112:6,10 115:25 122:25
164:11 181:9,19 186:25 189:4
190:3

**eyes** 12:23

___

**F**

**face** 91:3 192:7 194:5,9 198:16

**Facebook** 134:6

**faced** 198:3

**facing** 67:22,23 89:5,6 99:18,21,23
192:15 193:9 194:5,9,19 197:10,
11,13 198:13,15 202:11

**fact** 14:22 21:14 22:12,14

**facts** 8:25 15:6,9

**fading** 167:22

**failures** 12:16

**fair** 64:1 93:15 98:3 102:1 104:12
105:7 107:19 114:18 125:3 193:23
195:11

**fall** 174:6,8

**falling** 91:2

**familiar** 13:24

**family** 35:23 49:20 50:14 137:14
159:10,22,25 160:14,15 172:15
175:14

**family's** 50:21 51:3 156:16,20

**father** 137:1,17 138:11 156:23,24
157:18

**father's** 137:2 157:6

**favorite** 49:21

**feel** 55:20 138:16 139:25 179:19
201:14

**feeling** 186:21,23

**feels** 174:2

**fell** 91:2

**felt** 29:25 60:1 72:22 74:21 90:23
103:20 104:2 105:2

**fence** 90:3 99:19 101:20 102:24
106:6,7,9,10 107:20,22 108:24
109:16 194:5 198:11,16

**Fentanyl** 117:22,25 118:4,13

**field** 42:3

**figured** 81:10

**file** 21:19 137:8

**files** 209:23

**finally** 169:20 186:22

**find** 13:10 92:14 146:7,23 149:16

**fine** 89:11 137:11

**finger** 40:9 109:18

**finish** 11:8 135:4 137:10,14 176:14

**finished** 121:14

**fire** 104:5,7,9 166:17,18,23

**firearm** 28:5,10,17 29:2,10,20
31:19,20 33:3 34:11 36:18,19,25
38:7,14,18 39:3,25 54:21,24 55:7
59:3 66:22 67:4 84:21 110:7,21
111:7 112:18 114:22

**firearms** 39:14,22 110:9 111:5

**firefighters** 91:21

**firemen** 167:11

**firsthand** 13:20

**fish** 174:5

**fix** 101:16

**fixed** 91:24

**flash** 61:25

**flashed** 62:4,5 81:2,12

**flashing** 64:10 65:7 66:5 115:4

**flashlight** 96:1,3

**floor** 170:17

**focus** 159:13

**focused** 133:15

**follow** 9:16 21:15 83:17,24

**food** 49:22

**foot** 71:16,17 91:14 92:5 169:5,8
173:5,8 175:15,16 197:3,6

**football** 30:6 157:8,9,10,13

**foreman** 155:20

**forever** 103:21 105:2

**forgot** 94:16 112:14 143:6

**forward** 22:6 71:21 91:15

**found** 65:5

**foundation** 18:22 19:25 23:20
24:2,11,18 25:9,15,25 26:11,21
27:6,16 28:22 29:14 30:10 31:5
32:13 34:1,15,23 35:11 36:1,11
37:25 38:20 40:4 41:5 43:15 44:2,
12 45:4,13 46:15 47:6 48:3,18,24
57:21 58:17 63:7 66:25 69:5,10
80:22 84:3 85:9 86:6 112:8 113:2,6
115:16 122:23 130:24 131:2
165:18

**Francisco** 6:7,11,13 7:22 18:1
42:16 209:20

**freshman** 138:18

**friend** 29:24 30:17 31:2,10,15
49:20 50:11 155:19 156:13 159:25
160:15 161:13



| | | |
|---|---|---|
| **friend's** 30:1 50:14,21 51:3 | **grabbed** 92:6,7 | **H** |
| **friends** 161:8 | **graduated** 146:4,11 | |
| **friends'** 161:11 | **gray** 32:9 207:5 | **half** 78:21 184:21 187:25 |
| **front** 14:3 52:12 53:13 65:24 88:2, 4 97:1 101:5 194:24 196:12,14 200:3,8,9,16 202:1,18 208:5 | **great** 142:6 160:5 190:14 | **hammer** 173:6 |
| | **grew** 156:13 157:8 | **hand** 14:24 71:5,6,9,10,13,20 72:16 74:19 75:1 76:23,24 77:3,25 88:1,10,21 100:1,4 125:9 144:1 178:3 192:14 196:19,23 197:14,24 199:9,10,15,18,22,23 200:6 203:21,23 204:16 208:8 |
| **frozen** 202:24 | **grocery** 166:6 | |
| **Fucking** 203:22 | **groggy** 189:11 | |
| **full** 17:25 57:25 128:1 160:5 | **ground** 71:17 72:17 75:6 76:9 78:14 87:22,24 91:2 93:25 94:2 95:25 96:13,15 97:2 101:13 142:25 194:2,15 196:1,8 | |
| **fully** 195:2 | | **handle** 199:9,15,18 |
| **funeral** 121:6 | **Group** 184:3 | **handled** 113:18 |
| **futility** 22:13 | **grow** 30:5 138:1 | **hands** 76:3,6 91:5,11 97:6 105:9 |
| **future** 129:10 | **grown** 138:22 | **hands-on** 149:5,24 |
| | **guess** 13:15,21,22,25 36:20 40:12 64:2 75:14 87:3 98:6 133:3 139:9 149:15 150:6 153:8 160:22 207:11 | **happened** 90:15,25 91:1 126:17 142:17 143:18 144:19 158:2 163:3 167:2,15,19 183:20 187:4 189:3,14 203:9 |
| **G** | | |
| | **guessing** 14:19 162:1 | **happening** 142:23 |
| **gait** 179:8,11 180:6 | **guilty** 164:19 | **hard** 99:9 101:14 181:20 185:2 |
| **Galipo** 7:3 | **gun** 31:23 32:1,5,10,20 33:7 36:8,9 37:20 40:10 55:20 57:5,8 65:14,17, 21,24 68:20 70:13,17 71:2,4,8,20, 21,24 72:1,15,22 74:18,21 75:1,2,9 76:2,4,6,24,25 77:3,4,12,23,24 82:17,22 86:18 87:21 88:3,20 89:13,14 91:6,8,9,10,16,17 93:25 96:3 97:7 98:12,24 101:2,8 102:9, 15,19 103:1,7,8 104:21 105:6,10, 11,12,14,19,25 106:4,8 108:10,11, 19,23 109:11,13,16 110:4 111:12, 15 112:2,3,14,24 113:12 143:21, 23,25 189:21,23,25 190:6 191:24 192:7 194:1,13,18,23 195:10,20,24 196:4,8,11,18 197:14,24 198:3,16 199:1,2,9,11,12,16,19,21,24 200:5, 12,22 201:7,22,23 202:1,4,10,15, 17 203:14,21 204:15 205:2,3,9,13 207:21,22 208:8,12,16 | **harder** 181:11 |
| **gang** 18:4,18 19:7,21 23:16,24 24:7,15 25:3,11,22,23 26:8,9,20 27:4,13,23 29:12 31:3 33:24 34:13, 22 35:8,9,24 40:14 41:2,15 44:10 46:13 47:1 81:8 | | **hassle** 146:21 |
| | | **hat** 206:18 207:7,8 |
| | | **hate** 173:20 |
| | | **he'll** 140:8 |
| **gate** 107:16 194:6,9 197:11,13 202:12 | | **head** 10:8 160:13,18 |
| **gave** 10:23 135:8 176:1,2,24 | | **heading** 101:7 |
| **get-together** 158:7 160:8,20 | | **heads-up** 137:9 |
| **ghost** 112:2,3 | | **health** 183:14 |
| **girlfriend** 52:6,7 | | **hear** 11:13 13:2 36:15 57:25 70:21 72:14 74:3,9 84:8,9 86:14,15,17,19 88:19 97:3 109:25 115:5 142:14 163:18 164:7 |
| **girlfriend's** 52:8 | | |
| **give** 12:4,6 14:1,4,10,12 17:3 68:1 74:20 84:10 97:3 114:7,11 130:3 137:9 138:13,15 147:11,23 151:6, 12 166:7 175:22 176:4 180:10,22 190:10 203:4 | **guns** 96:4 113:16 | |
| | **gunshots** 90:15,18 | **heard** 8:8 12:21 13:19 23:11 72:11,12,25 74:19 86:18 90:13,14 97:8 112:4 115:6 116:10 117:7,24 118:20 119:12 143:4 163:1,2,4,7 |
| | **guy** 30:19 | |
| | **guys** 76:16 | |
| **giving** 16:14 72:13,25 | | **hearing** 16:20 97:6 162:17,21,24 163:3,8,10,19 164:18 |
| **Glendora** 175:11,12 | | |
| **God** 169:20 | | **heart** 127:13 |
| **goddamn** 75:14 | | **heating** 147:19 |
| **good** 8:3,5,8 104:20 140:14 149:23 | | |
| **grab** 92:8 | | |



Angel Sanchez

November 05, 2024
Index: heavy..initially

**heavy**  173:17

**Hector**  160:15

**held**  6:18 163:20 207:22 208:7,12, 16

**helped**  144:13,21,22 145:9

**helps**  145:7,8 180:10

**heroin**  118:19 119:1

**hid**  195:5

**hide**  70:13 87:24 88:14 106:2,3 194:24 195:1 196:3,15 198:2 202:8,20

**high**  94:15 138:18 146:1,2,3,5 148:21

**higher**  77:12

**hiking**  174:4

**history**  150:14 165:16

**hit**  71:17

**hitting**  88:13

**Hmm**  124:6

**hold**  73:19 98:21 174:8 178:1 202:6

**holding**  75:9,12 76:2,4 199:22

**hole**  171:4

**home**  145:15 182:10

**homemade**  112:16

**hope**  192:21

**hospital**  92:2 132:19 143:9,10 167:6,16,17,18,20 168:7,8,11,18, 21 169:24 170:2,4,5,16,19 171:22 172:12 175:22 176:16,19 177:8

**hour**  6:4 15:14 78:21

**hourly**  152:6 153:23 155:12

**hours**  17:2 153:5 154:2

**house**  49:12 50:10,13,20,21 51:3, 12,15,23 52:3 53:16 99:25 106:9 121:12,14,16 128:25 129:11 156:16,20,24 157:4 158:5,9 159:10,13,15,19 166:4 181:15 187:4,8 197:12,14 198:11

**household**  138:2,12 140:22

**houses**  67:24 71:22 72:19,21 89:7

**how's**  179:8

**huh-uh**  10:6

**hurt**  172:14

**hurts**  173:18,19,21,22,24

**HVAC**  147:19 148:4

**Hydro**  185:13

**hydroxyzine**  185:3,13

**hypothetical**  83:19 84:1 122:22

**hypothetically**  83:16,23

---

**I**

**icloud**  130:13,20 131:7

**ICU**  133:3 168:7,11,12,13,16 170:13

**ID**  127:6

**idea**  50:25 154:11 180:15

**ideal**  141:17

**identification**  42:1 47:15 52:23 56:12 93:3 95:1 97:17 123:6 127:7, 12 191:5

**identified**  7:19

**identify**  158:14 159:7

**ill**  16:15

**impair**  17:2

**impaired**  201:15

**impediment**  16:16

**implicate**  20:2 31:7 36:4 39:7 41:7

**implicates**  18:6,20 19:9 22:5 23:18 24:1,9,20 25:7,18 26:3,15,24 27:9,19 28:1 29:7,16 34:3,18 35:1, 15 36:3 37:2,13,23 38:10 40:20 41:18 42:6,19 43:2,13,25 44:16 45:18 46:19 47:4 48:1 49:2 58:19 68:6,13,23 69:14 83:8 95:11 110:13,23 111:19 112:20 115:14 116:14,23 117:10,19 118:6,15,23 119:4,15,21 120:2 125:25 126:10, 19

**implies**  14:21,25

**important**  10:4 11:7,8,15 12:3

**improve**  178:16

**incident**  8:25 17:17 22:17 28:5,11, 18 29:3,20 31:18,25 32:20 33:2 34:10 36:9,18 38:8 41:16 46:10 48:23 49:6,9,15,24 50:2,6 51:13,16 52:16 53:5,9 54:20 57:2,18 58:3 59:2 68:19 70:25 73:18 80:10 86:11 90:14 92:4 93:17 95:20 97:4, 11 98:5,12 101:24 102:3 106:17 108:12,20,21 109:24 110:2,20 111:16 112:25 114:20 115:2,11 116:21 117:17 118:13 119:25 120:11 123:13 124:20 125:12,17, 20 126:25 129:3,7,17,21,25 130:8, 16,19 131:9,13,20 132:4,15 133:11,17 134:15,20 135:7 136:2, 9,12,16 140:24 141:2,6,10 142:8, 10 143:15,18 144:2,5,12,19,25 148:7,9 149:20 151:13 155:11 158:2,15,22,25 159:3,8,16,19 160:9,24 161:2,8 163:17 166:17 171:15 172:18,19,24,25 174:12 178:16,24 180:15 181:4,6 182:7 183:10,18,20 184:16,18 186:12 188:2,15 205:8 206:15 208:9,17

**incident-related**  135:10,15

**including**  135:24 152:14

**income**  152:9,21 181:3 188:12

**Incomplete**  83:19 84:1 122:22

**incorrectly**  94:7

**Indio**  139:11

**individual**  22:4 47:17,19 53:4,7 93:6 95:3,5

**individual's**  30:25

**Industry**  154:7,17

**information**  12:22 48:12 127:22 163:22 164:2,18 176:24

**ingest**  115:12

**Ingrid**  52:9,13,16 53:3,7,11,20 54:16 58:4 59:16 64:12 74:4 82:20 87:5 158:24

**Ingrid's**  54:4

**initial**  170:25

**initially**  55:12 59:1,6 78:1 80:18 82:4 96:5 98:23 115:3 195:1,9,19

199:8

**initiating**  65:8

**injure**  39:22 69:8

**injured**  40:2

**injuries**  75:20 166:21 170:22,25
171:10 172:17 173:12 175:24
183:17

**Inland**  184:1,2

**inserted**  109:2

**inside**  194:16 195:6

**insomnia**  184:9 187:2

**Instagram**  133:16,19,25 134:3

**instruct**  18:5,19 19:8 20:1 23:17,
25 24:8,19 25:6,17 26:1,14,23
27:8,18,25 29:5,15 31:6 34:2,17,25
35:14 36:2 37:1,12,22 38:9 39:5
40:18 41:6,17 42:5,18 43:1,12,24
44:15 45:17,24 46:18 47:3,24 49:1
58:18 68:5,12,22 69:12 83:6 95:10
110:12,22 111:18 112:19 115:13
116:13 117:9,18 118:5,14,22
119:3,14,20 120:1 122:17 125:24
126:9,18 127:20

**instructing**  116:22

**instruction**  11:22

**instructions**  175:23 176:5

**insurance**  171:14,16,24 187:18

**intend**  38:17 39:3

**intentionally**  204:7

**interfere**  181:7

**interference**  87:8

**interferes**  181:17

**interrupt**  27:15 89:10

**intersection**  59:24 80:18

**interview**  42:3 181:21 182:25
183:6 191:11

**interviewed**  165:9,12,18 188:16,
19 191:23 192:4 203:18

**invoke**  22:2

**invoked**  21:1

**invokes**  23:5

**involved**  17:17 68:11,18,20 69:7
108:20

**involving**  9:1 21:8 22:17

**iphone**  130:9

**iron**  102:24

**issue**  21:3,23

**issues**  22:23

**item**  98:20

---

### J

**jacket**  55:16 206:17 207:1,2,3

**jail**  168:18 170:2,3,5,15 175:22

**January**  165:6

**Javier**  139:5,6

**jeans**  96:20 206:16,20

**Jenny**  138:24 139:21

**Jensen's**  121:24,25 122:3

**Jesus**  44:23,25 45:3,9,15 46:6,9,
12 47:1,21 82:16 87:5 158:18

**job**  149:8,14,16 151:16,17,18
153:13,14,18 154:14,15,18,19,23,
24 155:16,25 157:17,21,24 181:20

**jobs**  158:11,12 182:7 183:9

**John**  15:12,13

**join**  23:15

**joint**  21:19

**Jr**  140:17,21

**Juan**  128:11,17,18 137:3 140:3,15,
17,21 141:4

**judge**  10:23

**July**  31:14

**jumped**  27:23

**jury**  10:21,23

---

### K

**Kass**  7:7

**Keling**  174:20 175:3,13

**kids**  206:12

**kill**  39:22

**killed**  29:24 30:8,13 31:11 40:2

**killing**  30:17

**kind**  17:7 28:10,16 51:25 89:25
99:9,20 106:1 107:9 120:13 130:8
132:25 133:3 135:21 139:7 145:10
146:9 147:1,3,17 154:17 156:8
157:14 171:24 173:7 177:10,13
185:2,8 187:13 189:11 193:15
194:16 196:14 198:6 200:7 204:16
208:4,5

**kinda**  192:13 203:24

**kindly**  16:9

**kinds**  116:5

**knee**  173:3,4 177:14

**knew**  14:22 32:3 57:19 58:25
80:19 81:1,11,12,17,20,21,25
100:17,25 130:2 143:3 157:16
201:17,19,21

**knife**  92:20 107:9,10

**knowing**  14:16

**knowledge**  12:18,19,20,25 13:4,
18 15:6 17:21

---

### L

**LA**  146:5,19,25 147:10 148:22
155:3 167:18 168:8,21 191:11,23

**lacks**  18:21 19:25 23:20 24:2,11,
17 25:9,15,25 26:11,21 27:6,16
28:21 29:14 30:9 31:4 32:13 33:25
34:14,23 35:11,25 36:11 37:25
38:19 40:4 41:4 43:15 44:2,12
45:4,13 46:14 47:6 48:3,18,24
57:21 58:17 63:6 66:24 69:5,10
80:21 84:3 85:9 86:5 112:8 113:1
115:16 122:23 130:24 131:1
165:18

**LADWP**  155:20

**Lakes**  139:9

**language**  15:11

**large**  22:12

**late**  148:1 152:1 154:13



Angel Sanchez

**law**  7:2 9:1 68:11,20 69:7,23 70:1
81:25 86:4 94:11 125:23

**Lawler**  188:21

**lawsuit**  150:4 180:20

**lay**  113:6 177:10

**lead**  26:12 35:13 37:4 43:5 44:14
46:16 47:9 48:6

**Leap**  7:2 18:5,19 19:8,24 20:11,14
21:24 22:1 23:1,17,25 24:8,16
25:6,14,24 26:10,21 27:5,14,24
28:6,12,21 29:4,13 30:9 31:4 32:12
33:14,25 34:14,23 35:10,25 36:10,
21 37:1,12,22 38:9,19 39:5,16
40:3,11,17 41:4,17 42:5,18 43:1,
12,24 44:12 45:4,7,11,17,24 46:14
47:3,24 48:18,24 57:15,21 58:17
61:6 63:6,21 64:5,14 65:1 66:1,24
67:5 68:5,12,22 69:4,10 70:19
73:3,13,16 75:16 77:14 78:21 79:1
80:21 83:6,18 84:1 85:8,17 86:5,23
88:7,25 89:4 95:10 98:25 99:5
100:21 104:14 105:16 106:18
110:11,22 111:18 112:6,19 113:1,
13 115:13,24 116:13,22 117:9,18
118:5,14,22 119:3,14,20 120:1
122:17,22 123:18,22,23 124:5,7
125:24 126:9,18 127:16,20 130:24
131:1,5,10 134:24 137:6,15
141:12,17,21 161:3 164:11 165:17
181:8 190:13 195:3,13 204:4
205:21 208:25 209:2,11,13 210:2,5

**learn**  157:20

**leave**  42:8 50:2 51:12,15,18
121:16 152:2 154:14 187:4,8
203:14

**leaving**  75:18

**left**  50:1 51:23 52:3,11 53:8,16
59:19 60:24 62:13 71:10,13 76:23
92:9 98:7 101:19 103:7,8 107:17
121:15 152:1,5 154:12,15 170:2,14
171:2 173:3,9,10 178:2 180:2,8
196:23 197:3 198:21,22,23,25
200:6 202:14

**leg**  90:21 92:6,9 103:7 105:4 145:3,
4,6,14 165:25 166:2 169:1,2,4,6,
13,15,22 170:14 171:2 172:8
173:3,5,19,25 177:9,13 180:2,8

**legal**  6:22 17:25 63:21,23 67:6
68:15 69:11 80:23 83:18 84:2 85:8

86:23 104:16 112:7 164:13 209:23

**legs**  75:20

**length**  14:2,5,9

**letter**  135:25

**letting**  150:9

**level**  75:5 76:9 77:12,19 78:1
89:19,20,22,23 200:12,13,14

**license**  127:4,9

**lie**  105:15,20

**life**  128:24

**lifetime**  83:5 114:10 158:12

**lift**  89:14 173:17

**light**  12:24 13:1,3,4 61:25 81:2,12

**lights**  61:21 62:16 63:5,16,20
64:10,21 65:7,10 66:5 115:4,7,9

**limitations**  173:11 187:1

**limp**  179:9,13

**linemans**  147:4

**lines**  15:13 147:5 155:21

**list**  185:6

**listen**  12:5 17:23 163:15

**live**  127:25 128:3,5,7 137:4,19
139:6,21 140:5,21 156:10,21,24
157:4 158:1 161:15

**lived**  128:22 156:25 159:14

**lives**  137:23 139:7 157:24 158:8,9

**Liz**  160:16

**Lizbeth**  160:16

**Lizette**  160:16

**load**  28:17,19

**loaded**  28:5,7,20,25 29:20 31:19
32:1,3 33:3 34:11 36:8,11,18 37:20
38:7 39:15 54:21,24 55:7 56:5 59:3
143:23

**loading**  143:1

**located**  33:7 183:25 209:24

**location**  70:6 98:13 101:9 103:25
153:10,11 154:5

**lodge**  61:6

**log**  135:25

**logged**  203:4,5

**logs**  135:25

**Lomita**  30:19,21,22

**long**  30:20 46:5,6 59:23 104:2,11
128:22 132:23 133:8 138:7 144:24
146:18,20 147:6,10,22 148:14,16
151:5,6 167:7 168:11 173:18
186:6,7

**longer**  141:13 147:12 209:6

**looked**  54:6 82:11 93:16 98:4
100:16 102:2

**lose**  130:21 175:16

**lost**  131:6,7 177:4

**lot**  86:20 174:14 179:17

**low**  57:24

**lower**  173:4 191:19 200:13,14

**lowered**  75:14

**lunches**  155:4

**lying**  189:13,15

---

**M**

**Madam**  18:13 19:2 38:24

**made**  59:19 60:22 62:13 152:11

**magazine**  56:4 109:1,6

**Magna**  6:22 209:23

**mail**  8:15 150:6

**main**  175:1

**majority**  152:9

**make**  10:17,19 11:16 36:21 69:24
75:21 131:20 136:6 152:14,17
153:1 175:15 178:21,25

**makes**  181:11

**making**  11:6,13,17

**Mammoth**  139:9

**Manning**  7:7

**March**  44:9 126:6,17 148:11,18,19
166:13

**marijuana**  119:10,11,18,24



**Mario** 160:2

**mark** 18:14 19:3,17 20:9 23:7 41:24 47:12 52:20 56:8 97:13 191:1

**marked** 18:15 19:4,18 20:10 23:22 24:4,13,21 25:10,20 26:6,17 27:2, 11,21 28:3 29:9,18 31:9 34:8,20 35:6,21 36:6 37:9,18 38:5,12 39:12 40:25 41:12,21,25 42:12,21 43:6, 20 44:7,21 46:4,24 47:14 48:10 49:4 52:20,22 56:11 58:24 68:9,17 69:3,16 83:14 93:2,5 94:25 95:17 97:16,19 110:18 111:3,25 112:22 115:21 116:19 117:4,15,21 118:11, 17,25 119:9,17,23 120:5 123:5 126:5,15,21 127:23 190:25 191:4,7

**marker** 107:23

**market** 51:21,22 121:24,25 122:4 209:24

**marks** 6:9

**married** 138:7 206:10

**mask** 93:8

**massage** 145:11

**matter** 6:13 7:6 8:9 21:8,20 22:14, 18

**Mcgaughey** 188:25 192:11,21

**means** 9:22 12:4 70:3

**meant** 63:10 158:19

**meat** 171:3

**med** 94:11,13

**Medi-cal** 171:18,20,23 172:3 175:2 180:16,19 181:2 182:3 188:6,7

**media** 6:10 135:22,24 136:9 209:22

**medical** 94:9,10,13,16,17,21 104:13 167:9,14 171:14 180:14 181:1,25 182:1 184:3

**medication** 125:16,19 184:23 185:1,11,15,20,23,25 186:3,20 187:20

**medicine** 94:19

**medium** 135:23

**meds** 178:19

**meet** 46:9 49:8 50:5 157:12

**meeting** 21:17

**member** 18:4 19:7,21 27:4 29:12 44:10 46:13 47:2

**members** 26:8,20 35:23,24 40:14 159:10 160:15

**memorized** 129:14,15,22 177:5

**memory** 168:2,3 189:11

**mental** 184:6 187:14

**mentioned** 158:17 177:23

**Mercado** 43:10 68:19

**messages** 133:10,13 134:19 135:24

**met** 21:4 52:13,16 157:14

**metal** 99:19 202:11

**methamphetamine** 116:9,12,21

**mick** 51:20

**Mida** 160:11

**middle** 139:7 208:6

**miles** 15:14

**military** 149:25

**mine** 36:24

**minimum** 152:8 153:25 154:3 155:14

**minute** 68:2 190:12

**minutes** 16:2 20:13 33:13 137:12 141:13,14 190:12

**Mis** 100:21

**Misrepresents** 34:16

**missed** 204:10

**missing** 171:4

**misstates** 34:14 63:7 66:1 73:4 85:17 100:21 165:17 195:3

**mistaken** 204:14

**Modelo** 120:14 121:9 124:22,24

**Modelos** 120:22,24

**Molina** 60:15,22 62:6 64:24 65:12, 14,23 66:6 82:21,25 87:5 158:24

**Molina's** 60:4

**mom** 132:1,13,14,18 140:23 142:6, 24 159:2 171:25 182:1 186:15

**mom's** 130:3 143:3 171:16 177:1

**moment** 18:14 77:11,13 90:12 97:14 106:12 107:12 114:25 194:18

**money** 180:25 188:8,11

**moniker** 23:24 24:6

**monikers** 42:24

**monitor** 165:25 166:2

**monitoring** 165:23

**Monte** 153:12

**month** 147:11,14 184:21 187:24 188:9,11,13

**monthly** 130:4

**months** 147:11,12,24 148:16 174:19 186:10,12 187:23

**Morales** 30:2,3,5,8,13,18 31:11,16 156:4,14,21 157:23 159:14

**Morales's** 31:2

**morning** 8:3,5,6

**mother** 128:6 136:19 142:9,16,20, 22 143:10,15,17 144:7,11,15,24

**mother's** 128:20 136:22

**move** 129:9 196:4,11 199:2 200:22 201:7 202:4

**moved** 50:12 88:4 138:11,22 168:17 170:15

**multiple** 56:9

**murder** 31:2

**murdered** 31:13,16

**muscle** 169:3

**music** 49:22

---

**N**

**named** 160:15

**names** 128:10 138:23 160:3 161:11 174:11,21 185:8



**narcotics** 115:12,23

**needed** 38:18 39:4 141:12

**nephews** 174:4

**nerve** 172:4,6,9,16 176:7

**nervous** 73:15,22,23

**network** 57:25

**New-something** 153:17

**Newegg** 153:17,18

**news** 118:2

**nickname** 45:10,12

**nieces** 174:3

**night** 38:18 39:4 46:9 52:15 53:5
55:16 57:1 59:2 92:18,20 97:4
98:4,12 101:24 102:2 108:12
112:25 124:20 125:12,16 144:2
159:16,19 160:9 168:17 185:19
206:15 207:15 208:8,16

**no...just** 192:22

**noon** 79:4

**Norm's** 151:20 153:2,10,13,14
154:12

**normal** 9:15 59:18 132:17

**north** 25:3,4 72:20

**Northside** 18:18 19:6,21 23:16,24
24:6,15 25:2,12,22 26:8,19 27:4,23
29:11 34:12,22 35:9,24 40:14
46:12 47:1,23

**note** 22:19

**notes** 114:25 135:25 136:16
205:23

**notice** 8:13,15,17,20 179:15 180:3

**noticed** 124:21

**noticing** 8:13

**notified** 20:25 142:19 180:19

**notify** 20:22

**November** 6:1,4,19 80:1

**NSBP** 44:10

**numb** 172:8

**number** 6:10 37:21 108:4 127:13,
19 129:13,18,20 133:7 152:25

157:2 161:17 191:18

**numbness** 172:21,23

**nurse** 132:20,22

**nurse's** 144:9

**nurses** 167:24

**nursing** 144:9

---

**O**

**O'LINN** 20:21 22:10 33:11

**oath** 9:22 23:12 33:21 80:7 142:4
190:21 206:7

**object** 23:19 24:16 25:14 26:4
27:15 29:4 32:12 36:10 40:17
75:16,19 98:25 110:11 164:11
204:4

**objected** 123:23

**objection** 11:23 19:24 23:21 25:24
26:10,21 27:5 28:6 29:13 40:3
44:12 61:7 66:2 67:5 85:8 89:4
104:14 112:6 131:1

**objections** 11:14,16,17 36:22
40:11

**observed** 13:11 15:10 163:16

**obstructing** 126:8

**obtain** 8:25

**occurred** 8:25 148:7,9

**October** 126:24 165:1,5

**offer** 157:17

**offered** 155:23,25 157:20,23

**office** 176:21 209:24

**officer** 7:8 8:10 34:11 40:15 41:15
43:22,23 44:9 66:15,19,21 67:3
72:5,12,25 78:8 81:23 82:6,10
83:16,22 84:9,12,16,20,25 92:3,4,
8,11 93:12,16 94:5 95:7,8,21 96:6,
16,19 97:3,13 103:6,11 104:12,24
105:5,12,15,20,24 114:22 126:8
143:7 162:13 163:4,6,7,15 165:11,
13 166:23,24 190:7 191:25 205:1

**officer's** 83:24

**officers** 9:1 19:23 33:6 63:19 64:4,
9 65:8 73:10 74:10 78:19 81:17,21,

24 83:5 86:3,10 87:11 88:19 91:13,
20 93:22 103:17,18 115:3 159:11
163:1,2 189:25 192:4 207:21

**officers'** 93:23

**Offices** 7:3

**older** 133:21 134:3 141:9 157:16

**omissions** 12:16

**ongoing** 22:16

**online** 112:13,18

**open** 64:23 71:9,12 122:19 125:2
169:2,6,14 170:14 197:1 198:10
199:25 200:21 202:23

**opened** 67:14 77:2 84:23 193:1
196:24 199:14 200:6 201:6

**opens** 193:10

**opinion** 15:8 67:7 84:2 85:10
104:15

**opportunity** 10:15

**opposite** 193:1

**opposition** 137:7

**option** 146:23

**order** 149:16

**ordered** 112:17

**orders** 83:16,25 84:10 97:4 153:22
177:7

**ortho** 178:13

**ounces** 120:15,25

**outskirts** 139:9

**overbroad** 40:18

**overcome** 149:16

**overdose** 118:3

**overtime** 154:3

---

**P**

**p.m.** 51:1,2 210:7

**Pa** 156:7

**Pac** 155:6

**Pacific** 6:24



Angel Sanchez

November 05, 2024
Index: pack..police

**pack** 155:3,4

**packet** 176:2 177:3,4

**packets** 176:25

**packing** 155:1

**pages** 42:15 191:9,21

**paid** 152:6 180:25 181:25 182:1
187:18 188:1,5

**pain** 172:8,9 175:18 176:7 178:17
180:1 207:19

**pains** 174:1

**panicking** 91:16

**paper** 135:25 136:16

**papers** 153:4

**paramedic** 103:24

**paramedics** 104:6 167:3,11

**parents** 50:10 138:4,7 156:21

**Park** 6:14 7:8 8:10 19:22 25:4
31:17 40:15 41:2,14 42:2 80:19
81:8 122:1 128:4 146:3,10,15

**Parque** 18:18 19:6,21 23:16,24
24:6,15 25:3,12,22,23 26:8,20
27:4,23 29:11,12 34:13,22 35:9,24
40:14 46:12 47:1,23

**part** 22:12 70:20 98:6 101:5 109:25
168:18 175:20 178:6 194:9 196:12
200:5

**parte** 137:7

**parties** 36:5

**parties'** 18:8 26:5 46:17 47:8 48:4

**parts** 112:18 153:20

**party** 51:6 150:3 158:6 160:7

**pass** 60:2

**passed** 49:20 50:11 66:3,7 74:17
103:12,15,19,22 104:4,8,22,25
155:19

**passenger** 33:10 52:12 53:13
54:9,10 55:6 65:24 67:15 71:1,5
80:13 84:23,24 86:16 99:11,12

**passenger's** 53:18 54:14 56:25
67:11 75:10 99:14 101:11 109:19

**past** 17:2 101:5,11 102:9,15,16,17,

18,22 103:3 192:24 197:19,22

**patients** 132:25 133:3

**paying** 132:11

**pays** 188:7

**peace** 162:13

**Peacock** 150:6

**Penal** 126:7

**pending** 16:8 21:21 162:2,10
164:16 180:20

**Pennsylvania** 209:25

**people** 87:3 90:8 113:15 118:2
134:6,16 147:4 159:6,9,18,23
160:7,19,21 183:12 187:12

**percent** 30:23 185:14 207:6,9

**period** 145:1 151:9 190:1

**periods** 173:18

**permanent** 176:8,9 178:20

**permit** 37:11

**person** 11:7 12:25 13:3,4 32:21
55:9,11,12 65:21 157:23

**personal** 12:18,19,20,25 13:3,18
15:6

**petals** 107:4

**Phelan** 50:19,21 51:4 53:16 54:20
59:9,11,14,25 62:2 80:19 87:11,12
157:1,24 160:8

**Philadelphia** 209:25

**phone** 20:23 48:17 129:13,18,20,
24 130:7,8,15,18 131:8,13,18,21
132:3,6 133:15 161:17

**photo** 17:11 99:1

**photograph** 17:19 47:13,17,19
52:25 53:2 56:15,18 93:7 95:3,19
97:22,23,25 98:13,20,23 101:17,21
102:6,22 106:24 107:8,17 108:1,3,
9,14,17 109:1 110:6 123:8 124:15

**photographs** 17:5,16 56:9 68:1
97:10,20 107:21 125:4 130:21
171:12

**photos** 17:9,10,12,13,22

**phrase** 112:4

**phrases** 14:20

**phys** 145:7

**physical** 145:8,14,22,24 173:11
175:25 176:5,10,15,18 177:7
178:23 179:4

**physically** 156:1

**pick** 49:11 153:21

**picture** 98:7 101:14

**pictures** 130:11 171:9

**piece** 171:3

**pillar** 102:7,18,23 103:3

**place** 57:5,8

**places** 133:2 151:15

**plain** 78:9

**plaintiff** 6:14 7:3 20:25

**plaintiff's** 21:6,18 134:25

**plan** 70:13 130:3 177:2

**plans** 129:9 176:25

**play** 174:2

**played** 30:6 49:21 157:10,13

**playing** 157:8

**pleas** 164:19

**pocket** 55:14,15,18 57:5,11
180:25

**point** 10:23 22:1 23:3,4 40:8 58:6
59:5 66:6 72:25 74:19 101:8
103:10,11,16,23,24 104:9,24
105:23 114:21,24 138:5 167:8
189:21 190:9 192:6 196:4,11
201:11,14 204:13 205:7,11

**pointed** 34:11 71:24 87:21,23
88:10 91:6,10 105:3 189:25 190:6
191:24 194:2,14 195:25 196:8,10
200:18 204:1

**pointer** 56:24 98:21

**pointing** 39:25 40:4 56:24 71:21
72:1,17 75:4,5 76:7,8,9,19 77:7,8,
18 78:3 93:25 95:25 96:2 104:21
200:1,17 204:15

**police** 19:22 42:3 57:20 58:7 59:6
60:10 63:5,11 66:5,16,19 68:4
80:19 81:1,12 83:4 85:15,22 94:1



Angel Sanchez

96:25 100:5,12,18 101:1 102:10
126:8 131:18 161:10 166:23 192:6
194:20

**Pomona** 139:22 162:7,9 164:6,10

**poop** 107:1

**Pop** 157:9

**position** 21:25 151:21 182:21
193:6 198:8 199:10,24 202:6,11,
15,17 207:19

**positions** 181:22

**possessed** 29:2 34:10 68:19
110:20 111:16 114:22

**possibly** 133:18 189:25

**post** 136:11,13

**posted** 136:5,8

**potential** 22:22

**power** 147:5 155:20

**practice** 15:12

**practiced** 111:12

**prazosin** 185:3 186:2

**preexisting** 183:13 187:14

**preface** 136:6

**prefer** 22:8

**preliminary** 162:17,20,23 163:2,8,
10,19

**preparation** 17:7

**prepared** 22:6

**prescribe** 185:1

**prescribed** 125:19 178:10,11
184:23

**present** 159:7 162:23

**pressure** 169:7

**pretrial** 164:22

**pretty** 17:15 54:7 73:14 93:19
108:10 131:19 132:17 150:8
159:11 161:10 171:8 179:22

**prevent** 16:14 179:6

**prior** 21:4 41:15 172:17 187:15

**privacy** 36:4

**private** 127:21

**privilege** 18:7,21 19:10 20:3 22:3,
4,5 23:19 24:10,20 25:8,19 26:3,
16,25 27:10,20 28:1 29:7,16 31:7
34:3,19 35:1,16 36:3 37:3,14,24
38:11 39:8 40:20 41:8,19 42:7,20
43:3,14 44:1,16 45:19 46:19 47:5
48:1 49:2 58:20 68:7,14,24 69:14
83:8 95:12 110:14,24 111:20
112:21 115:15 116:15,24 117:11,
20 118:7,16,24 119:5,16,22 120:3
126:1,11,20

**privileged** 127:22

**probation** 165:9,11,12

**problem** 78:24

**problematic** 21:14

**problems** 16:18,20,23

**procedure** 169:16

**procedures** 9:16

**proceed** 21:13 22:21

**proceeding** 23:4

**proceedings** 21:21 210:6

**process** 9:14 22:11 62:7

**program** 147:1,2,17 148:4,8,12,
14,17,22,25 149:3

**programs** 149:9

**pronounce** 185:9

**prosecution** 21:22 22:15

**protection** 29:21,22,25 38:14

**provided** 144:25

**provider** 129:25

**providing** 144:16 189:2

**Psychiatric** 184:3

**psychiatrist** 183:21 184:14 186:8,
13,20 187:19,20,21,22 188:2,5

**psychologist** 183:19

**PTSD** 184:7 187:2

**pull** 64:12,19,22 65:5 109:22 110:3
177:18 190:11,24

**pulled** 66:6 68:4

**pulling** 107:12

**pulse** 175:16

**purchase** 210:3

**purpose** 8:24 15:9 106:1 113:12

**purposes** 20:21 21:11

**pursuit** 68:11,20 69:7,9,11,12,18,
25 70:2

**push** 177:14

**pushed** 71:12 197:1

**put** 33:23 56:1 65:23 67:25 91:5,
18,19,22 105:9 109:18 113:11,15
133:2 136:24 144:22 166:24,25
167:5,25 174:7 177:14,15 180:11
207:18 209:8

**putting** 34:12 142:13

---

**Q**

**qualified** 150:8 171:22

**question** 10:7 11:22 12:5,7,9,11,
12 16:8,9 18:10,24 19:12 20:6
21:10 22:5 23:20 24:11,17 25:8,15
27:16 29:5 32:25 35:4,15 36:16
37:25 38:23,25 39:2,6 41:20 43:4
44:2 47:6 48:2 49:13 57:21,25 69:4
70:20 75:7 85:20 104:15 110:1
111:19 126:3 164:12 180:23
204:24 205:17 210:3

**question-and-answer** 9:20

**questioned** 190:5

**questioning** 26:4 137:10 190:2

**questions** 10:5,24 11:9 12:4 13:7
21:2 23:6 24:24,25 137:14 193:5
208:23,25

**quick** 33:12 192:14

**quickly** 32:12 153:14

---

**R**

**raise** 36:21

**Ramona** 25:4

**ran** 13:3,4 50:8 73:6 74:13 75:2
85:15,25 86:3,10,14 87:7,10 88:5,
11 89:7,12 161:9 189:21,23 192:5,



8 193:1

**Randy** 6:20 209:10

**range** 111:10

**rate** 153:23

**reach** 22:23 71:1

**reaching** 199:19

**read** 38:25 39:1 112:12 192:12 193:7,15,18 203:25 204:12

**reading** 16:23 204:5

**Ready** 155:6

**realized** 91:15,18,22

**rear** 54:14 55:6 56:24 67:11,14 84:23 86:16 109:19,23

**reason** 16:13

**reasonable** 63:19,23

**recall** 14:21,25 28:14 113:4 127:15 182:15 192:18

**recalling** 14:17

**receive** 10:14 132:6 133:10 135:2, 6,9 148:24 149:20 150:20 151:5 164:2,3 166:10 188:10,12

**received** 8:12 132:10 150:22 186:24 188:8

**receiving** 132:3 150:16

**recess** 7:16 20:18 33:17 79:4 141:24 190:17 206:3

**recognizance** 165:20

**recognize** 22:11 42:4 47:17 52:24 56:15 93:6,12 95:3 97:23 101:23 107:6,7 108:8,16 114:18 123:8,9 143:2 191:8

**recommend** 186:15

**record** 6:23 7:1,12,14,18,20 9:21 11:6,24 20:13,17,19,21 21:5,11 22:19 23:2,11 33:16,18 34:16 39:1 57:16 79:2 80:4,12 87:9 100:22 141:23 142:1 175:8 190:15,16,18 191:3 202:25 203:2,10,12 206:2,4 209:8,15,19

**recordings** 17:6,23 130:11

**records** 17:7

**red** 12:24 13:1,3,4 62:16 63:16,20 64:9 65:7 66:5 115:4

**red-and-blue** 64:21

**referring** 87:4

**refuse** 24:24

**refuses** 23:6

**refusing** 18:10,24 19:12 20:6 21:2 34:6 35:4,19 37:6,15 38:2 39:10 40:23 41:10 42:10 43:18 44:4,18 46:1,21 48:7 58:21 68:25 83:11 95:14 110:15,25 111:22 115:18 116:16 117:1,12 118:8 119:6 126:2,12

**regain** 177:9

**regard** 21:18 22:10,22

**register** 38:7

**registered** 110:9

**regular** 60:1,3 145:23 179:2

**rehabilitation** 149:12

**related** 8:25 48:23 135:6 136:2,9, 12,16 143:18 149:14 150:23 161:2 165:10 174:12 180:14

**relative** 20:24 21:10 22:16

**release** 165:22 166:11

**released** 165:19 175:21 176:11

**relevant** 18:8 26:5,11 46:17 47:8 48:4

**relieve** 169:7

**remain** 23:5

**remember** 15:1,21 28:15 31:21,24 32:7 44:9 45:14 48:15,21 50:15 54:12,17 55:13 60:8,14,17 61:3,9, 12,13,16 71:18 80:7 90:10,11 100:8,9,12,13 115:6,8,10 120:23 121:4 122:5,13 123:11 125:10,14, 18,21 131:25 132:2,3,7,8,9 133:12, 13,14,18 134:4,21 136:10 142:11, 12,13,15 143:16,17,22,24 144:3,6 152:7,8 153:24,25 154:9 155:7,13 160:7,12,18 161:12,20,22,24 163:11 167:22,23 168:1 171:13 172:11,15 174:16,18,20 176:6 180:17 182:14 184:15 187:16 188:18,21,22,24 189:2,5,6,8,13,17, 19,20,24 190:1 192:1,3 193:3

197:5 200:23 201:9 204:21 205:6 206:21,22,24 207:1,10,13

**remembered** 6:3 167:25

**REMOTE** 6:1 80:1

**remotely** 6:5,8,18

**render** 91:21 144:8

**rendered** 104:13 105:3 166:21 167:4

**rendering** 103:25

**repeat** 15:18,21 23:7 32:24 36:16 85:19

**rephrase** 30:11 33:1 38:22 45:8 58:1 63:25 64:1 73:17 89:1

**reply** 201:4

**reported** 152:21,22,23

**reporter** 6:7 7:10,21 10:2,9 11:5 18:13 19:2 23:9 41:25 47:14 52:22 56:11 92:25 93:2 94:25 97:16 123:4,5 191:1,4 209:9 210:2

**reporter's** 6:21

**represent** 7:1,6,7 8:8

**representation** 99:2

**request** 23:6

**requested** 21:9,19

**requesting** 21:20

**reserve** 21:16

**residence** 129:3,5,6

**respond** 192:17 193:18 203:24

**responded** 192:25

**responses** 21:15

**restaurant** 151:20 152:4,5,12 153:11

**restock** 153:21

**restraining** 14:18

**restraints** 149:15

**result** 183:18

**retained** 209:23

**retraining** 149:9,21

**retrieved** 70:17



Angel Sanchez

November 05, 2024
Index: review..short

**review** 10:15 17:20 191:13,15

**reviewed** 10:25 17:5

**reviewing** 114:25

**revolver** 32:11

**right-handed** 55:22 196:21

**rights** 36:4

**rival** 25:11,16,22 26:1 35:8

**road** 64:20

**Robert** 188:24

**rocks** 174:5

**rolled** 91:4

**rose** 107:4

**roses** 102:5,10,14,19,23 103:4

**Roslynn** 7:5

**round** 55:24 56:1 109:15

**rounds** 112:24

**row** 187:10

**rude** 157:14

**Rule** 26:13

**rules** 9:16

**run** 12:24 50:9 70:13 72:19 73:5
75:3 82:22 83:2 84:25 85:2,6,15,22
86:10,12 87:8,11,13 88:24 101:4
173:16 174:3 193:11 194:11
197:24 198:20 202:15

**running** 12:25 85:3 87:14,20,21
88:23 89:2 90:7 101:9 143:19
192:23 201:19

**S**

**S-E-R-I-O** 24:7 42:24

**safer** 57:11

**San** 6:7

**Sanchez** 6:11,13 7:4,22 8:3 18:1,
9,17,23 19:5,11,20 20:5 21:6,22
22:2,13,16 23:5,10,15,23 24:5,14,
22 25:2,12 26:7,18 27:3,12,22
30:12 33:20 34:5,21 35:3,7,18,22
36:7 37:7,10,16,19 38:6,13,25
39:9,13 40:13,22 41:1,9,13,23
42:4,9,13,16,22,25 43:11,17,21

44:5,8,22 45:9 46:2,5,22,25 47:11,
16 48:11 52:25 56:16 57:18 58:22,
25 64:3 69:6,18 75:20,24 76:21
80:6 83:12,15 94:9 95:2,15,18
97:23 100:9 103:23 104:23 106:13,
23 107:14 108:16 110:16 115:22
117:2,5,23 118:9,12,18 119:7
123:7 126:3,7,23 128:11,15,18
135:4 137:3 141:5 142:3 162:2
190:20,23 191:6 192:25 196:18
202:23 203:13,17 204:9 205:25
206:6 208:13 209:1,21

**Santa** 136:20,23 142:7

**Santana** 128:21 136:23,25 142:7

**scared** 74:1,2 187:6,7

**scarred** 171:8

**scene** 17:11 97:10,21 98:4 101:23
102:2 103:17 142:16

**scheduled** 8:13

**school** 94:11,12,13,15 138:18
146:1,2,3,5,7,9 148:21

**schools** 155:2

**Scott** 188:21

**screaming** 91:7 105:8,10 143:4

**screen** 41:22 56:7 97:15

**scroll** 191:9

**scrolling** 43:7 191:17

**search** 92:12

**searched** 92:14

**seat** 33:8,9 52:12 53:17,19 54:9,
10,15 55:6,9 57:6,9 65:24 67:11
70:18 71:1,5 88:10 101:11 124:13
199:17,19

**seconds** 59:17,20,22 66:8

**Section** 126:8

**Security** 127:19 150:16,21 188:9,
10

**self-incrimination** 20:4 24:10
25:19 26:16 27:1,10,20 28:2 29:8,
17 31:8 34:4,19 35:2,17 37:14,24
38:11 40:21 41:8,19 42:7,20 43:3,
14 44:1,17 45:19 46:20 47:5 48:2
49:3 58:20 68:7,14,24 69:15 83:9
95:13 110:14,24 111:21 112:21

**115:15 116:15,25 117:11,20 118:7,
16,24 119:5,16,22 120:4 126:1,11,
20**

**semiautomatic** 32:11,18

**send** 134:19

**sending** 133:13

**sense** 63:24

**separate** 138:4 145:10

**separated** 138:8

**serial** 37:21

**Serio** 24:7 42:24 44:11

**Seroquel** 185:3,22

**serotonin** 185:3

**server** 151:23

**service** 129:25 150:7 182:22

**services** 6:22 167:10,14 209:24

**session** 9:21 80:2

**set** 163:22 164:22,24

**setting** 164:22

**shake** 10:8

**Shannon** 7:2

**sharing** 41:22 56:7 97:15

**sharp** 172:8 173:25 174:1

**she'll** 145:3

**sheriff** 131:17

**sheriff's** 188:20,25 189:9 191:11,
23 203:18

**shield** 199:6

**shin** 173:5

**shined** 61:21

**shirt** 101:13 195:17 206:22,24

**shocks** 174:1,2

**shoes** 173:20,21

**shoot** 40:7

**shooting** 111:10,12 170:23 171:2

**shopping** 166:6

**short** 16:3 20:12 137:6



**shorter** 153:7

**Shorthand** 6:6

**shot** 17:15 40:15 78:19 93:22 94:4 96:14,24 98:2 103:6,10,16,24 104:5,9,23 143:20 161:10

**shots** 72:23 74:19,22 86:18,19

**show** 75:11 76:16 78:24 97:10 98:15 207:22

**showed** 142:22,24 176:1

**shower** 144:20,21

**showers** 174:8

**showing** 41:23 42:14 47:11 52:19 92:22 93:4,10 94:5,23 97:18 101:19 106:21 107:6,14 108:3,6 124:22 190:23,25 191:6 192:9 208:7

**sibling** 139:3 140:1 141:4

**siblings** 138:19,21 141:3,9

**sic** 88:9 191:7

**side** 25:3 55:21 56:25 58:13 63:5 64:20 75:10 76:14 88:3,21 89:7 98:7 99:14 100:2 101:3 106:9 107:17,20 109:19 124:16 158:3,4 169:14,21 194:2,13,14,16,19,23 195:2,6,25 196:2 198:17 200:1,4,7, 9,15,16 202:2,16,18 208:5

**sides** 67:24 169:2,7 170:14

**sidewalk** 87:15,16 98:18,19 99:13 101:4,11 194:10 197:25 198:20

**sign** 59:8,11,16,18,24 60:2,5,19 62:3,6,8,9,12

**silent** 23:5

**siren** 115:5,8

**sister** 138:24 139:20 160:10

**sit** 52:10 55:7 75:25 187:9

**sitting** 14:3,9 33:10 53:20,21,22 54:11 80:14 89:21 99:12,16 124:12 163:13

**sleep** 173:23 186:22

**slip** 174:6

**slow** 153:7

**slowly** 65:4 91:14 191:9

**smelled** 12:22 13:19

**Snapchat** 134:14,15,16,19

**social** 127:19 135:22,24 136:9 150:16,21 171:21 188:9,10

**sock** 177:15

**socks** 144:22 173:22

**sort** 16:15 94:13 148:3 149:8,11, 15,20 150:3,4 160:23 171:18 183:19 184:5 188:12

**sought** 178:15

**sounds** 185:8

**space** 179:17,23

**speak** 11:7 161:19

**specialized** 111:7

**specific** 21:10

**speculate** 13:22

**speculation** 18:22 19:25 23:21 24:3,12,17 25:9,15,25 26:11,22 27:6,16 28:12,21 29:5,14 30:9 31:5 32:13 33:25 34:15,24 35:12,25 36:12 38:1,20 40:5 41:4 43:16 44:3,13 45:5,12,21 46:14 48:4,19, 25 58:18 61:7 63:7 64:5 66:24 80:21 84:4 85:10 86:6 112:9 113:1 122:24 124:5,7 131:10 181:8

**speeding** 15:12

**spell** 128:12 139:1 175:4,7 185:7

**spend** 159:22

**spent** 168:17,19

**split** 193:19,22

**spoke** 142:12,15 161:12,13 189:8, 12

**spoken** 15:21 161:1

**sports** 174:2

**spot** 64:22 65:5

**spotlights** 58:12 63:14

**spots** 64:23

**squat** 173:17,18

**stabbing** 172:8 174:1

**stage** 179:3

**stamp** 191:18

**stand** 75:11 151:1 179:18 202:3 207:21

**standing** 96:7

**start** 75:2 88:23 89:2 121:2,5 140:11 147:25 148:17 151:10,16 184:10,13 185:5,11 197:23

**started** 8:11 84:25 85:2 90:7 103:25 148:18 151:22 155:9 167:21,22 169:21 186:19 192:23

**starting** 193:16

**state** 6:8,25 7:1 150:22

**statement** 15:19 23:8 189:2

**statements** 12:17

**status** 164:5,9,15

**stay** 21:20,25 22:2 83:23 84:10 140:9 181:15

**step** 22:20 72:15 194:4,5 197:3,19, 22 200:22 201:6,7,25 202:9

**stepped** 67:17,21 72:24 197:6,9

**stepping** 55:4,5

**steps** 72:22 99:9,10,11,13 101:10

**stick** 107:1

**stiff** 177:22

**stipulation** 21:19,20

**stipulations** 7:10,20

**stomach** 91:4

**stop** 33:6 59:8,11,16,18,24 60:2,5, 18,19 62:3,6,8,9,12 64:18 65:9 66:10,12 69:24 70:6 81:16 83:2 85:5,23 88:17 100:8,10 115:5 155:10

**stopped** 59:17,20,23 60:4,20 62:1, 9 63:18 65:5 66:14,18 67:11 70:5, 8,9,25 148:19

**stopping** 62:7 64:4,7,9,25 69:24

**store** 52:4 55:2 121:17,23

**straight** 77:4,13 88:16 89:17 99:18 193:10 196:8 198:15

**streaming** 150:7

**street** 17:14 50:16,18 51:21,23



62:1 87:11,12,14,17 89:8,12 90:6,8
96:2,6,10,17 98:14,16 99:22 128:3,
23 129:6 157:1,24 158:1,4,8
209:25

**strength** 177:9

**stretcher** 143:2 167:5

**stretches** 145:11 177:21

**strike** 182:5

**stroke** 137:21

**struck** 90:17,20,25

**stuck** 145:9 169:3

**stuff** 49:22 131:16 132:17 145:11
147:5 149:23 153:22 171:8 176:23

**substantive** 21:15

**sued** 150:4,10,12

**suggesting** 13:8

**suing** 150:6

**super** 169:4

**super-deadly** 118:1

**support** 67:3 86:22 178:9 180:10

**supposed** 62:11 83:24 85:6,15,22

**surgeries** 168:20 169:23 170:1

**surgery** 168:23 169:9,10,12,17
180:17 204:25

**suspicion** 63:19,23

**swear** 7:11,21

**sweating** 91:16

**switched** 175:2

**swollen** 175:19,20 177:22

**sworn** 7:24 12:3 13:17

**system** 201:12

---

**T**

---

**T-MOBILE** 130:1

**table** 14:3,5,9,13

**Tahoe** 52:2 56:20 59:23 61:14,22
64:4 66:9,18,22 67:4,10,15,17,21
70:5,6,9,24 71:15,19 75:10 78:13
80:14 81:17 82:4,12,16 83:1 84:9,

13,18,21,24 86:16 88:16,17,18
90:7 96:12 98:8 99:2,17 100:13
101:5,19 107:19 109:20,23 110:3
122:7 123:12 144:2 195:20,24
197:16,20,22 198:9,10,17,24
199:25 200:6,17,21 201:8 202:10
205:8,12,19 208:15

**taking** 10:3 21:24 105:1 186:20

**talk** 9:13 11:4 14:15 51:9 54:1
61:10 81:15 82:16 132:14 141:4,9
145:25 180:23 182:23 200:25
201:5

**talked** 48:14 132:1,2,12 135:22
136:3 140:23 141:1,7 142:7 171:21

**talking** 51:10 132:16 142:6

**tall** 120:18,19

**tall-can** 120:22,24

**Tamson** 174:22

**tasted** 12:21 13:20

**tattoos** 47:23 106:13

**taxes** 152:21,23 153:4

**teach** 146:25

**team** 22:22

**technically** 145:2

**telling** 204:21

**tells** 83:23

**temp** 153:15,16 154:18

**ten** 114:5 141:14

**ten-minute** 205:22

**term** 27:13 33:23 112:7

**terms** 165:22 166:7,11,14 181:13

**territory** 24:15 25:3 35:9,11

**test** 9:10

**testified** 7:25 9:8,11 60:22 80:11
82:3 163:5 193:25

**testify** 48:23 162:20 163:1,2,4

**testifying** 78:18 90:4

**testimony** 12:3 16:14 17:3 34:14
59:21 63:8 66:1 73:4 78:12 85:17
100:22 102:25 114:21,23 125:11
163:7,16 165:17 195:3

**text** 133:10,13 135:24

**texted** 48:16

**therapist** 145:22,24 175:25
176:11,15,19 177:7 178:24 179:4

**therapy** 145:8,14 176:5

**thereof** 6:5

**thigh** 76:17 88:1,4,13,14 90:1,2,24
171:4 194:17,25 195:6,7 196:2,5,9,
12,15 199:4,6 200:2,3,5,10,11,16
201:10 202:1,2,18,19 205:14
207:22,23 208:21

**thing** 63:11 149:18 173:16 174:7
177:14 178:20

**things** 12:17,21 13:19 99:5
144:14,23 174:9 177:11

**thinking** 204:17

**thought** 63:10 103:13 158:19

**thousand** 152:18,20

**threw** 72:22 74:21 86:17 89:13,14,
16,17 90:3 98:12,24 102:12,13,15,
19 103:1 106:8 108:23 109:16
189:23 192:8

**throw** 101:8 102:9 106:2,4

**tight** 173:21

**tilt** 207:25

**tilted** 193:15,22

**time** 6:24 11:8,13 15:7 16:3 20:12
22:12 32:22 48:14,16 49:8,10,14
50:6,20,22,23,25 51:15,17 52:16
65:6 66:3,4,7 73:16 74:17,20,24
77:14 78:3,18 87:21 88:8 93:16,23
95:21 96:16 103:12,15,19,22
104:2,4,8,22,25 105:2 106:17
114:3 118:3 121:2,3 125:20 126:25
129:3,6,9 132:23 133:8 134:18
135:23 137:16 138:3 142:24
143:14 145:1 151:9 152:8 153:25
155:14 159:7,22 167:12 171:15
173:19 175:17 178:14 183:5 190:1
208:24 209:2,5,13 210:5

**times** 113:17,22 114:1,5,8,13,14,
15,16 125:22

**tinted** 61:14,18

**tips** 152:10,14,15,17,19,25


MAGNA
LEGAL SERVICES

Angel Sanchez

**today** 6:20 8:11,14,19 9:22 10:2
12:3 13:7 16:15 17:3,8 22:6
114:21,23 163:13

**today's** 10:12 209:22

**toe** 173:6

**toes** 145:9 173:6,7,21 177:15,16

**told** 48:22 91:5,9,10 105:9,14
136:19,25 142:9 143:6,17,19
161:13 172:5,10,12,15 176:7 179:3
189:10,19,20 190:8 192:3,5

**Tomassian** 174:18,24,25 175:5,9

**top** 42:16 160:13,18 171:7 200:11

**total** 180:13 191:20

**touched** 12:21 13:20

**tough** 146:23

**tourniquet** 91:20,22,24 94:6,7
103:11 104:24 166:24 167:8

**town** 139:13

**towns** 139:12

**trade** 146:8,9

**Trade-tech** 146:5,19,25 147:10
148:22

**traffic** 33:6 65:8 69:24 81:16 83:2
85:5,23 88:17 100:8,10 115:5

**training** 94:21 111:8 148:25

**trans** 10:16

**transcript** 10:13,14,16,17,20,25
18:14,15 19:3,4,17,18 20:9,10
23:7,22 24:4,13,21 25:10,20 26:6,
17 27:2,11,21 28:3 29:9,18 31:9
34:8,20 35:6,21 36:6 37:9,18 38:5,
12 39:12 40:25 41:12,21 42:12,21
43:6,20 44:7,21 46:4,24 48:10 49:4
58:24 68:9,17 69:3,16 83:14 95:17
110:18 111:3,25 112:22 115:21
116:19 117:4,15,21 118:11,17,25
119:9,17,23 120:5 126:5,15,21
127:23 191:10 210:4

**treat** 179:1

**treated** 167:9,15

**treatment** 178:15 186:24

**tree** 155:16

**trees** 155:20

**trick** 204:8

**trigger** 40:9 109:19,22 110:4

**trouble** 70:14 73:24 86:2 203:15,
16

**true** 24:6 25:2,5 41:14 47:22 57:17
62:20,21,24 63:4,18 66:21 78:10
190:4,5

**truth** 7:24,25 9:23,24

**truthful** 189:10

**Tuesday** 6:3

**turn** 60:23,24,25 62:13 63:17 67:20
72:4,7 88:23 89:3 101:4 124:16
197:23 198:18,19,21 202:14
208:11

**turned** 61:3,10 115:4 124:15
126:24 151:23 169:3 198:22

**turning** 198:23 199:2,3

**Twitter** 134:9,10

**two-dimensional** 99:1

**type** 26:19 32:10 182:9 187:13

---

## U

**U.S.** 6:16

**UCLA** 128:9 140:2

**UEI** 146:8 147:16 148:8,12,14,22,
25 149:2

**ugly** 171:8

**uh-huh** 10:6 76:18 151:3 170:12,
18 171:5 177:12

**unable** 75:17

**uncomfortable** 76:1

**undercover** 80:20

**understand** 9:18,25 10:10 11:2,
10,19,25 12:7,9 13:5,12 14:6 15:2,
16,23 16:11 23:13 39:14 75:7
195:18 204:23 206:7

**understanding** 21:5 69:25 164:14

**understood** 12:12

**unfrozen** 203:7

**uniform** 96:19

**uniforms** 73:10 93:23

**unit** 41:3

**unmarked** 62:23 63:3,10

**unusual** 9:14

**USC** 167:18 168:9,21 178:10

---

## V

**vague** 19:25 24:18 25:16,25 26:22
27:6,17,24 28:6 31:4 32:14,22
34:1,24 35:10 36:1,10 37:3 38:19
39:16 40:3,17 41:20 45:5,11,20
46:15 47:6 48:2,25 57:22 63:6
64:14 65:1 68:8,15 69:10 73:16
77:14 80:22 83:9,19 84:3 86:5,24
88:7,25 104:18 105:16 113:13
115:16,24 122:23 164:12 195:13

**vary** 152:25

**vehicle** 17:16,18 53:8,17,24 54:5
56:21 57:4,20 58:7,9,12 59:7,10
60:4 61:13 64:12 66:6,16 75:18
80:20 82:13 83:23 85:6 100:5,12,
18 101:1 102:11

**ventilation** 147:20

**verbatim** 15:19,22

**Verizon** 130:1

**versus** 6:14 14:20

**vest** 94:1 96:22

**video** 75:8 160:24 209:12

**videoconference** 6:19

**videos** 17:6

**view** 101:18 107:2 204:13

**violated** 166:14

**virtual** 6:11 209:20

**vision** 16:18

**visit** 137:18 140:8

**vocational** 149:11

**Volume** 6:10 209:19



Angel Sanchez

November 05, 2024
Index: wage..Zoom

## W

**wage** 152:8 153:25 155:12,14

**waist** 75:5 76:9 77:19 78:1 89:18, 25 90:2 200:12,13,14

**wait** 11:16 12:5 168:13

**waited** 62:10 167:1

**waiter** 151:23

**Waking** 168:5

**walk** 144:19 173:18 177:24 178:8 179:8,9,12,18 180:9

**wanted** 149:4 204:4 205:24 206:9

**ward** 168:18 170:15

**warehouse** 153:19 154:6

**Warner** 157:9

**warranted** 10:18

**waste** 22:12

**ways** 10:21

**weapon** 92:15 162:13

**weapons** 37:11 92:17 106:16 166:8,9

**wear** 26:20 173:20

**wearing** 55:15 73:10 82:10 96:20, 23 173:20 206:14,16,18,23,25 207:4,15

**website** 136:11

**websites** 135:25 136:14

**week** 153:5,6 154:2,3

**weeks** 140:8 152:13 168:13,19 184:22 187:24

**weight** 180:11

**west** 72:20

**whatsoever** 135:17 136:1 180:1

**white** 63:11 81:2 99:18 101:13,20 102:5,6,9,14,19,23,24 103:3,4 107:16 123:12,15 125:7,9 194:6 198:11,16 202:11

**Wilfert** 7:5,13 8:2 18:9,13,16,23 19:2,5,11,16,19 20:5,8,11,15,22,25 22:20,25 23:3,10,23 24:5,14,22

25:11,21 26:7,18 27:3,12,22 28:4, 10,17 29:1,10,19 30:11 31:10 32:19 33:1,12,20 34:5,9,21 35:3,7, 18,22 36:7,17,23 37:6,10,15,19 38:2,6,13,24 39:9,13,21 40:8,13,22 41:1,9,13,22 42:2,9,13,22 43:7,17, 21 44:4,8,18,22 45:7,15,22 46:1,5, 21,25 47:11,16 48:7,11,22 49:5 52:19,24 56:7,13 57:12,17 58:1,21, 25 61:9 63:13,25 64:8,19 65:6 66:3 67:2,10 68:10,18,25 69:6,17 70:23 73:5,14,17 75:24 77:19 78:23 80:6, 13 81:3 83:11,15,22 84:8 85:14,21 86:9 87:4,10 88:15 89:1,9 92:22 93:1,4 94:23 95:2,14,18 97:9,18 101:2 104:22 105:20 106:21 110:15,19,25 111:4,22 112:1,17,23 113:5,17 115:18,22 116:3,16,20 117:1,5,12,16,22 118:8,12,18 119:1,6,10,18,24 120:6 122:19 123:3,7,21 124:3,6,8 126:2,6,12, 16,22 127:18,24 130:25 131:3,8,12 135:1 137:13,16 141:11,19 142:2 161:7 164:17 165:19 175:9 181:12 190:10,14,20,23 191:6 195:9,19 203:3,13 204:6 205:21 206:6 208:23 209:4,16

**window** 197:10

**windows** 61:14

**windshield** 61:17

**withdraw** 121:19,23

**withdrew** 121:20

**witnesses** 86:21 158:15

**woke** 168:6

**wondering** 16:1 172:14

**word** 204:10

**words** 15:21

**work** 33:23 34:12 132:16,18 141:15,19 147:4 151:24 152:4 153:5 154:2 155:15 169:7 177:16 181:4 182:10

**work-from-home** 181:22

**worked** 151:20 153:6 154:23 158:12 186:18

**worker** 149:5,24 171:21

**working** 153:1 155:10 179:5

**workout** 176:25 177:2

**workouts** 145:8,11,15,21 176:2 178:21 179:5

**works** 132:19 141:18

**worried** 59:3,4 73:24 74:2 82:17

**worse** 177:17 178:22 179:7

**wounds** 144:17 167:24 169:1

**write** 136:1,15

**written** 96:25

**wrong** 91:22

**wrote** 62:20 63:2

## X

**X-RAYS** 175:19

**Xavier** 43:9 68:19

## Y

**year** 137:18 138:14 140:13 146:15 147:25 151:8,9,10,12,13 153:1 154:11,21 165:2 176:8 178:20

**years** 127:2 133:4 151:17,24

**young** 6:20 206:10 209:17

**younger** 30:7 157:11

## Z

**zone** 15:15

**Zoom** 6:1,5,11 80:1

